UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-00148 |
| ELLIPSO, INC., | ) | (Chapter 11) |
| | ) | |
| Debtor. | ) | |
| | ) | |

# DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT

## August 28, 2009

Kermit A. Rosenberg (D.C. Bar No. 219089)
Neal Goldfarb (D.C. Bar No. 337881)
Butzel Long Tighe Patton, PLLC
1747 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20006-4604
Telephone: 202.454.2800
Facsimile:  202.454.2805

*Attorneys for Debtor*

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................1

II. OPERATION AND HISTORY OF THE DEBTOR .......................................................2

    A.  Formation and Business of the Debtor....................................................2

    B.  Events Leading to Chapter 11 Filing. ....................................................4

    C.  Postpetition Events. ...............................................................................5

    D.  The Debtor's Assets. ..............................................................................6

    E.  Certain Allegations Against Insiders.....................................................11

    F.  Claims Against the Estate. ....................................................................12

    G.  Executory Contracts.............................................................................12

    H.  Creditors' Committee. ..........................................................................13

III. CONFIRMATION REQUIREMENTS AND   DEBTOR'S RECOMMENDATION.13

    A.  Confirmation Requirements...................................................................13

    B.  Recommendation of the Debtor. ...........................................................14

IV. OVERVIEW OF THE PLAN ................................................................................14

    A.  General Structure of the Plan................................................................14

    B.  Unclassified Claims or Expenses..........................................................15

    C.  Classification of Claims and Interests. .................................................17

    D.  Treatment of Classes and Interests. ......................................................17

    E.  Summary of Other Provisions of the Plan. ............................................18

V.  PENDING LITIGATION........................................................................................21

VI. RETENTION OF JURISDICTION ..........................................................................22

VII.    ALTERNATIVES TO THE PLAN .....................................................................23

VIII.   LIQUIDATION ANALYSIS...............................................................................23

IX. RISK FACTORS .................................................................................................25

X.  PLAN CONFIRMATION .......................................................................................25

    A.  Classes Entitled To Vote......................................................................25

    B.  Confirmation Standards. ......................................................................26

XI. TAX CONSEQUENCES ........................................................................................26

XII.    DISCLAIMERS ....................................................................................................26

XIII.    CONCLUSION .....................................................................................................28

## I.  INTRODUCTION

Ellipso, Inc., the Debtor and debtor-in-possession in this Chapter 11 case, has prepared this First Amended Disclosure Statement ("Disclosure Statement") in order to disclose information that is material and necessary for the creditors and interest holders to arrive at a reasonably informed decision in exercising their right to accept or reject its First Amended Plan of Reorganization ("Plan") filed with the Bankruptcy Court. A copy of the Plan accompanies this Disclosure Statement.

The legal standards governing this Disclosure Statement are set forth in Section 1125 of Title 11 of the United States Code. The Court has made a preliminary determination that this Disclosure Statement contains adequate information in that it provides you with sufficient information upon which to base your decision to accept or reject the Plan, i.e., the degree and detail of information that a reasonably prudent investor in the Debtor would have the right to expect before making a decision to invest.

Ellipso, Inc. filed a voluntary petition under Chapter 11, Title 11, United States Code ("Bankruptcy Code" or "Code") in the United States Bankruptcy Court for the District of Columbia ("the Court") on February 25, 2009 (the "Filing Date" or "Petition Date").  In this Disclosure Statement and the Plan, Ellipso, Inc. is referred to as "Ellipso," "the Debtor," and "the Reorganized Debtor." This Disclosure Statement sets forth the basic concepts of and support for a Plan that proposes the following:

1.      Cancellation of existing equity interests in the Debtor;

2.      Contribution of new value in cash in the amount of at least $600,000 by either (a) David Castiel and/or his assigns ("Purchaser")[1], or (b) the qualified bidder who presents the highest and best offer, in exchange for 100% of the new common stock to be issued by the Reorganized Debtor[2]; and

3.      Debt reduction and/or satisfaction through (a) adjudication by this Court, or (b) discounted cash payments following confirmation of the Plan.

---

1.   The Purchaser will form a new entity to contribute the $600,000 in new value, none of which will be contributed by Dr. Castiel.

A copy of the Letter of Intent submitted by the Purchaser is attached as EXHIBIT A.

Defined terms are capitalized in the Disclosure Statement and Plan and are defined in the Plan.

Court approval of the Disclosure Statement is not a decision by the Court on the merits of the Plan.

## II.   OPERATION AND HISTORY OF THE DEBTOR

### A.   Formation and Business of the Debtor.

Ellipso, Inc. was incorporated in May 1998 following a restructuring of Mobile Communications Holdings, Inc. (MCHI), which became a subsidiary of Ellipso. Formed in 1991, MCHI was a leader in the Mobile Satellite Services (MSS) industry having filed with the FCC for authorization to construct and deploy a satellite system named Ellipso.

The Ellipso system design was patented by the company and drew investment from the world's largest aerospace companies, including Boeing and L3-Com, as well as financial partners. Following the award of a Federal Communications Commission ("FCC") license, investments and other contributions in capital reached a mark close to $100 million. Those funds were used up, however. They were used primarily to pay for the early phases of building a telecommunications satellite—a project that was projected to cost approximately $1.6 billion. Ellipso was unable to obtain further investment, due to a collapse in the MSS industry. In mid-1999 Ellipso's leading competitor filed for bankruptcy protection, closely followed by two other potential competitors. This destroyed any chances for further investment in Ellipso in the short term.

In addition to the above MSS business, Ellipso created the Virtual Geo satellite technology which it spun-off to Virtual GeoSatellite, LLC ("Virtual Geo") in 1999. Virtual Geo attracted $5 million in outside investments and was offered a license by the FCC in late 2006.  The funds it had raised were expended for the most part on the licensing and regulatory process and the development of intellectual property. Unfortunately Ellipso was forced to surrender the license after the FCC introduced a requirement that

---

2.  Ellipso will file a motion for an order establishing procedures for submitting competing bids and selecting the

licensees post a $5 million construction bond within 30 days and the company did not have sufficient remaining funds to comply.

In 2002 Ellipso entered into a technology and licensing transaction with a publicly traded company called ICO Global ("ICO") controlled by Craig McCaw in return for equity in ICO. Ellipso subsequently needed an infusion of cash. To meet that need, and based on the expectation that its equity in ICO would rise in value, in 2004 Ellipso pledged its ICO shares as collateral for a $90,000 loan from a company named Mann Technologies LLC. Mann Technologies subsequently declared the loan to be in default and foreclosed on the pledged stock. It sold the stock for approximately $519,000 and kept the full amount of the proceeds. (Ellipso subsequently became involved in litigation regarding this transaction, as discussed below in the section regarding the events leading to Ellipso's Chapter 11 filing.)

