UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Ellipso, Inc. | ) | Case No. 05-15407-PM |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**OBJECTION TO DEBTOR ELLIPSO, INC.'S
SECOND AMENDED DISCLOSURE STATEMENT**

COME NOW Mann Technologies, LLC, creditor in the above-captioned bankruptcy case, by and through its counsel, and files this objection to the approval of the Disclosure Statement filed by the Debtor, and in support hereof state the following:

1. The approval of a disclosure statement is governed by 11 U.S.C. §1125(a), which requires that post-petition disclosure provide adequate information. Adequate information is defined as:

   "…information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information;…"

1

2. In its 10/6/09 Order to File Amended Plans, this Court admonished Debtor to provide "full and accurate disclosure" that would allow creditors to evaluate the risk, which the Court found to be "…risk akin to evaluating an IPO…"

3. The Disclosure Statement fails to comply with the statutory requirement because it both lacks necessary information on numerous key issues critical to a hypothetical reasonable investor, and contains material omissions and misrepresentations that call into question whether or not the Plan is made in good faith. Together, these problems will prevent creditors from making the informed judgment about the Debtor's plan, or the alternatives, as anticipated by statute, the bankruptcy rules or this Court's admonition.

4. The Disclosure Statement lists the patent assets held in Debtor's subsidiaries MCHI and Virtual Geo, but disingenuously asserts that their value or their marketability is "speculative" and therefore assigns them a collective value of $2.00. To justify this "value", the Disclosure Statement lamely suggests that any prospective purchaser would "be unlikely to make an upfront payment of more that a very small fraction of the patents' potential value"[1], presumably the basis for Castiel's $600,000 bid.

5. The Debtor recounts that "Ellipso, together with its subsidiaries, continued over time to seek outside investment and to exploit the value of the patents held by its subsidiaries ... However, these efforts were unsuccessful."[2] Since the Debtor admits to retaining several professionals to pursue investment in Debtor and its subsidiaries, it is reasonable to expect that valuations, business projections, and offers/rejections have been exchanged. On information and belief, Debtor has rejected several proposals in the

---

[1] See Debtor's Second Amended Disclosure Statement pg. 9.
[2] See Debtor's Second Amended Disclosure Statement pg. 3

months preceding the filing of bankruptcy that <u>greatly exceed</u> the $600,000 valuation of the proposed plan. The creditors cannot reasonably evaluate the Debtor's proposed plan without access to these proposals, the underlying evaluations, and the reasons that such offers were not accepted or withdrawn.

6. Neither the Plan nor the Disclosure Statement contain adequate disclosures concerning any claims that the Debtor's subsidiaries may have. For example, Debtor states that two of its subsidiaries, MCHI and Virtual Geo, have entered into "tolling agreements" with Lerman Senter LLC regarding unliquidated claims[3] that each subsidiary asserts against Lerman Senter LLC. Since the Lerman Senter claim against Debtor appears to be based on Debtor's guarantee of obligations of the subsidiaries, it is important for the other creditors to understand the nature and amount of the subsidiaries' claims, and the terms of these "tolling" agreements. Since such agreements with Debtor's subsidiaries, in which are located most, if not all, of Debtor's assets, it is particularly important that all such agreements be made available to all of the creditors and to the US Trustee to ensure that all creditors are treated fairly and equitably, as required.

7. Neither the Plan nor the Disclosure Statement contain adequate disclosures concerning litigation in which the Debtor has been involved and still is involved:

   a. The Second Amended Disclosure Statement finally, albeit belatedly, discloses that <u>additional</u> cash proceeds were received from the ICO settlement but <u>fails to disclose</u> where such cash proceeds were expended in June 2008.

---

[3] MannTech has no reason to believe that Debtor's assertions of claims against Lerman-Senter are anything more that Castiel's "business as usual" tactic of suing parties to whom he, or one of his alter ego companies, owes money.

b. The Disclosure Statement misrepresents the status of the current litigation with Mann Technologies, LLC and John B. Mann and fails to disclose significant findings of the District Court regarding the nefarious conduct of Debtor and its owner and CEO, David Castiel.  In particular, the Disclosure Statement does not disclose the District Court's finding that Ellipso, acting through David Castiel, its chief executive and the proposed manager of the reorganized Debtor, filed and prosecuted its lawsuit in bad faith[4] with the purpose of harassing and vexing Mann and Mann Technologies, the defendants. The fact that the plan proponent and intended recipient of the Debtor's assets has misrepresented essential material facts in that litigation, both before the District Court and the US Court of Appeals, is vital to any understanding creditors may reach concerning their willingness to accept Debtor's representations, or to invest in the reorganization. Disclosure of such conduct by the only individual disclosed to be involved in consummating the Plan would be required in any financial disclosure in connection with an investment in the Debtor, and the concealment of such pertinent information from creditors/investors renders the Second Amended Disclosure Statement inadequate.

