UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| In re. | ) | Case No. 09-00148 |
| | ) | (Chapter 11) |
| ELLIPSO, INC. | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

FILED
OCT 26 2009
Clerk, U.S. District and
Bankruptcy Courts

## RESPONSE OF DAVID CASTIEL TO OBJECTION TO HIS CLAIM BY JOHN PAGE

David Castiel hereby submits this Response to the Objection filed by John Page (Page) on September 23, 2009, to my claim submitted on July 13, 2009.

I. <u>Allegation of Improper Disposition of Assets.</u>

1. Page alleges that I caused Mobile Communications Holdings, Inc. (MCHI), a subsidiary of Ellipso, the Debtor, to fraudulently conceal MCHI's ownership of valuable stock during a period in which MCHI was in bankruptcy. Page further alleges that after MCHI emerged from bankruptcy, I caused that stock to be secretly and improperly transferred to Ellipso, and then into a personal account of mine. These allegations are totally false and unsupported by any evidence.

2. Page has no personal knowledge to substantiate his wild allegations since he was not associated with any of the Debtor's entities during the period his claimed improprieties were supposed to have occurred. Page cites no documents or other evidence whatsoever to substantiate his outrageous contentions and defamation of my character.

3. The true facts, which are verifiable from the Debtor's records, are these: In 2001, Ellipso, which had been the sole owner of MCHI, sold a portion of its equity in

MCHI to ICO Global (ICO), a company owned by Craig McCaw and Bill Gates. As consideration, Ellipso, through its wholly owned subsidiary EPH, Inc., was to receive ICO stock sometime in 2001 and 2002. After obtaining *pro forma* approval from the Federal Communications Commission (FCC) for this transaction, ICO erroneously issued its stock to MCHI rather than EPH/Ellipso. Since Ellipso had sold a part of MCHI to ICO, the seller Ellipso was entitled to the proceeds from the sale, not MCHI, a part of which was being acquired by ICO. This is particularly obvious because in the second part of the Ellipso/ICO deal scheduled to take place three years later, ICO was to become the sole owner of MCHI.

4. In mid-2003, MCHI became illiquid and sought bankruptcy protection. This situation was resolved quickly. MCHI emerged from bankruptcy a mere three months later.

5. During that bankruptcy, MCHI did not report the ICO stock as an asset because that stock did not in fact belong to MCHI. Moreover, the ICO stock was not then a liquid asset that could have been converted to cash to help MCHI emerge from bankruptcy.

6. In 2004, under these circumstances Ellipso requested ICO to transfer to Ellipso the stock erroneously issued to MCHI. ICO agreed that a mistake had occurred and by a *pro forma* transfer gave the stock to Ellipso.

7. All the transferred stock remained in a bank account owned by Ellipso until it was eventually liquidated to meet the needs of the business, including paying Page's salary and perks.

8. No stock was ever transferred to my benefit and every share is accounted for in Ellipso's bank account statements. Nor were any of the events surrounding the ICO stock intentionally concealed from Ellipso's Board or its shareholders.

9. Ellipso's bank statements, which Page has had access to, provide the proof that no stock or other asset is or has been missing. Ellipso's business records also prove that all corporate funds have been used for business purposes and never improperly transferred to me.

II. <u>Allegation of Improper Compensation.</u>

10. My claim is based on my efforts on behalf of the Debtor using my experience and relationships as founder of the Company and chief designer of its patented systems.

11. I oversaw the development of the Company and caused it to raise over $850,000,000. Close to $100,000,000 of this sum was actually received by the Company and disbursed in the course of activities related to the construction of a satellite system know as the Ellipso system. In addition, Boeing offered to acquire 73% of the Company in May 1999 for $750,000,000. The Boeing deal was undone following the bankruptcy of Iridium, another key player in the telecommunications satellite industry.

12. Under my leadership the Debtor obtained valuable patents (23 including those issued to its subsidiaries), three major FCC licenses, and other important domestic and international licenses.

13. As a result it is not surprising that compensation to the key officers at that time reached levels commensurate with their achievements.

