**The Memorandum Decision below is signed.  It is not intended for publication in West's Bankruptcy Reporter.  Dated: February 7, 2011.**

*S. Martin Teel, Jr.*

**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re | ) |
| | ) |
| ELLIPSO, INC., | )   Case No. 09-00148 |
| | )   (Chapter 11) |
| Debtor. | ) |

MEMORANDUM DECISION RE OBJECTIONS TO THE CLAIM OF DAVID CASTIEL

This addresses the objections of John H. Page, Mann Technologies, LLC, John Mann, and Robert Patterson to the claim of David Castiel and represents the court's findings of facts and conclusions of law.  For the reasons that follow, I will uphold in part and overrule in part the objections.


I

On February 25, 2009, the debtor commenced the above-captioned case under Chapter 11 of the Bankruptcy Code, and on July 13, 2009, David Castiel, the debtor's president and CEO, filed an initial proof of claim seeking $3,227,000.84 in deferred compensation, bonuses, and unreimbursed expenses.  Thereafter, creditor John Page and creditors John Mann, Robert Patterson, and Mann Technologies filed objections to Castiel's proof of claim.

Castiel subsequently amended his proof of claim and the court
held hearings on the objections for several days in March and
April of 2010.  During the course of the hearings Castiel filed a
third amended proof of claim seeking $3,238,654.54.  At the
hearing on the objections the evidence was as follows.

In the early 1990's David Castiel formed MCHI, the debtor's
predecessor, for the purpose of creating a satellite telephone
system, ultimately raising tens of millions of dollars and
beginning construction on satellites to place into orbit.  As
founder of the company, Castiel has been employed pursuant to an
employment contract with MCHI and/or its related entities since
their inception as president and CEO, earning various salaries
throughout his tenure.  In the spring of 1998, Castiel
established Ellipso, the debtor, for the purpose of acquiring
MCHI and retaining it as a subsidiary.  Pursuant to that
transaction, Ellipso assumed MCHI's obligations, including
Castiel's employment contract.[1]  MCHI, however, continued to pay
Castiel's salary through 2003.

In 2001, after 10 years as a growing, successful enterprise,
Ellipso began to experience financial problems as a result of a

---

[1]  Castiel also testified that he had entered into a
separate employment contract directly with Ellipso, but that he
was unable to locate the contract to produce at the hearing.
None of the parties objected to Castiel's testimony regarding
both the merger agreement or the employment agreement
notwithstanding his failure to produce either document into
evidence at the hearing.

2

general shift in the telecommunications industry from satellite-
based telephone systems to cellular systems.  This shift resulted
in cash flow issues for the debtor, and at a March 2001 Board
meeting, Castiel informed Ellipso's Board that the company had
only enough money for 2 more months of expenditures.  Castiel Ex.
D.  In order to help the company through these difficult times,
certain employees, including Castiel, agreed to defer their
salaries.  Castiel Ex. D.  As a reward to those employees
agreeing to defer their salary, Castiel recommended that the
Board grant those employees a bonus, "provided the Corporation's
finances improved sufficiently."  The minutes, however, do not
reflect that the Board acted upon Castiel's recommendation at
that time.  Ellipso continued to experience cash flow problems
through the remainder of 2001, and into 2002 and 2003, with
employees, including Castiel, continuing to defer portions of
their salaries and with Castiel receiving no salary for 2003.
Castiel Ex. V.

    In late 2003, after the debtor's prospects for launching a
satellite telephone system into orbit appeared dim, Ellipso began
to shift the focus of its business towards the sale of vanity
phone numbers and 1-800-type service under two digits it had been
assigned under the 881 country code by the International
Telecommunications Union for its anticipated satellite system.
Towards this end, Robert Patterson, an Ellipso consultant,

3

introduced Castiel to John Mann, a former MCI engineer, and they decided to enter into two business arrangements.  Under the first, John Mann agreed to lend Ellipso $90,000 through a company he formed named Mann Technologies, LLC.  Ellipso and Mann Tech memorialized this understanding, executing a non-recourse loan agreement and providing Mann Tech with 492,611 shares of ICO Global Communications Holding Ltd. stock as collateral for the loan.  Under the second arrangement, Castiel and Mann agreed to develop an 881 vanity phone number service with The Registry Solutions Company (TRSC), another Mann-formed enterprise, working to locate purchasers for the numbers and developing the 881 registry.