In the meantime Ellipso put into operation the "virtual-country" telephone dialing codes +8812 and +8813, which it had been assigned by the International Telecommunications Union ("ITU"). Each of these codes was the equivalent of the dialing code assigned to a country (such as 01 for the United States). Ellipso had obtained these codes with the intention of using them to offer to offer universal dialing services that would allow a subscriber to be assigned a single telephone number that would be operational anywhere in the world. It is analogous to an email address for telephony. Ellipso contracted with The Registry Services Co. ("TRSC") for TRSC to build the database and associated software needed to support such service. However, the service never became operational, and the only revenue that Ellipso received on account of the 881 numbers was limited revenue from providing carriage for audiotext service. Ellipso ultimately lost its ITU-assigned country codes because it could not pay the associated ITU fees after the Mann Technologies matter described above.

---

highest and best offer at or shortly after the hearing on Confirmation of the Plan.

Ellipso, together with its subsidiaries, continued over time to seek outside investment and to exploit the value of the patents held by its subsidiaries (mainly satellite-system design patents that will start to expire in 2011/12). However, these efforts were unsuccessful.

In mid 2008 Ellipso received over 600,000 shares in ICO as final payment under the 2002 transaction described above. The market value of that payment was about $2.5 million. The subsequent market crash negatively affected the value of ICO stock more than most and in January 2009 it was trading at less than one tenth its value of summer 2008, dropping the value of Ellipso's remaining liquid assets to below $200,000. This coincided with an award of costs and fees in the Mann Technologies case that Ellipso could not pay. When Mann Technologies began efforts to enforce the fee award, Ellipso sought protection under Chapter 11.

In recent years, the Debtor funded its operations—which consisted in developing Virtual Geo's license and business, including seeking capital—from (a) the proceeds from the 881 service described above and (b) from obtaining liquidity through the sale of its ICO stock.

## B.    Events Leading to Chapter 11 Filing.

Ellipso's Chapter 11 filing was precipitated by events in the lawsuit entitled Ellipso, Inc. v. John B. Mann et al., No. 05-cv-1186-RDL (D.D.C.) ("the District Court Lawsuit"), which arose out of Ellipso's loan transaction with Mann Technologies, LLC. Ellipso had brought suit against Mann Technologies, John Mann, and Robert Patterson, asserting claims for rescission, lender liability/breach of fiduciary duty, lender liability/implied covenant of good faith and fair dealing, lender liability/fraudulent nondisclosure, breach of contract, fraudulent inducement, breach of fiduciary duty, fraud, conversion, trover/replevin, conspiracy, and RICO.[3] The defendants asserted counterclaims for breach of contract, fraud, quantum meruit, unjust enrichment, conspiracy, and fraudulent inducement.

---

3.    The suit also included claims against a company known as The Registry Services Corp., but that claim was dismissed based on the ground that it was subject to arbitration. The subsequent arbitration proceeding is discussed below.

4

All the substantive claims and counterclaims asserted by each party were ultimately dismissed, either on summary judgment or after trial.[4] However, Mann Technologies and John Mann moved for an award of attorney's fees against Ellipso, and on January 29, 2009 a fee award was entered in the amount of $201,314.04. Ellipso could not afford to post a supersedeas bond, and its motion to stay execution of the judgment without a bond was denied. On February 232009, Mann Technologies obtained writs of attachment directed to numerous financial institutions in the District of Columbia, including the institution at which Ellipso maintained the brokerage account in which it held its ICO shares. Those shares represented Ellipso's only liquid asset, and their market value at the time was less than the amount of the fee award. Ellipso was therefore faced with the prospect of losing its only source of operating cash (i.e., sale of the ICO shares). In order to prevent that from happening, Ellipso filed its Chapter 11 petition.[5]

## C.  Postpetition Events.

*The District Court Lawsuit.* At the time Ellipso's petition was filed, the following matters remained pending in the District Court Lawsuit: (a) a motion by Mann Technologies to alter or amend the award of attorney's fees against Ellipso to hold Ellipso's president, David Castiel, jointly and severally liable for the amount of the award and (b) a motion by John Patterson to alter or amend the attorney's fee award against Ellipso by adding a separate award of sanctions in his favor against both Ellipso and Castiel, and (c) a motion by Mann Technologies requesting payment to it of $100,000 that was being held in the registry of the court pursuant to an order providing that Ellipso forfeit the bond that it had posted in that amount in connection with a preliminary injunction that had been issued in its favor but that was subsequently dissolved.

---

4.  All parties noticed appeals or cross-appeals to the United States Court of Appeals for the District of Columbia Circuit from these decisions. Those appeals were stayed by the D.C. Circuit pending resolution of the sanction/attorney's fee motion referred to in the text. The status of that appeal is summarized below in the discussion of pending litigation.

5.  Additional information regarding the district court lawsuit is provided below in the discussions of post-petition events and pending litigation.

Mann Technologies and John Mann sought and obtained relief from the automatic stay to permit the district court to decide their pending motions (and to allow the rendering of a decision in the arbitration proceeding discussed below.) Mann Technologies then filed a supplement to its motion to alter or amend and a motion seeking additional attorney's fees. On May 14, 2009, the district court (a) granted the motion seeking the release of the funds in the court's registry, (b) denied the motion to alter or amend the fee award by holding Castiel jointly and severally liable along with Ellipso, and (c) granted the motion for additional attorney's fees in part (awarding an additional $19,655.41) but otherwise denying it.

Patterson's motion to alter or amend the attorney fee award by awarding sanctions to him remains pending. Patterson has neither sought nor obtained relief from the automatic stay with respect to that motion.

*The TRSC arbitration.* When Ellipso filed its Chapter 11 petition, hearings had just been completed in an arbitration proceeding between Ellipso and The Registry Services Co. ("TRSC") entitled *The Registry Services Co. and Ellipso, Inc.*, Case No. 16 494 00523 08 (American Arb. Ass'n). TRSC obtained relief from the automatic stay for the purpose of allowing the submission of post-hearing briefs and the rendering of a decision by the arbitrator. On June 5, 2009, the arbitrator issued his award, which awarded TRSC $133,103.99, plus pre-award interest of $29,231.46, for a total of $162,335.45. (In its post-hearing brief, TRSC had sought an award of more than $9 million.) The arbitrator denied Ellipso's counterclaims.

**D.   The Debtor's Assets.**

The Debtor's assets are as follows.

*Ownership interest in subsidiary: Virtual Geosatellite, LLC.*   The Debtor owns 1040 units (representing a 100% ownership interest) in Virtual Geosatellite, LLC ("Virtual Geo"). That interest is valued on the Debtor's schedules in this case at $1.00.