c. Similarly, the description of the TRSC arbitration is grossly incomplete and misleading.  The Disclosure Statement fails to state the finding of the arbitrator that Castiel defrauded TRSC by concealing more than six hundred thousand

---

[4] On January 29th, 2009, Chief Judge Royce Lamberth ruled that: "… Ellipso instituted its lawsuit in bad faith, misrepresented the critical fact upon which the litigation turned, and continued to pursue vexatious claims even in the absence of any damages…"
Chief Judge Royce Lamberth further noted that Ellipso, and its Chief Executive Officer, David Castiel, "… misrepresented the critical fact upon which the litigation turned.  This misrepresentation alone constitutes bad faith." Judge Lamberth continued, noting, "This false and misleading argument not only occurred in discovery, but also before this court and in the Court of Appeals."

4

dollars ($600,000.00) in revenues from TRSC. Again, such conduct by the Plan's proponent must be disclosed to permit creditors to make an informed evaluation of the proposal propounded by an insider.

d. The Disclosure Statement wholly fails to give an adequate or realistic description of the likelihood for future litigation against David Castiel personally. The Debtor itself may have substantial causes of action against Castiel for indemnification arising from the litigation described above, since Castiel was found to have acted in bad faith personally in the Mann litigation and since his own actions led to the finding of fraud in the TRSC arbitration. There likely are other substantial and valuable claims the Debtor has against Castiel. Castiel has received in excess of $2 million personally from the Debtor in the years prior to the bankruptcy case, <u>at a time when the company's financial position was insolvent</u>, and he was engaging in litigation that ultimately led to judgments against the Debtor. One of the principal assets of this Debtor is its ability to proceed against Castiel in order to recover funds which should be turned over to the estate. Although the Disclosure Statement acknowledges these potential claims and the fact that Castiel would be in an irreconcilable conflict with the need to prosecute them, they are misleadingly characterized as mere unsubstantiated "allegations" by certain creditors. This ignores Judge Royce Lamberth's factual findings that Ellipso <u>brought</u> and <u>maintained</u> its actions in bad faith, that Ellipso's lawsuit was "meritless" and that Debtor Ellipso and its CEO David Castiel lied to the Court and the Court of Appeals.

5

8. The Plan and Disclosure Statement do not discuss the impact of the potentially non-dischargeable claims of creditors John Mann, Mann Technologies LLC, and Robert Patterson. To the extent that Debtor was involved in racketeering, committed direct fraud, and inflicted personal injury to these parties, their claims may not be dischargeable under the Plan.

9. There is good reason to believe that Debtor's Plan is filed in abundant bad faith, since the only "new value" to the creditors is a "Letter of Intent submitted by the Purchaser"[5] from David Castiel, the Debtor's CEO, controlling shareholder, and sole officer. As described above, Castiel's receipt of moneys from the Debtor prior to this case bears signs of impropriety, and whatever personal holdings he intends to use to fund the Debtor may well consist of moneys inappropriately removed from Ellipso. At the very least, these circumstances suggest that he should disclose the source of the funds in this Disclosure Statement so that creditors can make a reasoned assessment whether the funds are derived from an appropriate source. Obviously, to allow Castiel to purchase his equity in the Debtor with money subject to claw backs and/or other avoidance actions by the Debtor would be grossly inequitable.

10. In an apparent attempt to deal with the knotty issue of use of funds from avoidable transfers, the Disclosure Statement asserts, *"The Purchaser will form a new entity to contribute the $600,000 in new value, none of which will be contributed by Dr. Castiel."* If this is so, who is providing the LOI? David Castiel signs it, but it is oddly

---

[5] Debtor's Second Amended Disclosure Statement @ pg. 2

6

characterized to be an <u>intention</u> of a <u>future</u>, <u>unnamed</u> assignee![6] Sounds like laundering of the creditor's money.

11. The Second Amended Plan and Second Amended Disclosure Statement submitted in belatedly acknowledge that an offer to pay a higher value was already available to the Debtor when the Debtor's First Plan and Disclosure were filed. John Page, a former employee of the company, indicated prior to the filing of this case that he was prepared to invest more than the $600,000.00 offered by Castiel for the company's equity in the Debtor's plan. Debtor's initial failure to reveal the real investment available to the Debtor, and Debtor's fatuous logic for failing to reveal it shows that Debtor's Plan continues to withhold information –<u>available only to insider Castiel</u>- to any investor who might wish to evaluate the appropriateness of the Debtor's $600,000.00 offer or any alternatives.

12. Likewise, Debtor reveals a business pro-forma that flatly contradicts their past assertion that the proprietary elliptical satellite constellation would require $2.3 Billion, and admits that they possessed plans to implement it at one/third the previously stated cost!