3

14. In 1998 my salary was voted by the full Board at $384,000 per year with 5 to 10% yearly adjustments.

15. The full Board was then comprised of:

    a. Mr. Michael Taylor, a principal at HarborVest then a $12 billion fund,

    b. Mr. Charles Bigot, Chairman of Arianespace, the leading private satellite launch provider in the world,

    c. Mr. Jacob Weiss, General Counsel for IAI, Israel's largest company and a defense powerhouse,

    d. Mr. Doug Mullins, principal at Venture First, an earlier backer of the venture, and

    e. myself

16. The Board was later in 1999, 2000 and 2001 enlarged to include:

    a. Honorable Richard Burt, former Ambassador to Germany and Chief Arms Negotiator for the SALT II Treaty,

    b. Honorable F. Whitten Peters, former Secretary of the Air Force, and

    c. Honorable Admiral David Oliver, former Principal Deputy Under Secretary of Defense for Acquisition, Technology, and Logistics.

17. Sometime in 2003, the Debtor was no longer in a position to meet its salary obligations to me and other executives.

18. In order for the activities to continue, especially the prosecution of the Virtual Geo license with the FCC, a license which was subsequently awarded in significant measure through my efforts and the approval of compatible international standards in the ITU, the Debtor's Board of Directors decided to

accrue salaries, plus bonuses equal to the deferred compensation, the sum of which would be paid if, and only if (and when), the Debtor would have the necessary resources. I regarded this compensation agreement as recognition that the time and personal capital and the risks I took on behalf of the Debtor, were of substantial benefit to the Debtor and merited compensation.

19. Nothing in the Board resolution, attached to my Statement of Claim, indicates a waiver in case of bankruptcy, or in any other case

20. I received payments from the Debtor from time to time, in proportion I believe to payments made to other similarly situated executives when funds were available and in accordance with other compensation decisions made and ratified by the Board.

21. A compendium of all paid and deferred compensation on the basis of that agreement approved by the Board was provided in my Statement of Claim.

22. For purposes of comparison, my income resulting strictly from running the operations of the Company, as verified by the corporate tax records, between 1997 (date of the first license and major investment into the company) and 2003 was as follows:

| Year | Amount |
|---|---|
| 1997 | $415,000 |
| 1998 | $465,606 |
| 1999 | $857,709 |
| 2000 | $479,590 |
| 2001 | $360,442 |
| 2002 | $384,515 |
| 2003 | Deferred in full |

23. I am aware that my deferred compensation will be part of all unsecured debt and I would thus receive a fraction of said deferments even in the best possible case.

24. Only the Debtor's Board is fully cognizant of the services it decided to reward as deferred compensation, including bonuses. Page is not and has never been a member of the Board. As a result he is not qualified to evaluate its decisions.

25. The Debtor, through its attorneys, has not indicated any objection to my claim. Instead, the Debtor has suggested the appointment of an independent auditor, the Plan Agent, specifically to consider the claims of insiders, such as myself and Page.

III. <u>Conclusion and Prayer for Sanctions</u>

1. The Debtor's current financial problems have two fundamental causes: (1) the worldwide collapse of the telecommunications satellite industry, and (2) massive litigation against the Debtor designed to steal its assets. Page's actions in this bankruptcy proceeding are yet another part of this seemingly endless litigation.

2. I incorporate herein by reference my Objection to Page's claim filed October 14, 2009, which describes his role in the litigation against Ellipso.

3. Page knows of the proposed appointment of Mr. Wexler as Plan Agent to deal with employment and compensation issues specifically.

4. Page's Objections to my Claim and to those of Ambassador Helman and Ms. Laury Blakley, filed the same day, represent unjustified workload for this Court and are solely intended to harass Ellipso and us.

5. Page's Objection thus must be denied and Page should be sanctioned for his knowingly meritless allegations and total misuse of the Court's limited time and resources.

Respectfully submitted

_____
David Castiel

October 26, 2009

## CERTIFICATE OF SERVICE

I hereby verify that on October 26, 2009, true copies of the foregoing

**RESPONSE OF DAVID CASTIEL TO OBJECTION TO HIS CLAIM BY JOHN PAGE** were delivered by hand to the court and upon the following by first class mail, postage prepaid:

John H. Page
1077 30th Street, NW #411
Washington, DC 20007

Kermit Rosenberg, Esq.
Butzel Long Tighe Patton, PLLC
1747 Pennsylvania Avenue NW 3rd Floor
Washington DC 20006-4604

Martha Davis, Esq.
Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA 22314

_____
David Castiel