In December 2003, in anticipation of future revenues stemming from the 881 service, the Ellipso Board adopted a "Commission/Bonus Pay from 881 Revenues."  Castiel Ex. E.  The key terms of that compensation plan were as follows: (1) upon receiving sufficient proceeds from the 881 service all salaries were to resume at the current rate; (2) all bonuses due to employees per past Board resolutions were to be paid in full, including stock bonuses and stock options; and (3) a commission structure was established providing for a certain percentage of 881 revenues to go into a commission pool and a certain percentage of that commission pool to be used to (x) "reward employees who deferred salaries in proportion of the amount

4

deferred since October 2002, date of the active beginning of the 881 project" and (y) to pay employees "in direct proportion of the salaries paid to employees in the 881 project . . . ." In approving the 881 compensation plan, however, the Board resolved that 881 revenues had to be "first allocated to paying company's obligations, including on-going operational expenditures necessary to support the 881 service." This limitation was echoed in the compensation plan itself which provided that "the commission shall be distributed monthly, funds permitting: i.e., after all obligations, debt, reserves and other liabilities of the Company having been met . . . ."

Eventually, the relationship between Mann and Castiel soured and litigation related to both business arrangements ensued. First, relating to the loan, Ellipso defaulted under the loan agreement with Mann Tech, and Mann Tech foreclosed on the ICO shares. Ellipso then brought suit against Mann, Mann Tech, and Robert Patterson, seeking to recover the foreclosed stock on the basis that Robert Patterson, who had arranged the financing between Ellipso and Mann Technologies, had failed to disclose an ownership interest he held in Mann Tech. Ultimately, after extensive litigation in the District Court, Mann Tech prevailed on the action and retained possession of the foreclosed shares. After receiving judgment in its favor, Mann Tech then moved the District Court for attorney's fees under theories of bad faith

and a fee shifting provision in the loan agreement.  In a
memorandum opinion dated January 29, 2009, Chief Judge Lamberth
awarded Mann Tech $201,314.04 in attorney's fees based on both
grounds.  Second, litigation also ensued between Ellipso and TRSC
under the 881 business arrangement when Ellipso filed suit in the
District Court against TRSC seeking to void the December 2003
agreement between them based on TRSC's alleged failure to pay
certain fees over to Ellipso and failure to disclose Patterson's
interest in the company.  The case was ultimately referred to
arbitration and TRSC was awarded $162,335.45 in damages.

Also while Ellipso was developing its 881 business, there
were ongoing activities in Mobile Communications Holdings, Inc.
(MCHI), an Ellipso subsidiary.  On July 12, 2002, Ellipso entered
into a stock purchase agreement with ICO Global Communications
for the sale of ESBH, Inc., a newly formed entity wholly owned by
MCHI.  Page Ex. 26.  Pursuant to that agreement, ICO was to pay
$425,000 in cash to Ellipso Private Holdings, a company holding
Ellipso shares, and transfer 1,571,547 of ICO Class A Common
Stock and 46,500 shares of ICO Class B Common Stock to MCHI in
exchange for shares of ESBH held by MCHI.  Page Ex. 26.  MCHI
ended up subsequently declaring bankruptcy in this court but did
not include among its scheduled assets the ICO shares.  At the
hearing, Castiel, who signed the MCHI schedules, testified that
the shares were not scheduled because ICO had erroneously issued

the shares to MCHI rather than Ellipso Private Holdings/Ellipso. Accordingly, they were not listed as assets of MCHI and in 2004 Ellipso had ICO execute a pro forma transfer of the shares from MCHI to Ellipso.

II

In objecting to Castiel's proof of claim, the creditors have raised several bases for denying Castiel's claim in its entirety and as well as several objections to specific portions of his claim.  Before reaching the arguments for denying the claim in its entirety, I will first evaluate Castiel's claim on the basis of the documentation he presented and the creditors' objections to specific portions of his claim.  After having arrived at a baseline figure for the claim, I will then address the creditors' arguments for denying the claim in its entirety to decide what if any adjustment to the baseline claim is appropriate.

A

In his proof of claim, Castiel claims $3,238,654.54, which consists of $1,431,782 in unpaid salary, $1,803,706 in deferral bonus, and $3,166 in unreimbursed expenses/advances.  I will address each part of the claim in turn.