Virtual Geo's assets are as follows:

U.S. Patent No. 5,845,206 (Issued 01-Dec-98): Elliptical Satellite System which Emulates the Characteristics of Geosynchronous Satellites

6

U.S. Patent No. 5,957,409 (Issued 28-Sep-99): Elliptical Satellite System which Emulates the Characteristics of Geosynchronous Satellites

U.S. Patent No. 6,263,188 (Issued 17-Jul-01): An Elliptical Satellite System which Emulates the Characteristics of Geosynchronous Satellites

U.S. Patent No. 6,577,864 (Issued 10-Jun-03): An Elliptical Satellite System Which Emulates the Characteristics of Geosynchronous Satellites

U.S. Patent No. 6,611,683 (Issued 26-Aug-03): An Elliptical Satellite System Which Emulates the Characteristics of Geosynchronous Satellites

U.S. Patent No. 6,678,519 (Issued 13-Jan-04): An Elliptical Satellite System Which Emulates the Characteristics of Geosynchronous Satellites

U.S. Patent No. 6,695,260 (Issued 24-Feb-04): Virtually Geostationary Satellite Array

U.S. Patent No. 6,795,687 (Issued 21-Sep-04): An Elliptical Satellite System which Emulates the Characteristics of Geosynchronous Satellites

U.S. Patent No. 6,954,613 (Issued 11-Oct-05): Fixed Satellite Constellation System Employing Non-Geostationary Satellites in Sub-Geosynchronous Elliptical Orbits with Common Ground Tracks

U.S. Patent No. 7,277,673 (Issued 02-Oct-07): Virtually geostationary satellite array with optimized parameters

STK (Satellite Tool Kit) orbital design software (approximately ten years old; purchase cost was approximately $40-50,000)

These patents listed above are directed toward a satellite system that emulates the characteristics of geostationary satellites and allows the reuse of electromagnetic spectrum through angular separation from the geostationary arc. (Copies of the patents are available at www.uspto.gov. ) The uses for which the system is suitable include telephony, broadband, HDTV, and other broadcast services.

Although these patents have the potential to be very valuable, their current value is unknown. Realizing the value of the patents would require an enormous investment (by the patent-holder or a licensee) in order to build and operate the satellite system to which the patents relate. The Debtor estimates that the necessary investment would be in excess of $750 million. Even the necessary intermediate step of obtaining a license from the FCC would cost millions of dollars, including the posting of a $5 million bond.[6]

---

6.  In order to obtain such a license, the applicant would have to meet a series of milestones within specified time limits. The first such milestone would be to enter into a contract for construction of the satellites. The second would be to successfully complete the Critical Design Review (CDR) process. The Debtor estimates that the cost of getting through these first two milestones could be in the range of $10 million to $50 million.

Because of these costs, together with the substantial uncertainties that would be associated with attempting to build and operate the satellite system, the patents would constitute a speculative investment. Any entity seeking to purchase the patents or to obtain a license to practice them would be unlikely to make an upfront payment of more than a very small fraction of the patents' potential value. Beyond such a payment, the economic benefit that these patents could generate would not be realized until an unknown number of years in the future, and the amount of those potential benefits is unknown.[7]

Virtual Geo has entered into a tolling agreement with Lerman Senter PLLC, which is a creditor in this case, regarding an unliquidated claim that Virtual Geo may have against Lerman Senter. For purposes of estimating the value of the Debtor's interest in Virtual Geo, no value is being attributed to that possible claim, due to the inherent uncertainties of litigation and to the expense of prosecuting such a claim.

As noted below, Virtual Geo owes The Debtor $4,501,703 on account of money loaned to Virtual Geo by the Debtor.

*Ownership interest in subsidiary: Airstellar, Inc.* The Debtor owns 100 shares in its subsidiary Airstellar, Inc (formerly known as EPH, Inc.), representing all of Airstellar's outstanding stock. It is valued on the Debtor's schedules in this case at $1.00.

Airstellar's only asset is an 80% interest in Mobile Communications Holdings, Inc., which is discussed below.

*Ownership interest in subsidiary: Mobile Communications Holdings, Inc.* The Debtor owns 5,213 shares in its subsidiary Mobile Communications Holdings, Inc. (MCHI), which represents approximately

---

7. This analysis is consistent with views stated by creditor John B. Mann in filings in this case. Mann, who can be described as being unfavorably disposed toward the Debtor's current management, has said, "The launch of a new satellite constellation requires approximately $2,000,000,000. There is currently no market to support another telecommunications satellite system and even less appetite in the investment community for such an expenditure." (Doc. No. 76-1 at 9.) He has estimated "that an immediate sale of these patents would yield no more than ten thousand dollars ($10,000.00)." (*Id.* at 33.)

While the Debtor does not often agree with what Mann says (and vice versa), Mann's statements are mentioned here because this unusual instance of agreement supports the conclusion that the Debtor's valuation analysis is correct.

20% of MCHI's outstanding stock. The remainder of the stock is owned by the Debtor's subsidiary

Airstellar, as noted above. Thus, the Debtor directly and indirectly owns a 100% interest in MCHI. MCHI

is valued on the Debtor's schedules in this case at $1.00.

MCHI's assets are its 100% ownership interest in ESBH, Inc. (which owns the patents listed

below) and the following furniture and equipment: 1 conference room table and 12 leather chairs; 2 side

chairs; 1 small round conference table and 4 chairs; 1 sofa and two leather reception chairs; 2 reception

"coffee" tables; 1 side table; 5 metal file cabinets; 2 wood file cabinets; 8+ framed pictures; 8 wood

shelves; 3 desks; 2 metal chairs; 1 credenza; 1 coat/hat hanger; 2 metal storage cabinets; 1 audio visual

rack with electronic components; 1 projection screen; and 1 white board.

ESBH's only assets are the following patents:

U.S. Patent No. 5,931,417 (issued 03-Aug-99): Non-Geostationary Orbit Satellite Constel-
lation for Continuous  Preferential Coverage of Northern Latitudes

U.S. Patent No. 5,582,367 (issued 10-Dec-96): Elliptical Orbit Satellite, System, and Deploy-
ment with Controllable Coverage Characteristics

U.S. Patent No. 5,788,187 (issued 04-Aug-98): Elliptical Orbit Satellite, System, and Deploy-
ment with Controllable Coverage Characteristics

U.S. Patent No. 5,669,585 (issued 23-Sep-97): Elliptical Orbit Satellite, System, and Deploy-
ment with Controllable Coverage Characteristics

U.S. Patent No. 6,102,335 (issued 15-Aug-00): Elliptical Orbit Satellite, System, and Deploy-
ment with Controllable Coverage Characteristics

U.S. Patent No. 6,122,596 (issued 19-Sep-00): Non-Geostationary Orbit Satellite Constel-
lation  for Continuous Preferential Coverage of  Northern Latitudes

U.S. Patent No. 5,979,832 (issued 09-Nov-99): Dual Ring Array of Satellites

U.S. Patent No. 6,249,672 (issued 19-Jun-01): Portable Telephone

U.S. Patent No. 6,227,497 (issued 08-May-01): Adaptively Positioned Solar Array

U.S. Patent No. 6,597,989 (issued 22-Jul-03): Non-Geostationary Orbit Satellite Constellation
for Continuous Preferential Coverage of Northern Latitudes

U.S. Patent No. 6,659,260 (issued 24-Feb-04) Virtually Geostationary Satellite Array

U.S. Patent No. 6,487,476 (issued 26-Nov-02): Redundant Satellite System

U.S. Patent No. D466613 (issued 03-Dec-02): Telephone Booth

U.S. Patent No. 6,766,166 (issued 20-Jul-04): Antenna Null

U.S. Patent No. 6,457,678 (issued 01-Oct-02): Constellation of Elliptical Orbit Satellites with
Line of Apsides Lying in or Near the Equatorial Plane

These patents (with the exception of No. D466613) are directed toward a communications satellite system using elliptical orbits and tailoring coverage according to earth latitude. This system would be suitable for satellite telephony.