13. Continuing its tactic of dribbling out financial information about Debtor's subsidiaries, the Second Amended Disclosure Statement and Plan reveals, *for the first time*, an additional $ 365,000 in liabilities by its MCHI subsidiary. One can only imagine what their *Third* Amended Disclosure Statement will reveal.

14. In a belated attempt to provide "full" financial disclosure, Debtor's latest disclosure statement has finally provided, in Exhibits B, C and D, what it characterizes as the "Unaudited consolidated financial statements of Debtor and its subsidiaries",

---

[6] How is it that this "LOI" is dated the day after it is filed?

presumably to meet the disclosure requirements of 11 U.S.C. §1125(a).  But these are decidedly <u>not</u> proper financial statements, instead they appear to be spreadsheet pro-formas, unmarked as being either assembled or compiled by any bookkeeper or accountant, and without any descriptive or explanatory footnotes or accompanying notes.

15. Perhaps in recognition of the continuing inadequacy of financial disclosure of their Second Amended Disclosure Statement, Debtor has now (October 13, 2009) provided a CD containing i) Debtor's tax returns for 2002-2007, ii) Financial Statements for Debtor for 1999- 2008, iii) Board Minutes for six (6) meetings from 2003-2007, iv) Virtual Geo LLC Manager's Minutes for nine (9) Board meetings from 2001 through 2007 and v) Castiel's 1099s for 2006, 2007, 2008.  As with all of its previous last ditch efforts at disclosure, documents provided by Debtor raise disturbing issues of commission and omission, including:

   a. No financial statements provided are audited.  The 1999-2004 statements for Debtor (and the 2005 statements for Virtual Geo LLC) are naked "compilations", provided <u>without</u> the accompanying <u>Accountant's Compilation Report</u> referenced in each, and bearing the disclaimer:

   > "A compilation is limited to presenting in the form of financial statements information that is the representation of management.  We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.
   >
   > Management has elected to omit substantially all of the disclosures and the statements of cash flows required by U.S. generally accepted accounting principles.  ***<u>If the omitted disclosures and statements of cash flows were included in the financial statements, they might influence the user's conclusions about the Company's financial position, results of operations, and cash flows.</u>***  Accordingly, these financial statements are not designed for those who are not informed about such matters. (Emphasis added)

8

There is therefore nothing in even the best of these statements that satisfy the disclosure requirements.

b.  No "financial statement" Debtor provides for 2006-2008 is anything other than a spreadsheet, without accompanying notes, and with no indication of the assembler or author.  Moreover, since the *metadata* accompanying each such file shows it was a worksheet produced by David Castiel on February 28, 2008 or August 10, 2009, it seems that these represent the <u>sole creation</u> of the Debtor's CEO, David Castiel.  Castiel lonely representations, by virtue of previous findings of the District Court, are not credible.

c.  Ellipso's Board Minutes are few, incomplete, and do not support Castiel's compensation claims or his implicit claim that he was authorized to sell virtually all the assets of the Debtor.

d.  Virtual Geo LLC's Managers Minutes are likewise skimpy, and the *metadata* shows them to be produced by David Castiel in Microsoft Word.  Since many of the minutes are signed by Mr. Helman in an electronic signature, they are of questionable authenticity.

e.  The tax returns and financial statements that are provided are incomplete and improper, but <u>do</u> reveal that a $10-12 million asset of Debtor has not been disclosed, nor has a $10-12 million liability of one of its subsidiaries.

f.  Castiel's 1099s do not agree with the compensation provided in his Proof of Claim.

These are just the most glaring errors and inconsistencies that emerge from a cursory review of "Castiel's latest truth".

16. Even the most cursory review of this last minute financial information – not provided in the Second Amended Disclosure Statement – reveals that the financial data is not even remotely complete or credible. Debtor's counsel cannot make a silk purse of this "sow's ear" information that Debtor has finally provided.

WHEREFORE, it is prayed that this Honorable Court enter an Order denying the approval of the Debtor's Disclosure Statement and grant such other and further relief as is just.

Respectfully submitted,

_____/s/_____
Ronald B. Patterson, Esq.
D.C. Bar No. 224915
P.O. Box 1756
Alexandria, VA. 22313
 (571) 274-0782

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2009, true copies of the foregoing Opposition were served upon the following by first class mail, postage prepaid:

Kermit A. Rosenberg, Esquire
Neal Goldfarb, No. 337881
Butzel Long Tighe Patton, PLLC
1747 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20006-4604
*Attorneys for Debtor Ellipso, Inc.*

Martha L. Davis, Esquire
Office of the United States Trustee
115 S. Union Street, Room 210
Alexandria, VA 22314

Ellipso, Inc.
4410 Massachusetts Ave., NW
Suite 385
Washington DC 20016

_____/s/_____
Ronald B. Patterson, Esq.
D.C. Bar No.  224915
P.O. Box 1756
Alexandria, VA. 22313
 (571) 274-0782