1

For the unpaid salary portion of his claim, Castiel started from a base salary of $480,000 per year and subtracted from that amount the salary he actually received.  The first issue to address, then, is whether $480,000 was in fact Castiel's baseline salary.

Under Federal Rule of Bankruptcy Procedure 3001(f), "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."  A party in interest objecting to the claim, however, can overcome the prima facie validity of the claim by introducing some evidence that calls into question the viability of the claim, at which point the creditor filing the proof of claim must carry the ultimate burden of proving its entitlement to the claim.  *See In re Stancil*, 2005 WL 3036647, at *43 (Bankr. D.D.C. Nov. 7, 2005).  Moreover, when the claimant is an insider, he must further demonstrate the reasonableness of the claim.  11 U.S.C. § 502(b)(4); *see also In re Siller*, 427 B.R. 872, 881 (Bankr. E.D. Cal. 2010) (holding that the burden of proving reasonableness on an insider claim rests with the claimant).  Indeed, Castiel's claim must be "subjected to rigorous scrutiny" and his burden is "not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."

*Pepper v. Litton*, 308 U.S. 295, 306 (1939).  Regarding Castiel's salary claim, this leads the court to a two-step analysis: first, what was Castiel's salary, and second, was that salary reasonable?

Regarding the amount of the salary, the first issue is whether the objecting creditors have overcome the prima facie validity afforded the claim under Rule 3001(f).  To overcome the presumption, the creditors rely on the absence of a board resolution authorizing a salary of $480,000. Particularly, the objecting creditors note that the last resolution authorizing Castiel's salary was from 1994 at $240,000.  This is sufficient to overcome the prima facie validity as to the amount of Castiel's salary and, accordingly, Castiel bears the ultimate burden of proving his entitlement to a salary of $480,000 per year for the claim period.

At the hearing on the objection, Castiel presented several pieces of evidence in support of his claimed salary.  First, Castiel presented Ellipso Board minutes from 1992 up until 2001.  These minutes reflect that as early as November 1992 Castiel was earning $150,000 per year, which was thereafter increased to $210,000.  Castiel Ex. B.  By 1994, the minutes reflect that Castiel's salary was $240,000.  Castiel Ex. C.  Second, Castiel testified that from 1994 forward the Board provided raises in the range of 5-10% per year, culminating in $480,000 per year by

9

2000.  Third, Castiel introduced into evidence his year 2000 W2,
showing a taxable salary of $480,000.  Finally, Castiel invoked
the testimony Richard Burt, a director on Ellipso's Board, at a
hearing on an objection to Burt's claim where Burt testified that
Castiel's salary was around $500,000.[2]

Although Castiel has come forward with no resolution
explicitly authorizing his claimed $480,000 salary, Castiel's
testimony coupled with the testimony of Richard Burt and
Castiel's 2000 W2 lead me to conclude that Castiel has met his
burden and his salary was fixed and authorized at $480,000.

Having determined the amount of Castiel's authorized salary,
the next issue is whether that salary was reasonable.
Importantly, it is unsettled law whether Rule 3001(f)'s
presumption as to validity and amount applies to determinations
of reasonableness under § 502(b)(4).  *Compare In re Coates*, 292
B.R. 894, 904 (Bankr. C.D. Ill. 2003), *and In re Baker*, 49 B.R.
240 (Bankr. E.D. Pa. 1985), *with Matter of O'Conner*, 153 F.3d
258, 260-61 (5th Cir. 1998), *and In re Delta Smelting & Refining
Alaska, Inc.*, 53 B.R. 877, 883 (Bankr. D. Ak. 1985).  This court,
however, need not decide the issue because even were Castiel's
claim afforded prima facie validity as to its reasonableness

---

[2]      All the objecting creditors were in attendance at this
hearing at which Burt Testified and did not object to Castiel
bringing in this testimony at this hearing on the objection to
Castiel's claim.

under Rule 3001(f), for the reasons stated below, the objecting
parties having overcome this validity and, consequently, the
ultimate burden of persuasion rests with Castiel. *In re Siller*,
427 B.R. 872, 882 (Bankr. E.D. Cal. 2010).