The Debtor believes that these patents have substantially less potential value than Virtual Geo's patents because the market for satellite telephony (which the ESBH patents could be used to provide) is much more limited than the market for broadband communications (which the Virtual Geo patents could be used to provide). Therefore, it is unlikely that anyone would be willing to expend the costs that would be necessary to develop a new satellite telephone system, which would be comparable to the costs of commercializing the Virtual Geo patents.

MCHI has entered into a tolling agreement with Lerman Senter PLLC, which is a creditor in this case, regarding an unliquidated claim that MCHI may have against Lerman Senter. For purposes of estimating the value of the Debtor's interest in MCHI, no value is being attributed to that possible claim, due to the inherent uncertainties of litigation and to the expense of prosecuting such a claim.

*Stock in ICO Global Communications, Inc.* The Debtor owns 210 shares of ICO Global Communications, Inc., a satellite communications company based in Reston, Virginia. This stock is publicly traded on NASDAQ (symbol: ICOG). As of the close of trading on August 27, 2009, the stock was trading at $0.65 per share. As a result, the Debtor's shares were at that point worth $136.50.

*TD Ameritrade brokerage checking account.* As of August 27, 2009, the balance in this account was $0.36.

*Loan receivable from Virtual Geosatellite, LLC.* Virtual Geo owes the Debtor $4,501,703. Given the uncertainty as to the value and ultimate commercialization of Virtual Geo's patents, and the fact that Virtual Geo has no other assets, the collectibility of this debt is unknown.

*Claim against Peter Sahagen et al.* The Debtor has a claim for unliquidated damages against Peter Sahagen. This claim is valued on the Debtor's schedules in this case at $1. Its actual value is unknown.

*Other assets.* The Debtor's remaining assets—security deposits, an escrow forfeiture, accounts receivable, computer equipment, and cell phones—has an estimated value of less than $30,000.[8]

## E.   Certain Allegations Against Insiders.

Certain creditors (John B. Mann; Mann Technologies, LLC; and Robert Patterson) have alleged that the Debtor's president, David Castiel, improperly took millions of dollars from the Debtor before it filed its petition in this case and that as a result the Debtor may have claims against Mr. Castiel to recover those funds. They also allege that the Debtor may have a claim against Mr. Castiel for indemnification from the award of attorney's fees imposed against Ellipso in the District Court Lawsuit. The Debtor does not believe that those allegations have merit. Furthermore, even if the claims were assumed to have merit, based on information from Mr. Castiel about his assets it is doubtful whether any judgment that might be entered against Mr. Castiel would be collectible.

Nevertheless, the Debtor recognizes that Mr. Castiel is subject to a conflict of interest with respect to these allegations. Accordingly, the Plan provides for the appointment of a Plan Agent to investigate and prosecute any and all claims, including but not limited to avoidance of transfers under Chapter 5 of the Bankruptcy Code, that the Reorganized Debtor may have against insiders, *inter alia,* with the proceeds of such claims to be distributed pro rata among the holders of allowed Class 3 Claims, as discussed in subsection IV. E.1. (b) below.

---

8.   The Debtor's schedules in this case list a $600,000 claim against The Registry Solutions Company. That claim was pending in an arbitration proceeding when the schedules were filed. The arbitrator subsequently issued his decision, which awarded the Debtor nothing on its claim.

Inadvertently omitted from the Debtor's schedules was its claims against John Mann, Mann Technologies, and Robert Patterson, which were the subject of the District Court Lawsuit. Those claims were dismissed by the district court and an appeal from that dismissal is pending before the U.S. Court of Appeals for the D.C. Circuit; that appeal is currently stayed by the automatic stay and by the appeals court's own order. For the purposes of the Plan and this Disclosure Statement, those claims are estimated to have no value, given that (a) the prospects of any appeal are inherently uncertain, and most district-court decisions that are appealed are affirmed, (b) prosecuting the appeal and any subsequent retrial would entail substantial expense, and (c) the collectibility of any judgment that might ultimately be obtained is uncertain.

## F.   Claims Against the Estate.

The total amount of (a) claims scheduled by the Debtor as undisputed and (b) claims asserted in timely proofs of claim is $25,344,042.17.[9] The Debtor has so far filed objections to six proofs of claim, which total $17,066,246.99: a claim filed for $14 million filed by Robert Patterson, two claims filed by John B. Mann (one for $500,000 plus punitive damages and another for $201,314), two claims filed by Mann Technologies, L.L.C. (one for $500,000 plus punitive damages and another for $220,969.45), and a claim for unpaid sales taxes filed by the District of Columbia Treasury for $1,643,963.54. If the Debtor prevails on all of these objections, the unsecured nonpriority claims against the estate would be reduced to $8,277,795.18. The amount of such claims would be reduced further if objections are filed to other claims and such claims are disallowed.

## G.   Executory Contracts.

The Debtor has a call-termination agreement with Verizon, a copy of which is attached hereto as EXHIBIT B. The contract has two elements, the second of which has so far not been implemented. First, the contract provides for voice-over-internet protocol (VoIP) calls generated by the Debtor or its agents to be routed to Verizon for termination anywhere in the Verizon network at "Verizon gold rates." For this service, the customer would pay (or prepay) the Debtor and the Debtor would pay (or prepay) Verizon a portion of that amount. The Debtor and its agents would keep the difference. Second, the contract would allow a customer of the Debtor to dial a number assigned to another customer of the Debtor anywhere on the Verizon network and have that call routed by Verizon to its destination. The Debtor began receiving revenue under this contract in April 2009. Its gross receipts to date have been as follows:

| | |
|---|---|
| April 2009 | $3,800 |
| May 2009[10] | 2,017 |
| June 2009 | 938 |

---

9.   Where a claim was scheduled as undisputed but the creditor filed a proof of claim in a larger amount, only the latter amount is included in this total.