Although an issue of first impression for this court, other
courts evaluating the reasonableness of insider wage claims under
§ 502(b)(4) weigh several factors: (1) the proportion of the
claimed salary to the revenues of the debtor, *In re The Heritage
Organization, L.L.C.*, 2006 WL 6508182, at *9 (Bankr. N.D. Tex.
Jan. 6, 2006); (2) the claimant's position in the company, *id.*;
(3) whether there is evidence of overreaching by the insider
claimant, *i.e.*, whether the claimant sought to "extract[]
inflated amounts for [his] services at the expense of creditors,"
*id.*; (4) whether any creditors were prejudiced as a result of the
salary, *id.*; (5) the salaries of individuals of like education,
experience, and position in the claimant's field, *id.*; and (6)
whether "the transaction carries the earmarks of an arm's length
bargain," *Pepper v. Litton*, 308 U.S. 238, 245 (1939).  I also
find relevant (7) the claimant's performance during the claim
period, (8) the degree of risk associated with the position, and
(9) the expertise/skill required of the position.

In attempting to overcome the prima facie validity afforded
Castiel's claim under Rule 3001(f), the creditors attack, in some
degree, factors 1, 4, 6, and 7.

The creditors first contend that Castiel's salary was
disproportionate to Ellipso's revenues during the claims period.
The debtor's financial statements show that from 2000-2008 a loss
of $47,868,070[3] on revenues of $5,068,506.[4]  At a rate of
$480,000, Castiel's aggregate salary through the end of 2009
would be $4,400,000, or 86% of the revenues from the claim
period.

The creditors also argued that they were prejudiced as a
result of Castiel's salary.  Particularly, the creditors contend
that Castiel's salary was part of a larger scheme to loot Ellipso
of its assets.  In support of this, the creditors presented
evidence of an unauthorized loan to Castiel from the company,
unauthorized sales of shares, the proceeds of which went to pay
Castiel's salary, the unauthorized payment of commissions from
881 revenues to Castiel, and a loan of $90,000 from Mann
Technologies to Ellipso, the proceeds of which also went to pay

---

[3]  The net income from each year are as follows: 2000,
($41,870,571) Page Ex. 9; 2001, no financial statement for year
ending; 2002, ($4,166,468) Page Ex. 11; 2003, ($2,573,979) Page
Ex. 11; 2004, ($631,360) Page Ex. 12; 2005, $639,628 Page Ex. 16;
2006, $627,174 Page Ex. 16; 2007, $466,546 Page Ex. 16; 2008,
($359,040) Page Ex. 17.  Castiel testified that the Year 2000
loss was a result of Ellipso abandoning the Ellipso system,
resulting in a large net operating loss for the year.

[4]  The revenues from each year are as follows: 2000,
$406,678 Page Ex. 9; 2001, no financial statement for year
ending; 2002, $299,300 Page Ex. 11; 2003, $267,542 Page Ex. 11;
2004, $198,944 Page Ex. 12; 2005, $1,447,820 Page Ex. 16; 2006,
$1,213,675 Page Ex. 16; 2007, $554,935 Page Ex. 16; 2008,
$679,612 Page Ex. 17.

Castiel's salary.

Third, the creditors contend that there is no evidence that Castiel's current salary is the result of an arm's length transaction.  The creditors point to the lack of a board resolution authorizing Castiel's salary at the claimed level and Castiel's failure to produce anything beyond his own testimony and a reference to Richard Burt's testimony in a separate proceeding in support of Castiel's $480,000 salary.[5]

Finally, the creditors last contend that Castiel's performance during the claim period also serves as grounds for finding his salary unreasonable.  In support of this argument, the creditors adduced evidence at the hearing of Castiel's failure to raise funds, loss of the 881 numbers, loss of the FCC spectrum license, commencing a lawsuit that the District Court found to be in bad faith resulting in $220,000 in legal fees, concealement of 881 revenues resulting in an arbitration case, and commingling of corporate and personal funds.

Taken as a whole, the aforementioned evidence is sufficient to overcome the prima facie validity as to the reasonableness of Castiel's salary.  I find particularly compelling the disproportionate share of revenues allocated to Castiel's salary

_____

[5]  Although Robert Patterson objected to Castiel's invocation of this testimony in Patterson's closing argument, his failure to object to the invocation at the time of Castiel's testimony constitutes a waiver of the objection.

13

and the absence of a board resolution authorizing his salary at the $480,000 claimed level.  Accordingly, the ultimate burden of proving reasonableness rests with Castiel.  I will now turn to the factors outlined above and evaluate the reasonableness of Castiel's claim.