10.   The Debtor's monthly report for May listed the revenue for that month as $1,870. The Debtor is unsure of the reason for this discrepancy but believes that the figure stated here is the correct one.

|                          |       |
|--------------------------|-------|
| July 2009                | 4,337 |
| August 2009 (as of Aug. 28) | 6,440 |

As noted above, the foregoing figures represent *gross* revenue. The Debtor is entitled to keep only 15% of these receipts.

## H.  **Creditors' Committee.**

No official committee of unsecured creditors was formed or appointed by the United States Trustee pursuant to 11 U.S.C. §1102(a)(1) in this case.

## III. CONFIRMATION REQUIREMENTS AND DEBTOR'S RECOMMENDATION

## A.  **Confirmation Requirements.**

In order to be confirmed (i.e., approved) by the Court, the Plan or its proponent must (among other requirements set forth in Section 1129 of the Code):

1.      Disclose all compensation paid or promised for professional services rendered or to be rendered in connection with the case;

2.      Disclose the identity and affiliations of all officers to serve after the Plan is confirmed and the compensation of any insiders to be employed after confirmation;

3.      Propose to distribute to each member of a Class of claimants property at least equal in value to what the claimant would receive if Ellipso's assets were liquidated on the date of the Confirmation hearing and distributed to creditors according to their rights and priorities under law;

4.      Propose to pay all Administrative Claims in full on the Effective Date; and

5.      Propose to pay all Priority Claims in full in cash or deferred payments of a total value equal to the allowed priority claims as of the Effective Date, including allowed Priority Tax Claims plus statutory interest within six years from the date or dates of assessment.

Since there is an impaired Class of Claims and Interests under the Plan, confirmation of the Plan will require, among other things, that the Class of impaired Claims vote to accept the Plan.  Generally, a

Class of claims or interests as to which legal, equitable, or contractual rights are altered is "impaired." In order for an impaired Class of Claims or Interests to accept the Plan, votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of claims voting in that Class must be cast in favor of the Plan. There is one (1) impaired Class of Claims and one (1) impaired Class of Interests under the Plan.

**B.   Recommendation of the Debtor.**

**Ellipso believes that the Plan is in the best interests of its creditors and will permit the best possibility of recovery for all interested parties. In arriving at this conclusion, Ellipso's management considered: (i) the estimated liquidation value of Ellipso's assets and the fact that Ellipso's creditors would receive more under the Plan than if the company were to continue to operate without substantial additional capital, financing, or revenue; (ii) the proposed new equity investment of $600,000 ("New Equity"); and (iii) the fact that Ellipso's creditors would receive greater payment on their claims substantially sooner in a reorganization pursuant to a confirmed Chapter 11 plan than through a liquidation under Chapter 7 of the Bankruptcy Code. Ellipso's management believes that, based upon the above factors, the Plan is fair and equitable and in the best interests of all parties.**

**IV.   OVERVIEW OF THE PLAN**

**A.   General Structure of the Plan.**

Set forth below is a summary description of the Plan that highlights its major terms and provisions. The summary is qualified in its entirety by reference to the provisions of the Plan itself, which accompanies this Disclosure Statement. In the event of any inconsistency between the Plan and this Disclosure Statement the terms of the Plan shall control. The Plan provides for payments to the creditors of Ellipso from the New Value investment of $600,000 as of the Effective Date. (As noted in Paragraph I on page 4, above, this amount is subject to higher and better offers.) The Plan establishes Classes of creditors and Interest holders for purposes of voting and distribution. Based on the proposed treatment of each

14

Class of creditors and the attached projections it is anticipated that each of the Classes will be satisfied as follows:

| Class | Description | Projected Class Satisfaction |
|-------|-------------|------------------------------|
| 1 | Claims of employees for wages and benefits (up to $10,950) | To be satisfied within thirty (30) days after the Effective Date |
| 2 | Claims of governmental units for taxes | To be satisfied within thirty (30) days after the Effective Date |
| 3 | Unsecured nonpriority Claims | To receive pro rata payments from available funds within 90 days after the Effective Date |
| 4 | Interests of Equity Security Holders | All common stock in the Debtor shall be cancelled. |

It is important to know which Class contains your Claim or Interest. Only holders of Class 3 Claims may vote to accept or reject the Plan. Class 1 and 2 claimants are deemed to have accepted the Plan, and holders of Class 4 Interests are deemed to have rejected it. If you have any questions regarding the classification of your claim, you may contact counsel for the Debtor.

**B.  Unclassified Claims or Expenses.**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall designate classes of claims other than priority tax claims and administrative expenses. Accordingly, the Plan regards tax claims and administrative expenses as "unclassified." The concept of "impairment" does not apply to these "unclassified" Claims and expenses.

**1.  Allowed Administrative Claims.** Allowed Administrative Claims consist of any cost or expense of the Chapter 11 case allowed under Section 503(b) of the Bankruptcy Code, including certain taxes and all actual, necessary expenses relating to the preservation of 's Ellipso's estate or the operation of the business. Awards of compensation to professionals, such as attorneys, financial consultants, and accountants hired by the Debtor for services rendered or expenses incurred after the Petition Date are also regarded as Administrative Claims. Payments to such professionals for compensation and reimbursement of expenses will be made in accordance with detailed procedures established by the Bankruptcy Code and Rules relating to such payments. The

Bankruptcy Court, on hearing after notice, will review all requests for compensation and reimbursement of expenses incurred through the Confirmation Date. It is anticipated that the total unpaid fees to be earned by the Debtor's professionals will be approximately $150,000 prior to Confirmation of the Plan[11]. The Debtor also believes that up to $120,000.00 in post-Confirmation administrative expenses (resulting mainly from litigating objections to claims and the fees and expenses of the Plan Agent) may be allowed.

Under the Plan, Allowed Administrative Claims will be paid in full in cash on the Effective Date if not previously paid pursuant to appropriate orders entered by the Court.

**2.** **Allowed Wage Claims,** Allowed Wage Claims are Claims against the Debtor entitled to priority in accordance with Section 507(a)(3) of the Code, i.e., unsecured claims up to $10,950.00 for individuals earned within 180 days before the Petition Date for wages, salaries, or commissions, including vacation, sick leave, and severance pay. Ellipso believes that Allowed Wage Claims total $43,800.00. The holders of such Claims are David Castiel, John Page, Gerald Helman, and Laury Blakley. Castiel and Helman are officers, and Castiel is a director, of the Debtor. Page was formerly an officer of the Debtor.

**3.** **Allowed Tax Claims.** Allowed Tax Claims are any Claims against the Debtor entitled to priority in accordance with Section 507(a)(8) of the Code, i.e., any unsecured claims of government units for taxes that were assessed before the Petition Date. Upon information and belief, the Debtor believes that no tax claims will be allowed.[12]

---

11. Debtor's counsel and special counsel hold $45,000 in their firm escrow accounts to be applied to such fees when and as allowed by the Court.