Regarding the first factor--proportion of claimed salary to the revenues of the debtor--Castiel testified that his salary from 2003 through 2009 in fact only represented 38% of the revenues during the claim period.  Castiel arrives at this number, however, by only using salary received,[6] which materially understates the relevant figure in two respects.  First, the $1,742,218[7] Castiel used to derive the percentage only represents the salary paid from 2003-2009 and does not include the salary claimed.  That amount of salary Castiel claims he is due from that period is actually $2,960,000, or 65.7% of revenues.  Second, the $1,742,218 only represents the salary Castiel received during the period and does not include commissions paid to him from the 881 service of $154,923.  Adding this amount to salary paid and unpaid salary claimed brings the total compensation from 2003 to 2009 to $3,114,923, or 69.1% of revenues.

---

[6]     $1,732,223 (Salary Paid 2003-2009) / $4,505,949 (Revenues 2003-2009) = 38%.

[7]     All amounts taken from Castiel's 3rd Amended Proof of Claim, field April 30, 2010.

14

As to the second factor--Castiel's position in the company--it is undisputed that Castiel was CEO and founder of the company, was singularly or jointly responsible for developing the intellectual property owned by Ellipso, and raised substantial funding for the company in the 1990s and on a more limited basis thereafter.

The third factor--overreaching at the expense of creditors--tends to weigh in favor of the creditors.  This depends in part on the extent to which accounts payable were accumulating, and his conduct in taking salary.[8]  By at least November of 2002 Ellipso had run out of funds and Castiel had agreed to defer his salary. Page Ex. 2.  The debtor's financial statements from 2000 to 2008, meanwhile, show accounts payable of $755,624, $1,454,474, $2,265,584, $3,205,884, $3,473,335, $2,208,983, $2,030,250, $2,763,180, $4,388,116, respectively.[9]  Only in 2005 did Ellipso substantially decrease its liabilities, which, presumably, was a result of the ICO settlement.  During this same period, however, Castiel received, in comparison, salary and

---

[8]  If Castiel's services were not being charged at an appropriate market rate, there would be an issue of overreaching by charging an overly generous salary, but that is a separate factor addressed later.

[9]  Although these figures are derived from the combined balance sheets of Virtual Geo, Ellipso, and its subsidiaries, because, as Castiel testified, they were operated as one company the figures provide an accurate picture of the financial state of Ellipso during this time.

commission payments as follows:

| Year | Accounts Payable | Salary and Commissions Received |
|------|------------------|---------------------------------|
| 2000 | $755,624 | $480,000 |
| 2001 | $1,454,474 | $361,000 |
| 2002 | $2,265,584 | $385,000 |
| 2003 | $3,205,884 | -0- |
| 2004 | $3,473,335 | $175,400 |
| 2005 | $2,208,983 | $424,753 |
| 2006 | $2,030,250 | $614,294 |
| 2007 | $2,763,180 | $484,148[10] |
| 2008 | $4,388,116 | $194,996 |

Castiel is claiming entitlement to $480,000 in base salary for each of those years.  In sum, while Castiel knew the company was in trouble back in 2002, he continued to take large salary payments while failing to pay off creditors.  Castiel failed to explain why he opted to pay himself, including past owed wages in 2006 and 2007, while failing to pay the company's creditors.  Although not determinative, this at least suggests overreaching.  Nevertheless, like any other creditor, Castiel was free to refuse his services if he was not receiving payment of compensation.  The Bankruptcy Code already addresses the issue of preferences paid to insiders in 11 U.S.C. § 547.  Nevertheless, an insider ought not run up accounts payable, while drawing a salary (at the expense of other creditors), if the company's prospects of being able to pay its debts is bleak.  If Castiel had a reasonable belief that creditors would fare better if he continued Ellipso's operations, that would weigh in Castiel's favor.  There was,

---

[10]     $371,925 of which is recoupment.

16

however, no substantial likelihood that Eillipso's continuing accumulation of accounts payable would be offset by Ellipso's turning itself around.  In that circumstance, it appears that Castiel continued operations (and continued to draw a salary, thus hurting other creditors) when he should have realized that this conduct was driving the debtor deeper into debt.

Fourth, Castiel took his salary to the prejudice of his creditors.  Especially telling in this area are 2006, 2007, and 2008, when Castiel received over $1,294,068 in salary and commissions, while accounts payable ballooned from $2,030,250 to $4,388,166.