12. The District of Columbia Office of Tax and Revenue has filed a proof of claim in the amount of $1,643,963.54 for unpaid sales and use taxes, of which $1,417,026.74 is designated as priority (Class 2) and $226,936.80 as unsecured (Class 3). Ellipso has since provided appropriate documentation demonstrating that no amount is due because the Debtor did not have income from sales during the designated periods and has objected to the proof of claim..

C.   **Classification of Claims and Interests.**

Claims against Ellipso are divided into the following classes

Class 1.    Allowed Unsecured priority Wage Claims.

Class 2.    Allowed Unsecured priority Tax Claims

Class 3.    Allowed Unsecured nonpriority Claims.

Class 4.    Interests of Equity Security Holders.

D.   **Treatment of Classes and Interests.**

The Plan provides for treatment of each Class as follows:

**Class 1.         Allowed Unsecured Wage Claims**. Class 1 consists of Allowed Unsecured priority Wage Claims. The holders of Allowed Wage Claims will be paid in full within 30 days after the Effective Date. The Class 1 Claims are not impaired.

**Class 2.         Allowed Unsecured Tax Claims**. Class 2 consists of Allowed Unsecured priority Tax Claims. The holders of Allowed Tax Claims will be paid in full within 30 days after the Effective Date. The Class 2 Claims are not impaired.

**Class 3:         Allowed Unsecured Nonpriority Claims.**     The Class 3 Claims consist of the Allowed Unsecured Nonpriority Claims. There are filed and/or scheduled Class 3 Claims totaling $23,883,215.45 that may be allowed. Holders of Allowed Class 3 Claims will receive pro rata distributions of approximately $300,000.00 within 90 days after the Effective Date. If all such filed Class 3 Claims are allowed, each holder will receive approximately 1.25 cents on the dollar on account of such Claim. However, Ellipso reasonably anticipates that, after payment of all administrative and post-Confirmation expenses and priority claims and disallowance of claims upon objections, claims totaling $8,233,995.18 may be allowed, and holders of Allowed Class 3 Claims could receive up to 3.6 cents on the dollar.

**Class 4:      Interests of Equity Security Holders.** Class 4 consists of the Equity Interests of the members of the Debtor. All Equity Interests will be cancelled on the Effective Date. The holders of member interests in Ellipso shall not receive any money or property under the Plan on account of such interests. The Class 4 Interests are impaired. Holders of Class 4 Interests are deemed not to have accepted the Plan.

**E.   Summary of Other Provisions of the Plan.**

**1.      Implementation of the Plan.**

Prior to the hearing on the confirmation of the Plan, the New Value investment of $600,000 in cash or a letter of credit from an accredited financial institution provided by the Purchaser will be placed in escrow with Butzel Long Tighe Patton, PLLC as Escrow Agent, pursuant to an Escrow Agreement.  The terms of escrow will provide for disbursement of the escrowed funds as follows:

a.      The escrowed funds shall be initially utilized for the payment of Allowed Administrative Expenses, Class 1 Allowed Unsecured priority Wage Claims, and Class 2 Allowed Unsecured priority Wage and Tax Claims. $150,000.00 will be reserved for post-Confirmation professional fees and expenses.

b.      As of the Effective Date, Stephen A. Wexler of Marcher Consultants, Inc.[13] shall be employed as Plan Agent for the Reorganized Debtor, to investigate and prosecute any and all claims, including but not limited to avoidance of transfers under Chapter 5 of the Bankruptcy Code, that the Reorganized Debtor may have against insiders ,and to object to claims filed by insiders, if appropriate, with the proceeds of such claims to be distributed pro rata among the holders of allowed Class 3 Claims. Mr. Wexler will be compensated at $250/hour and may select and employ experienced bankruptcy professionals, including attorneys and accountants, to carry out his duties. The Escrow Agent shall reserve $75,000 for the Plan Agent's fees and expenses, including professionals. The Plan Agent and his professionals shall send monthly invoices to the Escrow Agent for payment within 15 days. Upon

---

13. 8230 Leesburg Pike, Suite 610, Vienna, Virginia 22182; www.marcherconsultants.com.

completion of his investigation and all resulting litigation against insiders, the Plan Agent shall remit all funds recovered, if any, to the Escrow Agent for disbursement pro rata among the holders of Allowed Class 3 Claims.

c.        Within ninety (90) days after the Effective Date, with appropriate reserves for final adjudication and/or settlement of disputed, unliquidated and/or contingent claims, the balance of the escrowed funds will be distributed pro rata among the Holders of Allowed Class 3 Claims.

d.        In the event there are any reserved funds remaining in the escrow account after payment of such disputed, unliquidated and/or contingent claims as allowed by the Court and post-Confirmation fees and expenses, such funds shall be distributed pro rata among the Holders of Allowed Class 3 Claims.

e.        Should the Court fail to approve the Plan as submitted or subsequently modified by Ellipso, or if such confirmation does not occur on or before August 24, 2009, or such later date as may be agreed upon by the Debtor and the investors, the escrowed funds will be returned immediately to the Purchaser, with accrued interest (if any).

        **2.        Discharge of Debtor.**

        Except as provided in the order confirming the Plan, Confirmation of the Plan discharges Ellipso from any debt that arose before the date of confirmation, and any debt of a kind specified in Section 503(g), (h), or (i) of the Code, whether or not a proof of claim is filed or deemed filed, such claim is allowed under Section 502 of the Code, or the holder of such claim has accepted the Plan.

        **3.        Treatment of Executory Contracts and Unexpired Leases**.

        The Call Termination Agreement between the Debtor and Verizon International will be assumed on the Effective Date. Unless a motion to assume is filed by Ellipso prior to the Confirmation Date, all other Executory Contracts and Unexpired Leases not previously assumed or rejected by order of this Court shall be rejected, and any claim shall be filed within thirty (30) days after the Confirmation Date or shall forever

be barred. Any claim for damages resulting from the rejection of an Executory Contract shall be treated as a Class 3 Claim under the Plan.

### 4. **Stock in Reorganized Debtor.**

On the Effective Date, all outstanding securities in Ellipso shall be cancelled, and the Reorganized Debtor shall amend its charter to authorize and issue 20,000, 000 shares to Purchaser in exchange for the New Value investment.

### 5. **Amendments and Modifications.**

Ellipso reserves the right in accordance with the Code to amend and modify this Disclosure Statement and the Plan prior to the Confirmation Date. After the Confirmation Date, Ellipso may, upon order of the Court, in accordance with Section 1127(b) of the Code, remedy any defects or omissions or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

### 6. **Conveyance of Assets.**

Except as stated below, all assets of Ellipso and the Estate in existence as of the Effective Date shall vest on the Effective Date in the Reorganized Debtor free and clear of all liens, encumbrances, and interests.  The term "all assets of Ellipso and the Estate in existence as of the Effective Date" shall be deemed to include all claims or causes of action Ellipso or the Estate may have against any person or entity, including, but not limited to, those arising under the Code.