For the fifth factor--salaries of individuals of like education, experience, and position in the claimant's field-- Castiel presented no evidence.  While Castiel did testify to his level of education and what he did as CEO of Ellipso, he provided the court with no evidence as to what individuals in similar positions earned.  This factor weighs heavily against him.

Sixth, Castiel's salary fails to carry the indicia of an arm's length transaction.  Castiel introduced into evidence board minutes from 1992 and 1994 reflecting salary recommendations to the Board by the Employee Compensation Committee of $210,000 and $240,000, respectively.  Castiel presented no evidence that an independent Employee Compensation Committee authorized his claimed salary of $480,000.  Moreover, the evidence at the

17

hearing, including the board minutes and the previous testimony of Whitten Peters, leads the court to conclude that from at least 2000 on, that Ellipso's board was mostly inactive and wholly dominated by Castiel. Regardless, it was Castiel's burden to show that his $480,000 salary was the result of arm's length negotiations. He presented insufficient evidence in this regard.

The seventh factor--Castiel's performance during the claim period--although mixed, I find to tip in his favor. On the one had, Castiel faced a difficult task in navigating Ellipso through a shift in the mobile communications industry towards cellular-based phones. Castiel also appears to have worked diligently to position the company to leverage its remaining intellectual property and regulatory advantages in pursuing the 881 service. On the other hand, however, the litigation he had Ellipso institute against the Mann parties can only charitably described as a disaster, precipitating the company's decline into bankruptcy. And Castiel's comingling of corporate funds and failure to ensure the keeping of proper corporate records are also a cause for concern. On the whole, though, these represented relatively minor mistakes during a period in which Castiel performed ably.

The eighth factor--the degree of risk associated with the position--decidedly cuts in Castiel's favor. Castiel founded the company and devoted 20 years of his professional life to it.

Castiel's personal success or failure was inextricably tied to the performance of Ellipso.  Presumably, Castiel forewent opportunities for stable, gainful employment to remain in this risky venture.[11]  The risk of Ellipso failing and Castiel having spent what would be the prime years of his career should be accounted for here.

Finally, the ninth factor--the expertise required of the position--weighs against Castiel.  Castiel has a Ph.D. in physics and developed valuable intellectual property that had and has the potential to revolutionize the satellite communications industry. And, undoubtedly, were Ellipso still in the satellite communications business during the claim period, his expertise in that regard would warrant substantial compensation.  The problem here, however, is that the nature of Ellipso's business shifted dramatically during the claim period.  Following the collapse of the satellite telephone industry in the early 2000s, Ellipso justifiably shifted its focus from implementing a satellite telephone system to attempting to license its existing intellectual property and to develop the 881 vanity number service.  No longer was the company trying to set up a billion-

---

[11]     Perhaps an argument could be made that his compensation for this risk comes in the form of the equity he owned in Ellipso.  This equity, however, was compensation for his contributed intellectual property.  His ongoing labors and the opportunity costs of other employment is what he exchanged for his salary.

dollar communications system, where Castiel's training and
expertise would prove of immense value, but instead the company
had shifted to marketing telephone numbers and selling patents,
hardly tasks that necessitate a person with Castiel's expertise.
Castiel has not shown that, in the market, those tasks could not
have been carried out by someone else with telecommunications
experience at a much lower level of compensation.  Moreover,
undertaking this scheme against a regulatory backdrop where
Castiel could not have failed to have known that it was only a
matter of time before the ICU placed the 881 numbers back in
reserve, leads the court to conclude that Castiel's salary
exceeded what would have been required to attract a person
competent to handle the task.

    Evaluating these factors holistically, I conclude that
Castiel's claimed salary of $480,000 for the claim period is
unreasonable under § 502(b)(4).  In making this determination, I
find persuasive that the $480,000 salary  would represent 69% of
the company's revenues from the claim period, that Castiel
continued to pay himself amounts exceeding his yearly salary
during 2006 and 2007, while accounts payable were continuing to
rise, that Castiel failed to present any evidence demonstrating
that his salary was the result of an arm's length transaction,
failed to present evidence of comparable salaries, and that the
nature of Ellipso's business had so changed by the claim period

that a salary of $480,000 per year was no longer warranted given the expertise required of the position.