### 7. **Objections to Claims.**

Any objection to the allowance of a Claim not filed in accordance with the procedure set forth in the Code within ninety (90) days after the Effective Date shall be deemed waived, and the Claim shall be allowed in the amount set forth on the proof of claim filed by the holder of such Claim, or, if no proof of

claim is filed and such Claim is not listed in Ellipso's schedules as contingent, disputed, or unliquidated, the Claim shall be allowed in the amount listed in such schedules, as amended.

**8.      Contested and Unliquidated Claims.**

If you are the holder of a Claim or Interest which is listed in Ellipso's schedules as contingent or unliquidated or which has been objected to, you may ask the Court, pursuant to Section 502(c)(1) of the Code or Rule 3018(a), Federal Rules of Bankruptcy Procedure, to have your Claim or Interest temporarily allowed for the purpose of voting to accept or reject the Plan.

**9.      Post-Confirmation Employment of Insiders.**

Ellipso may employ David Castiel as an officer and director after Confirmation at compensation levels to be determined with the Reorganized Debtor.

**10.      Avoidable Payments.**

Ellipso has analyzed its transactions with creditors within 90 days before and with insiders within the one-year period immediately preceding the Filing Date and is not aware of any that are avoidable under the Code. As discussed above, the Plan Agent will investigate the avoidability of transfers involving insiders and pursue such actions for the benefit of the holders of Allowed Class 3 Claims.

## V.   PENDING LITIGATION

The only pending litigation to which Ellipso is a party is (a) the District Court Lawsuit and (b) the appeals that were taken from the judgment in that case before Ellipso filed its Chapter 11 petition.

The only matter that remains pending in the District Court Lawsuit is Patterson's motion to alter or amend the fee-award order. As noted above, that motion is subject to the automatic stay.

In the United States Court of Appeals for the D.C. Circuit, appeals and cross-appeals by Ellipso, John Mann, Mann Technologies, and Patterson are pending with regard to the final judgments that were entered in the District Court Lawsuit in September 2008. (*Ellipso, Inc. v. Mann*, Nos. 08-7119, 08-7125 & 08-7131.) The court of appeals had stayed those appeals pre-bankruptcy pending the resolution of the post-

judgment sanctions/fee litigation. That stay was still in effect when the petition was filed. As noted above, that litigation has not yet been fully resolved. Furthermore, proceedings in the court of appeals remain subject to the automatic stay.

The orders that have been entered to date in the post-judgment fee litigation are not yet appealable, because Patterson's motion to alter or amend remains pending. If and when Patterson's motion is decided, the fee and sanction motions will become appealable.

## VI. RETENTION OF JURISDICTION

The Court shall retain jurisdiction for the following purposes until such time as Ellipso's obligations under the Plan are fully discharged and the Court enters a final order terminating this Reorganization Case:

(1)    Classification of a Claim and the reexamination of a Claim that may have been allowed for the purposes of voting and the determination of such objections as may be filed to Claims. The failure by Ellipso to object to, or to examine any Claims for the purpose of voting, shall not be deemed to be a waiver of Ellipso's right to object to or reexamine the Claims in whole or in part.

(2)    Determination of all disputes regarding title to the assets of Ellipso and the determination of all causes of action, preferences, controversies, disputes or conflicts, whether or not subject to action pending as of the Confirmation Date, between Ellipso and any other party.

(3)    Determination of the validity, extent, enforceability or perfection of any claim of lien or other claim of security interest in or to the property of Ellipso.

(4)    Correction of any defect, curing of any omissions or the reconciliation of any inconsistency in the Plan, or in the Order of Confirmation, as may be necessary to carry out the purposes and intent of the Plan.

(5)    Enforcement and interpretation of the terms and conditions of the Plan.

(6)      Entry of an order, including injunctive relief necessary to enforce the rights, title, interests and powers of Ellipso and imposition of such limitations to, restrictions on the terms and conditions of such rights, title, interests, and powers as the Court may deem necessary.

(7)      Entry of an order closing this Reorganization Case.

(8)      Such other purposes as the Court deems necessary and reasonable to carry out the intent and purposes of the Plan.

## VII.   ALTERNATIVES TO THE PLAN

If the Plan is not accepted and confirmed, Ellipso or any other party in interest could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of Ellipso 's business or an orderly liquidation of its assets. Ellipso believes that it is unlikely that any alternate plan of reorganization would be feasible or would contain terms more favorable to the creditors than the Plan. Ellipso believes that the Plan, as described herein, enables creditors to realize the maximum recovery under the circumstances.[14]

## VIII.   LIQUIDATION ANALYSIS

The Bankruptcy Code provides that the Court will not approve a Chapter 11 plan unless the creditors will receive at least as much under a Chapter 11 as they would in liquidation under Chapter 7 of the Bankruptcy Code. Since the Plan provides for Ellipso to be sold to the highest bidder, it will yield at least

---

14. On or about June 22, 2009 (three days before the Debtor filed its original plan and disclosure statement), the Debtor received an offer from creditor John Page to buy the company for $400,000 in cash plus warrants for 10% of the stock in the reorganized company, which warrants would vest two years after the plan's effective date and would be redeemable by the reorganized company before exercise for $750,000. (This offer was conditioned on agreement as to a breakup fee.) The Debtor determined that accepting that offer would not be in the estate's best interest because it was highly uncertain whether the warrants would ever result in a payment that would, when combined with the initial cash payment, equal the value of the Debtor's original plan.

When Page learned about the offer upon which the Debtor's original plan based, he submitted an all-cash offer of $750,000. This offer was submitted on the afternoon of June 25, 2009, which was the final day of the exclusivity period. The Debtor did not have adequate time to engage in further discussions or due diligence with respect to this offer before the exclusivity period expired. Therefore, the debtor filed its original plan and disclosure statement later that day. The Debtor does not know whether Page actually had the financial resources or backing to pay the $750,000 offer price. However, the original plan preserved for the Debtor the value of

as much as would be realized through a liquidation sale by a trustee. Moreover, a sale under the Plan

would produce gross proceeds of at least $600,000, that being the amount of the offer by the Purchaser.

There would be no comparable minimum guaranteed proceeds in a liquidation under Chapter 7. Therefore,

the possibility exists that in such a liquidation, the gross proceeds of the liquidation would be less than the

minimum proceeds under the Plan.

The Debtor estimates that its assets are worth less than $50,000 on a liquidation basis:

| | |
|---|---:|
| ICO stock | 136.50 |
| TD Ameritrade checking account | .86 |
| Loan receivable from Virtual Geo[15] | 0 |
| Deposits, escrow forfeitures, A/R[16] | <30,000.00 |
| Claim against Sahagen[17] | 0 |
| Claim against Mann, Mann Tech, and Patterson[18] | 0 |
| Subsidiaries | <20,000.00 |

Therefore, there is no reason to think that a Chapter 7 liquidation sale would produce more in gross

proceeds than a sale under the Plan.