Having determined that Castiel's claimed salary of $480,000 per year was unreasonable for the claim period, the next issue becomes determining what was a reasonable amount of compensation. Of the factors outlined above, the one the court finds most vexing is the lack of board authorization for Castiel's $480,000 claimed salary and the changed nature of Ellipso's business. Regarding lack of board authorization, this issue can be rectified by starting from Castiel's last authorized salary of $240,000 from June 1994 and adjusting forward for inflation. This gives Castiel a salary of $274,246.73 for the year 2000[12] and from 2001 through 2009, $283,571.11, $288,108.24, $295,022.83, $300,628.26, $310,548.99, $321,107.65, $329,135.34, $342,629.88, $342,972.5 (annualized, or $28,581.04 per month), respectively.[13]  When those amounts are compared to what Castiel received, Castiel received $374,591.97 more in the aggregate:

| Year | Re-Calculated Salary | Salary and Commissions Received | Difference |
|---|---|---|---|

---

[12]   The inflations rates from June 1994 to December 1999 are 1.7 (June 1994-December 1994), 2.5% (1995), 3.3% (1996), 1.7% (1997), 1.6% (1999).  Source, Bureau of Labor Statistics, ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt

[13]   The inflation rates for those years are: 3.4% (2000); 1.6% (2001); 2.4% (2002); 1.9% (2003); 3.3% (2004); 3.4% (2005); 2.5% (2006); 4.1% (2007); .1% (2008).  Source, Bureau of Labor Statistics, ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt

| | | | |
|---|---|---|---|
| 2000 | $274,246.73 | $480,000 | $205,753.27 |
| 2001 | $283,571.11 | $361,000 | $77,428.89 |
| 2002 | $288,108.24 | $385,000 | $96,891.76 |
| 2003 | $295,022.83 | -0- | ($295,022.83) |
| 2004 | $300,628.26 | $175,400 | ($125,228.26) |
| 2005 | $310,548.99 | $424,753 | $114,204.01 |
| 2006 | $321,107.65 | $614,294 | $293,186.35 |
| 2007 | $329,135.34 | $484,148[14] | $155,012.66 |
| 2008 | $342,629.88 | $194,996 | ($147,633.88) |
| TOTAL | | | $374,591.97 |

Moreover, even taking these amounts as authorized, this does not allay the court's concern about the changed nature of Ellipso's business. In 1994 when the board authorized Castiel's $240,000 salary, Ellipso was in the process of developing a global telecommunications system. As I stated above, though, by the early 2000s that was no longer the case. Ultimately, the issue comes down to burdens of proof. It was Castiel's burden to prove the reasonableness of his salary, and he provided the court with no evidence as to what a reasonable salary would be for a company president in Ellipso's new business. Undertaking the exacting scrutiny as required for insider claims as direct by the Supreme Court in *Litton*, Castiel has not met his burden as to the reasonableness of his salary claim and, accordingly, it must be denied.

---

[14]    $371,925 of which is recoupment.

22

III

BONUSES

Because any bonus for salary deferred was a function of the underlying salary, and Castiel has not shown what a reasonable salary was for him, he has additionally failed to carry his burden of proof with respect to bonuses for having deferred salary.  Accordingly, the objection to the bonus portion of Castiel's proof of claim is sustained.


IV

EXPENSES

Castiel's claim for unreimbursed expenses incurred on behalf of Ellipso is not a claim category to which 11 U.S.C. § 502(b)(4), dealing with claims for services, applies.  In any event, even if the burden were on Castiel to demonstrate the validity of this claim, Castiel established that he is entitled to recover $3,167.00 in unreimbursed expenses.  This is not, at this juncture, subject to setoff for any recovery the trustee might pursue for recovery of any allegedly excessive compensation paid to Castiel for services.  The trustee's right to recover such compensation has not been litigated, is subject to a different allocation of the burden of proof, and is subject to elements of proof and to affirmative defenses not addressed in considering the objection to Castiel's claim for compensation.

23

For these reasons, the objection to the expense reimbursement portion of Castiel's proof of claim is overruled.

V

Pursuant to the foregoing, the objections to Castiel's proof of claim (Claim No. 14-4) (Dkt. Nos. 269 & 521) are sustained to the extent Castiel claims unpaid salary and unpaid bonuses from the debtor and overruled to the extent Castiel claims unreimbursed expenses from the debtor.  A separate order follows.

[Signed and dated above.]

Copies to: Debtor; Debtor's attorney; David Castiel; William Webster, Chapter 11 Trustee; Robert Patterson; John Mann; Mann Technologies, LLC; John Page.

24