Moreover, a Chapter 7 liquidation would entail delay and expense that would be avoided in a sale

under the Plan. Chapter 7 requires the appointment of a trustee to administer the estate, which would cause

delays and would involve the added expenses associated with the appointment of the trustee. Those

expenses include the trustee's statutory commissions and compensation for professionals such as

accountants, appraisers or liquidation agents employed by the trustee. The Bankruptcy Code authorizes

those expenses to be paid from the assets of the estate. Trustees' fees in a case of this size can be awarded

in an amount up to 5% of the distributed assets.

---

Page's offer (whatever it might have been) by providing for the company to be sold to the highest qualified
bidder.

15.  This asset is valued here at zero because the loan has value independent of the value of Virtual Geo's assets.

16.  Valued at face amount.

17.  Valued at zero due to cost of litigation, the inherent risk of litigation, and uncertainty about collectibility.

18.  See footnote 8, above.

## IX. **RISK FACTORS**

The success of the Plan and assurance of the optimum recovery for creditors of Ellipso are dependent upon: (i) obtaining the requisite acceptances of the Plan; and (ii) the expeditious confirmation of the Plan.

Any objection to the Plan filed in the Chapter 11 case by a member of a class of claims or interests could either prevent confirmation of the Plan or delay such confirmation significantly.

Because the success of the Plan is based solely upon contribution of New Value prior to Confirmation of the Plan and is not related to Ellipso's business operations, there are no other risk factors to consider in voting to accept or reject the Plan.

## X. **PLAN CONFIRMATION**

### A. **Classes Entitled To Vote.**

Only Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan. Generally, Section 1124 of the Bankruptcy Code provides that a class of claims or interests is impaired under a plan of reorganization unless the plan does not alter the legal, equitable and contractual rights of the holder of such claim or interest in the debtor.  In addition, such classes are impaired unless all outstanding defaults, other than defaults relating to the insolvency or financial condition of the Debtor or the commencement of this bankruptcy case have been cured and the holders of claims or interests in such classes have been compensated for any damages incurred as a result of any reasonable reliance by such holders on any contractual provisions or applicable law to demand accelerated payment.  Class 3 is impaired under the Plan. Only the votes of creditors in Class 3 will be solicited. Class 4 is deemed not to have accepted the Plan. If your Claim falls within Class 3, you will be requested to return your Ballot indicating your acceptance or rejection of the Plan at such time as the Court has conditionally approved this Disclosure Statement.

**B.**   **Confirmation Standards.**

In order for the Plan to be confirmed the Bankruptcy Court must determine that the plan is feasible and the need for further reorganization or a subsequent liquidation of Ellipso following confirmation is unlikely. The Plan is clearly feasible because it calls for the deposit of at least $600,000 into escrow prior to confirmation and because all bidders will have to show that they are financially qualified. Further, the success of the Plan does not depend in any way on Ellipso's performance after confirmation. And given that Ellipso's unsecured debts would be discharged to the extent that they are not paid under the Plan, and that Ellipso has no secured debts, it is unlikely that there would be any need for further reorganization or a subsequent liquidation.

## XI.  TAX CONSEQUENCES

As of the Petition Date, Ellipso had no outstanding federal tax obligations. If the Court determines that the Debtor owes sales and use taxes to the District of Columbia, such taxes will be paid in full under the Plan. All postpetition obligations and filings are current. Confirmation of the Plan is not expected to generate any adverse tax consequences to the Debtor. The Plan's distribution to creditors may have a tax consequence to creditors receiving a distribution. All creditors are urged to consult with a qualified professional to determine the income tax consequences, if any, of the Plan.

## XII. DISCLAIMERS

**THIS DISCLOSURE STATEMENT MAY NOT BE USED FOR ANY PURPOSE OTHER THAN TO SOLICIT ACCEPTANCE OR REJECTION OF THE PLAN. NO REPRESENTATIONS CONCERNING ELLIPSO, INC., PARTICULARLY AS TO FUTURE INCOME, BUSINESS AFFAIRS, TAX CONSEQUENCES, OR VALUE OF PROPERTY, OTHER THAN AS SET FORTH IN THIS STATEMENT, ARE AUTHORIZED BY GATE OR APPROVED BY THE BANKRUPTCY COURT.  NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING**

INVOLVING ELLIPSO, INC. OR ANY OTHER PARTY, OR DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON CLAIMS OR INTEREST HOLDERS.

THE INFORMATION AND DATA CONTAINED IN THIS STATEMENT HAVE BEEN SUPPLIED BY ELLIPSO, INC. ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT ACCURATE INFORMATION, NO WARRANTY AS TO ITS ACCURACY IS GIVEN OR SHOULD BE IMPLIED.

ANY REPRESENTATION MADE BY ANY PARTY, WHETHER INTERESTED OR NOT, TO SECURE AN ACCEPTANCE OR REJECTION OF THE ATTACHED PLAN, OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, IS UNAUTHORIZED AND UNLAWFUL. THIS DISCLOSURE STATEMENT MAY NOT BE USED FOR ANY PURPOSE OTHER THAN TO SOLICIT ACCEPTANCE OR REJECTION OF THE PLAN. NO REPRESENTATIONS CONCERNING ELLIPSO, INC., PARTICULARLY AS TO FUTURE INCOME, BUSINESS AFFAIRS, OR VALUE OF PROPERTY, OTHER THAN AS SET FORTH IN THIS STATEMENT, ARE AUTHORIZED BY ELLIPSO OR APPROVED BY THE BANKRUPTCY COURT.

THE TRANSACTIONS CONTEMPLATED IN THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY COURT OR GOVERNMENTAL AUTHORITY, NOR HAS ANY COURT OR GOVERNMENTAL AUTHORITY PASSED UPON THE FAIRNESS OR MERITS OF SUCH TRANSACTIONS OR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. CREDITORS AND EQUITY SECURITY HOLDERS ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY AND TO CONSULT WITH THEIR OWN LEGAL AND FINANCIAL ADVISORS IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

## XIII.   CONCLUSION

Ellipso urges all creditors to accept the Plan since the Plan will provide an opportunity for creditors

to receive at least as much as, if not more than, they would receive in a liquidation under Chapter 7 of the

Bankruptcy Code or any other known alternative.

Date: August 28, 2009                          Respectfully submitted,


                                               _____/s/ Kermit A. Rosenberg_____
                                               Kermit A. Rosenberg (D.C. Bar No. 219089)
                                               Neal Goldfarb (D.C. Bar No. 337881)
                                               Butzel Long Tighe Patton, PLLC
                                               1747 Pennsylvania Avenue, N.W.
                                               Suite 300
                                               Washington, D.C. 20006-4604
                                               Telephone: 202.454.2800
                                               Facsimile:  202.454.2805

                                               *Attorneys for Debtor*