The document below is hereby signed.

Signed: February 07, 2011.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | Case No. 09-00148 |
| ELLIPSO, INC., | ) | (Chapter 11) |
| | ) | |
| Debtor. | ) | **Not for publication in** |
| | ) | **West's Bankruptcy Reporter** |

MEMORANDUM DECISION RE DEBTOR'S
OBJECTION TO CLAIMS NO. 6, 7, 10, AND 11

This addresses the debtor's objections to claims number 6,
7, 10, and 11, and represents the court's findings of fact and
conclusions of law.  For the reasons that follow, I will sustain
in part and overrule in part the objection to the claims.


I

Robert B. Patterson, John B. Mann, Mann Technologies, LLC,
and The Registry Solutions Company have filed proofs of claim in
the above-captioned chapter 11 case, seeking $30,000,000 in
compensatory damages and $10,000,000 in punitive damages.  The
claims allege that the debtor committed multiple torts against
the claimants, including, among others, Federal RICO violations.

The debtor timely filed objections to the proofs of claim.

As a preliminary matter, at a hearing on June 21, 2010, and June 25, 2010, on the debtor's motion I denied as a matter of law Counts I, II, V (except with respect to fraud in the MCI contract and 881 revenues related thereto and to fraud from concealing 881 revenues in general that arose after 2006), VI (except for revenues arising after 2006 as they relate to 881 and MCI/Verizon), VII, VIII, IX, X (except for revenues from the 881 business after 2006, which would include revenues from the MCI/Verizon contract), XI (except for revenues from the 881 business after 2006, which would include revenues from the MCI/Verizon contract), XII, XIII, XIV, XV (except to the extent it would serve as a predicate act under RICO), XVI (except to the extent it would serve as a predicate act under RICO), XVII (except to the extent it would serve as a predicate act under RICO), XVIII (except to the extent it would serve as a predicate act under RICO), XIX (except with respect to Mann Technologies, which is limited to additional damages not awarded by the District Court), XX, XXI (except to the extent it would serve as a predicate act under RICO), XXII, XXIII, XXIV, and XXV. Accordingly, after the June hearings only the following counts remained:

- Count III:    Violation of 18 U.S.C. § 1962(c);

- Count IV:    Violation of 18 U.S.C. § 1962(d);

- Count V:         Fraud (with respect to the MCI/Verizon contract and 881 revenues after 2006);

- Count VI:        Conversion (with respect to the MCI/Verizon contract and 881 revenues after 2006);

- Count X:         Unjust Enrichment (with respect to the MCI/Verizon contract and 881 revenues after 2006);

- Count XI:        Intentional Interference with Contracts (with respect to the MCI/Verizon contract and 881 revenues after 2006);

- Count XV:        Violation of 18 U.S.C. § 201 (Bribery) and Common Law Bribery (solely as a predicate offense);

- Count XVI:       Violation of 18 U.S.C. § 1923 (Perjury) (solely as a predicate offense);

- Count XVII:      Violation of 18 U.S.C. § 1622 (Suborning Perjury) (solely as a predicate offense);

- Count XVIII:     Violation of 18 U.S.C. § 371 (Conspiracy to Commit a Federal Felony) (solely as a predicate offense);

- Count XIX:       Malicious Prosecution (solely with respect to Mann Technologies, which will be limited to damages not previously awarded in the District Court);

- Count XXI:       Violation of 18 U.S.C. § 1509 (Obstruction or Interference with Court Order) (solely as a predicate offense);

- Count XXVI:      Aiding and Abetting;

- Count XXVII:     Respondent Superior;

- Count XXVIII:    Common Law Conspiracy, Agency.

At a series of hearings in October, November, and December of 2010, and January 2011, I addressed the merits of the remaining counts.  The evidence as to those counts not yet

3

dismissed of was as follows.

In December 2003, the debtor, Ellipso, Inc., entered into a contract with The Registry Solutions Company (TRSC), of which John Mann and Robert Patterson were shareholders, to provide registry service to Ellipso for a vanity number venture it sought to develop relating to certain 881 telephone numbers Ellipso had been assigned by the ITU.  Under this contract, TRSC was to build a registry service for the numbers, market the numbers, populate the registry, and pay to Ellipso a percentage of its net profits. Ellipso was to provide the service for the 881 numbers.  The contract was subsequently amended on January 30, 2004, March 31, 2004, and August 2, 2004, the March 31 amendment reflecting that Ellipso had not been able to implement the 881 service by that date.  By October 2004, however, Ellipso was in contact with KPN, a European telephone service provider, about providing services for the 881 numbers, and things appeared to be moving forward.

In anticipation of KPN providing 881 service, on November 5, 2004, TRSC retained the services of GBH Services Group, a consulting firm consisting of John Page and Jeff Guzy.  Pursuant to the engagement letter between GBH and TRSC, GBH was to contact KPN, attempt to establish both a customer and partner relationship with KPN, and test market TRSC's registry service for eventual use on the KPN network.  TRSC subsequently retained GBH for a second engagement on November 19, 2004, to continue

4

developing and marketing the 881 registry, and developing a
website for the sale of 881 vanity numbers.  TRSC also retained a
web designer to construct the website and contacted a 1-800
vanity number consultant to assist them in implementing the
registry once the KPN service came online.

On December 9, 2004, KPN had not yet begun to provide
service of the 881 numbers and John Mann contacted David Castiel,
chief executive officer of Ellipso, about "explor[ing]
alternative ways to get the service that Ellipso ha[d] been
unable to provide." (Ellipso Ex. AC).  In February 2005, Ellipso
was still unable to provide 881 service and Mann and Patterson
began discussions with Page about establishing a new company,
Global Custom Communications (GCC), to provide the 881 service
required to make the registry functional.  GCC was registered as
a Nevada corporation on March 23, 2005.  Through the remainder of
2005, Page, using the GCC business name, worked to establish 881
service through his contacts at several major carriers.  After
working for several months, in December 2005 Page was able to
negotiate a service contract with MCI, draft versions of the
contract being between MCI and GCC (Ellipso Ex. BE).  In
anticipation of the execution of the MCI contract, Page drafted
and asked Mann and Patterson execute the following:

•    A GCC board resolution that (1) appointed corporate
     officers, including Page as President; (2)resolved to enter

5

into an agreement with TRSC whereby TRSC would assign its
rights under the Ellipso registry contract to TRSC; (3)
enter into a consulting agreement with Page; (4) resolve to
enter into the MCI service agreement; and (5) approve an
initial budget;

- A consulting agreement with Page whereby Page would contact
  other carriers to provide 881 service in exchange for a
  $30,000 finder's fee and 15% of the equity in GCC;[1] and

- An assignment from TRSC to GCC of the Ellipso registry
  contract. (Ellipso Ex. BG).

During the time the 881 carrier business was being
developed, John Mann was involved in a separate transaction with
Ellipso. In October 2002, Ellipso had hired Robert Patterson as
a consultant for the purposes of securing investor financing for
the company. Pursuant to that consulting agreement, Patterson
placed Ellipso in contact with John Mann. In January 2004, after
TRSC and Ellipso had entered into the registry agreement, Mann
agreed to lend Ellipso $90,000 through a newly formed entity,
Mann Technologies, L.L.C., a venture he jointly owned with
Patterson. The loan was non-recourse and secured by 492,611
shares of ICO Global Communications Holding Ltd. stock held by
Ellipso. Under the loan agreement, if Ellipso were to default,

---

[1]    Presumably this agreement was to cover Page's
compensation for the MCI contract.

Mann Technologies was entitled to take possession of the
collateral.  The loan agreement required quarterly interest
payments and a final lump sum of the entire loan amount at the
end of the 1-year term of the loan.  Ellipso was in default from
the date of the execution of the agreement and never made any
interest payments to Mann Technologies.

In August of 2004, Ellipso and Mann Technologies executed an
amendment to the loan agreement whereby Ellipso and Mann
Technologies agreed to sell 25,000 ICO shares and split the
proceeds.  Subsequently, Ellipso and Mann Technologies discussed
selling an additional 200,000-300,000 shares and again splitting
the proceeds, but ultimately agreed on selling 150,000.  When it
came time to effectuate the sale, however, Mann declined, and
opted instead to have his company foreclose on the collateral in
December 2004 and retain all the proceeds of the sale.[2]

After Mann Technologies foreclosed on the stock, Castiel
consulted an attorney and on December 23, 2004, emailed Mann and
Patterson a letter informing them of this and advising them to
protect the collateral (Ellipso Ex. CI).  In June 2005, Ellipso
filed suit against Mann Technologies, John Mann, and Robert
Patterson, seeking, among other things, rescission of the loan
agreement based on Patterson's and Mann's alleged failure to

---

[2]     It is unclear whether Mann Technologies informed
Ellipso prior to selling the stock that it was foreclosing on the
collateral.

disclose Patterson's interest in Mann Technologies prior to

executing the loan documents (the "District Court lawsuit").

Also included in the District Court lawsuit was a count against

TRSC for breach of contract based on its failure to pay royalties

to Ellipso under the registry agreement.  Ellipso retained

Leftwich and Ludaway as attorneys for the case.

In the District Court lawsuit, John Mann executed an

affidavit wherein he divulged the development of the 881 service

that TRSC had been pursuing (albeit without disclosing that it

was doing so in conjunction with Page and GCC).  In response to

this disclosure, on October 19, 2005, an attorney for Ellipso

mailed a cease and desist letter to Thomas Mauro, Mann

Technologies's and John Mann's counsel in the District Court

lawsuit, directing Mann to stop any efforts at implementing the

881 service (Mann Ex. 3).  Mann did not cease and desist,

however, because he had a motion to dismiss pending before the

court and thought the suit would soon be resolved (Mann

Testimony).  As December 2005 approached, however, and the MCI

contract was ready to be executed, Mann began to have second

thoughts based on a number of unfavorable rulings in the District

Court lawsuit.  Accordingly, when it came time to execute the MCI

contract that Page had negotiated, Mann was not ready to execute

at that time.  Moreover, Page was demanding a compensation

arrangement that Mann was leery of entering into because, it may

be inferred, there was obvious uncertainty whether Ellipso would

cooperate as the owner of the 881 numbers in allowing a Mann-

related entity to act as the intermediary with any carrier.

On December 27, 2005, two weeks after Page had delivered the

final, executable version of the MCI contract to Mann, Page

emailed Mann requesting that he confirm whether he intended to

move forward with the MCI deal (Ellipso Ex. BK).  The next day,

Mann replied as follows:

> I would like to move ahead.  As I understand it, Bob
> will be back next week and we should be able to wrap up
> the various agreements required.  I am very concerned
> that we not obligate GCC beyond its near term
> capabilities with multi-year employment agreements and
> large near-term budgets.  I'm sure that Bob [Patterson]
> will have some changes required due to Mann Tech's
> current legal entanglement's[sic].

On December 29, 2005, Page sent a short email to Castiel asking

him to call Page if he was "interested in a specific revenue

generating business proposal." (Ellipso Ex. BL).

The afternoon of January 6, 2006, after Mann had still

failed to execute the MCI contract, Page sent Mann and Patterson

an email advising that he would "not indulge in stalling tactics

with MCI." (Ellipso Ex. BM).  That evening, Mann replied

expressing more reservations about executing the contract with

regards to costs and service description.  On January 11, 2006,

Page again emailed Mann and Patterson advising them that with the

imminent merger of MCI and Verizon he was not certain how long

the approval for the MCI contract would last (Ellipso Ex. BO).

9

The next day Page sent another email in response to a
conversation he had earlier in the day with Patterson regarding
consultant fees he was allegedly owed for pursuing the MCI
contract.  In that email Page stated that "Unless you confirm to
me by close of business tomorrow that you will execute the
transaction as originally discussed, or that you offer an
alternative compensation arrangement acceptable to me, you may
consider my current business relationship with GCC at a close."
(Ellipso Ex. BQ).  On January 13, 2006, Mann accepted Page's
decision to "discontinue [his] relationship with GCC."  (Ellipso
Ex. BR).  On January 14, 2006, Page emailed Mann and Patterson a
new proposal for GCC: he would take out a home equity loan, form
a new corporation name YGP, and have YGP execute the MCI contract
and pay profits to both GCC and TRSC (Ellipso Ex. BV).  After
Mann declined Page's final proposal, on February 1, 2006, Page
sent an email to Mann and Patterson advising that "there are no
other obligations between us and our respective companies aside
from the customary confidentiality which we will respect."
(Ellipso Ex. BY).  Finally, in the evening of February 1, 2006,
Page sent the following email:

John and Bob:

This email deals with internal GCC issues.

1.  I was associated with GCC from the time of its
formation until COB 1/12/2006 as per item 1 in my email

below.[3]

2.   During that time, GCC was unable to enter into any
agreements regarding the assignment of rights needed to
implement its planned business.   The non-execution of
the assignment agreement ultimately rests with TRSC and
GCC's shareholders.

I am making these points upon consideration of Bob's
diagram of corporate and contractual relationship
between Ellipso, TRSC and GCC this morning.   GCC's
participation in the relationships in Bob's diagram had
clearly not happened by 1/12/2006.

In my role at GCC I represented that the company
planned to implement an +8812/3 business on the basis
that the assignment of TRSC's rights would happen.   You
guys decided not to go forward with that assignment so
I quit GCC-it had no funding and none of the rights it
needed for its business plans.   I hope this is clear
and that the information is helpful to you in preparing
for any arbitration action.

Regards, John

(Ellipso Ex. BZ).

In January 2006, Page met with Castiel to follow up on his

December email.   At the meeting he explained to Castiel how he

could get the 881 numbers loaded on a major carrier, but did not

divulge the name of the carrier at that point.   Page proposed to

enter into a contract with Ellipso on a contingency basis to find

---

[3]    That item read:

1.   GCC has decided not to go forward at this time with
the drafted Carrier Consulting agreement, under which the
compensation was mutually understood to be contingent on
GCC signing with a carrier for loading of the +8812/3 in
any event.   As of the correspondence between us on the
12th and 13th of last month I have already exited any
role in representing or doing business as GCC.

11

carriers to load the 881 numbers.  Castiel rejected this offer and instead, on January 16, 2006, opted to have Page enter into an employment agreement with Ellipso for 3 months at $6,000 per month extending to three years at $8,000 and a $30,000 bonus if he established 881 service (Ex. BX).  Only once the contract was signed did Page divulge MCI's identity.  Soon thereafter, Ellipso executed a contract with MCI on the same terms that Page had previously negotiated on behalf of GCC.[4]

At the hearings on the objection there was conflicting testimony on whether Castiel knew that Page was working on behalf of Mann, Patterson, and TRSC in procuring the MCI contract, but I need not resolve that issue.

Meanwhile the District Court lawsuit wound on.  On January 30, 2006, Chief Judge Lamberth dismissed TRSC from the District Court lawsuit based on an arbitration clause in the registry contract, forcing Ellipso to take TRSC to arbitration on the breach of contract count.  Then, in the spring of 2006, both Patterson, Mann, and Mann Technologies filed counterclaims against Ellipso, seeking recovery on their own contract and fraud claims.  The District Court dismissed many of Ellipso's counts, but the case ultimately went to trial.  On August 5, 2008, the District Court dismissed the remaining counts in the complaint

---

[4]     Ellipso subsequently amended the contract when the ITU placed most of the 881 and 882 numbers back in reserve, leaving Ellipso only the 88238 series in March of 2007 (Ellipso Ex. CA).

and counterclaims, finding, with regard to Ellipso, that Castiel

knew of Patterson's interest in Mann Technologies at the time he

reaffirmed the Mann Technologies loan in August 2005. Finally,

on January 29, 2009, Chief Judge Lamberth awarded Mann

Technologies $201,314.04 on the independent grounds: "(1) Ellipso

instituted its lawsuit in bad faith, misrepresented the critical

fact upon which the litigation turned, and continued to pursue

vexatious claims even in the absence of any damages; and (2) Mann

Technologies successfully enforced the loan agreement and

therefore is entitled to attorneys' fees pursuant to the parties'

fee-shifting agreement."

In the TRSC arbitration, the arbitrator awarded TRSC

$162,335.45 in damages and denied Ellipso's claims against TRSC.


II

In their proofs of claim, Mann, Patterson, TRSC, and Mann

Technologies seek damages for fraud, conversion, unjust

enrichment, intentional interference with contract, malicious

prosecution, Aiding and Abetting, Respondent Superior, Common Law

Conspiracy, Agency, and violations of § 1962(c) and (d) of RICO.

At the close of evidence at a hearing January 21, 2011, I

sustained the debtor's objection to the fraud, conversion, unjust

enrichment, intentional interference with contract, and malicious

13

prosecution counts.[5]  This opinion addresses the remaining counts
that I took under advisement at that hearing and revisits and
revises my prior ruling on the malicious prosecution count.


A

Malicious Prosecution

At the January 21, 2011, hearing I rendered an oral decision
as to Mann Technologies' malicious prosecution claim against
Ellipso, denying the count based on the speculative nature of its
alleged damages.  To the extent that ruling addressed damages
related to lost revenues, it was appropriate.  To the extent the
ruling addressed damages not previously awarded in the District
Court lawsuit and punitive damages, it was in error.  I revisit
the malicious prosecution in light of this error here.

In its malicious prosecution count, Mann Technologies
alleges that Ellipso instituted the District Court lawsuit in bad
faith, "for the improper purpose of harassing, vexing, and
wrongfully causing harm" to Mann Technologies.  To state a claim
for malicious prosecution in the District of Columbia, Mann
Technologies has the burden of pleading and proving: "(1) that
the underlying suit terminated in plaintiff's favor; (2) malice
on the part of the defendant; (3) lack of probable cause for the

---

[5]    With respect to the malicious prosecution count (Count
XIX, I elaborate upon my oral decision in addressing Count XXVII
(respondeat superior).

14

underlying suit; and (4) special injury occasioned by plaintiff
as the result of the original action." *Joeckel v. Disabled
American Veterans*, 793 A.2d 1279, 1282 (D.C. 2002).  While there
is no dispute that Mann Technologies prevailed in the District
Court lawsuit, there are unresolved questions as to fact and law
as to the remaining three prongs.  I will address each in turn.

Regarding the malice prong, Mann Technologies contends that
the District Court's finding of bad faith in its award of
attorney's fees conclusively establishes this element.  The
District Court decision, however, was on the alternative bases of
bad faith and a fee shifting provision in the Ellipso/Mann
Technologies loan agreement.  There is a split of authority among
the circuit courts as to whether alternate grounds for judgment
are entitled to preclusive effect in subsequent proceedings, *see
Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d
244, 251-52 (3rd Cir. 2006) (citing cases illustrating the
circuit split), and the courts of this circuit have yet to
definitively resolve the issue, *see Jewish War Veterans of the
U.S. of America, Inc. v. Gates*, 506 F. Supp. 2d 30, 40 (D.D.C.
2007) (citing *Dozier v. Ford Motor Co.*, 702 F.2d 1189, 1194 & nn.
9-10 (D.C. Cir. 1983)).  This court, however, has consistently
held that decisions on alternative grounds are not entitled
preclusive effect because, echoing then-Judge Scalia's
observation in *Dozier*, "a rule which gives *res judicata* effect to

15

both grounds leaves the losing party who concedes the adequacy of one no appellate remedy for the patent invalidity of the other except a frivolous appeal." Accordingly, the burden rests with Mann Technologies to show malice on the part of Ellipso.

Under District of Columbia malicious prosecution precedent, "[i]t is generally held that the requisite malice is that dependent on the existence of an improper motive (as distinguished from malice in the technical sense), and has also been described as the existence of an evil purpose or motive, a wicked or mischievous intent, or a wilful, wanton, reckless or oppressive disregard [of] the rights of the plaintiff." *Ammerman v. Newman*, 384 A.2d 637, 640-41 (D.C. 1978). Here, the evidence shows that Ellipso acted with malice. I base this finding on the November 4, 2004, email where Castiel wrote that he knew of Patterson's interest in Mann Technologies by May/June of 2004, on Ellipso's failure to produce both the November 4, 2004, and October 20, 2004, emails in the District Court lawsuit, and on Ellipso having sought a preliminary injunction with Castiel having previously sent these emails.

Regarding the probable cause prong:

> Lack of probable cause is an essential element of an action for malicious prosecution, and a showing of probable cause is thus a valid defense which warrants a directed verdict for the defendant. *Smith v. Tucker*, D.C. App., 304 A.2d 303 (1973), citing *Prieto v. May Department Stores, Co.*, D.C. App., 216 A.2d 577 (1966). With reference to civil actions, probable cause has been said to be such reason supported by facts and

16

> circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are legally just and proper. *See Masterson v. Pig'n Whistle Corp.*, 161 Cal. App. 2d 323, 326 P.2d 918 (1958). One need not be certain of the outcome of a proceeding to have reasonable grounds for instituting it, however. Probable cause does not mean sufficient cause. *Burt v. Smith*, 203 U.S. 129, 27 S. Ct. 37, 51 L. Ed. 121 (1906). According to the generally accepted view, probable cause depends not on the actual state of the case in point of fact, but upon the honest belief of the person instituting it. It may flow from a belief that turns out to be unfounded as long as it is not unreasonable. *Lee v. Dunbar*, D.C. Mun. App., 37 A.2d 178 (1944).

*Ammerman v. Newman*, 384 A.2d 637, 639-40 (D.C. 1978). Mann Technologies contends that the District Court lawsuit was without probable cause because the suit was based on Ellipso not knowing that Patterson had an interest in Mann Technologies, which, as shown by the November 4, 2004, email, it knew by the time it reaffirmed the loan. This, however, is only partially correct. While part of count I (rescission) and the motion for preliminary injunction depended on Ellipso having not learned of Patterson's interest prior to reaffirming the loan, the other counts survived Mann Technologies' motion for summary judgment notwithstanding the fact that Castiel admitted he knew of Patterson's interest in May/June 2004. Indeed, the District Court in the very order where it found "bad faith" on the part of Ellipso observed that "it appeared that some of Ellipso's claims may have had merit even though it ratified the contract after it learned of Patterson's dual role." *Ellipso v. Mann*, 594 F. Supp. 2d 40, 44 (D.D.C. 2009). Included among those counts that survived were

17

Counts IV (Fraudulent Non-Disclosure), VIII (Fraud), IX
(Conversion), X (Replevin), and XI (Civil Conspiracy).  It was
only on a motion for directed verdict after the conclusion of
evidence that the District Court dismissed the remaining claims
based on Ellipso's failure to show damages.  *Id*.  This
determination necessarily depended on the District Court's
finding that Mann Technologies foreclosed on the shares in
October 2004.  *See* Transcript of Court Decision at 6-7, *Ellipso
v. Mann*, Case No. CA 05-1186 (D.D.C. August 5, 2008).

    In light of these facts, the debtor contends that while it
might not have had probable cause for the rescission count, it
had probable cause for counts IV, VIII, IX, X, and XI, and this
is sufficient to defeat Mann Technologies malicious prosecution
count.  In support of this contention, the debtor cites to cases
from several other jurisdictions holding that the relevant
inquiry is whether there was probable cause for suit, not whether
there was probable cause for each claim presented in the suit.
*See Bobrick Corp. V. Santan Prods., Inc.*, 698 F. Supp. 2d 479,
494 (M.D. Pa. 2010); *Fleetwood Retail Corp. of N.M. v. LeDoux*,
164 P.3d 31, 36-37 (N.M. 2007).  My research revealed further
cases supporting this proposition.  *See Shannahan v. Gigray*, 131
Idaho 664, 670 (1998) (Trout, C.J., concurring) ("Thus, as long
as one of the theories under which the case was pursued is
supported by probable cause, the proceeding is supported by

18

probable cause and an action for wrongful civil proceeding must fail."); *Zahorsky v. Griffen, Dysart, Taylor, Penner and Lay, P.C.*, 690 S.W.2d 144, 151 (Mo. App. 1985) ("An action in malicious prosecution therefore requires the plaintiff to show want of probable cause for the proceeding.  The plaintiff does not meet his burden by showing the defendant's lack of probable cause in one of the number of theories underlying the proceeding where other theories are supported by probable cause."); *Perryman v. Village of Saranac Lake*, 41 A.D.3d 1080, 1080 (N.Y. App. 2007) ("[B]ecause the action, considered as a whole, was not entirely without probable cause, plaintiff's malicious prosecution claim should have been dismissed."). At least two other jurisdictions, however, go the other way.  *See Singleton v. Perry*, 45 Cal. 2d 489, 499 (1955) (adopting the reasoning of the Missouri Supreme Court that "it would seem almost a mockery to hold that, by uniting groundless accusations with those for which probable cause might exist, the defendants could thereby escape liability . . .."); *Brown v. Willoughby*, 5 Colo. 1, 8 (1879) ("If groundless charges are maliciously and without probable cause, coupled with others which are well founded, they are not on that account the less injurious, and therefore constitute a valid cause of action.").

I believe that the District of Columbia courts would follow the line of cases holding that there must be a lack of probable

cause for the proceeding as a whole, not just specific claims
within the proceeding.  I reach this conclusion for two reasons.
First, the probable cause prong of the malicious prosecution test
itself indicates that the court must look at the entire
proceeding: "lack of probable cause for the underlying *suit.*"
The word "suit" connotes an entire proceeding.  If the District
of Columbia courts wanted to expand the scope of malicious
prosecution actions and limit the probable cause defense, "claim"
or "count" instead of "suit" could accomplish this end.  Second,
the District of Columbia courts have also expressed a preference
to limit the scope of malicious prosecution actions, "in the
belief that it best promotes this jurisdiction's policy of
encouraging free access to the courts." *Morowitz v. Marvel*, 423
A.2d 196, 198 (D.C. 1980).[6]  In light of this, the next issue

---

[6]     The D.C. Court of Appeals further explains:

It is axiomatic that the American system of jurisprudence
favors free access to the courts as a medium of dispute
settlement.    It  is  the  annouced  policy  of  this
jurisdiction to allow unfettered access to our courts.
In an effort to avoid infringing upon the right of the
public to utilize our courts, we are cautious not to
adopt rules which will have a chilling and inhibitory
effect on would-be litigants of justiciable issues.  We
are likewise cognizant of our obligations to protect the
innocent against frivolous litigation and to make victims
of groundless *lawsuits* whole, where they suffer special
injury as the result of the suit.   Predicably, our
decisions have evolved in response to these competing
interests.

*Id.* at 197-98 (emphasis added).

20

becomes whether there was a lack of probable cause for counts IV,
VIII, IX, X, and XI.

At the hearing on the debtor's objections to the claims, the
debtor argued that there was probable cause for these claims
based on the lack of a definitive foreclosure date. As stated
above, the District Court granted judgment for Mann Technologies
on counts IV, VIII, IX, X, and XI based on Ellipso's failure to
show damages, which necessarily turned on price of the ICOHA
shares on the foreclosure date. If there was probable cause for
the debtor to believe that Mann Technologies had foreclosed on a
different date and the price of the shares exceeded the amount of
the Mann Technologies' loan on that date, then the malicious
prosecution claim must fail.

David Castiel testified that John Mann did not inform him
that he was foreclosing on the stock until December 2004. This
is further corroborated by a series of emails between Mann and
Castiel that month. (Exs. AD, AE, and AG). The ICO stock price
between December 10, 2004, and December 23, 2004,[7] the latest
dates during which Ellipso definitively learned that Mann
Technologies had foreclosed on the collateral, was never lower
than $0.43/share. Moreover, at that time at least 417,611 ICO
shares were still remaining, leaving a low point liquidation
value of $179,572.73 for the period. Accordingly, had the

---

[7]      I take judicial notice of these prices.

District Court determined that Mann Technologies foreclosed
during this period in December 2004 instead of October 2004,
Ellipso would have been able to show damages and judgment in
favor of Mann Technologies would not have been appropriate on the
basis of lack of damages.  This evidence was sufficient to
overcome the prima facie validity of Mann Technologies' proof of
claim and, accordingly, the burden shifted to Mann Technologies
to show a lack of probable cause for the December foreclosure
date or to show a lack of probable cause for the claims in
general.  At the hearing, however, Mann Technologies presented no
evidence that a December 2004 foreclosure date was unreasonable
or that counts IV, VIII, IX, X, and XI otherwise lacked probable
cause.  Mann Technologies having failed to show lack of probable
cause, its malicious prosecution claim is appropriately denied.

A

Count III: Violation of 18 U.S.C. § 1962(c).

Section 1962(c) of RICO provides that "it shall be unlawful
for any person employed by or associated with any enterprise
. . . to conduct or participate, directly or indirectly, in the
conduct of such enterprise's affairs through a pattern of
racketeering activity or collection of unlawful debt."  Section
1961(3) defines "person" to include "any individual or entity
capable of holding a legal or beneficial interest in property,"

and Section 1961(4) defines "enterprise" to include "any
individual, partnership, corporation, association, or other legal
entity, and any union or group of individuals associated in fact
although not a legal entity."  Section 1961(5) defines "pattern
of racketeering activity" as at least two acts of racketeering
activity within the past ten years, and Section 1961(1), in turn,
defines "racketeering activity" as an extensive list of criminal
offenses indictable under both state and federal law.

Complicating an already complicated RICO statute is Federal
Rule of Bankruptcy Procedure 3001(f), which gives prima facie
validity to some proofs of claims and places the initial burden
of going forward on the objecting party.  Taking the RICO statute
and Rule 3001(f) together leads the court to a three-step
analysis: (1) what if any part of the RICO count is entitled to
prima facie validity under Rule 3001(f); (2) for the parts I
determine are entitled to prima facie validity, has the debtor
met its initial burden of going forward; and (3) for the parts
not entitled to prima facie validity or for which the debtor has
met its initial burden, have the claimants carried the ultimate
burden of persuasion.

1

Federal Rule of Bankruptcy Procedure 3001(f) provides that
"[a] proof of claim executed and filed in accordance with these
rules shall constitute prima facie evidence of the validity and

amount of the claim." When a claim is based on a writing, Rule 3001(c) requires the claimant to file an original or copy of the writing with the proof of claim. When the claim is based on a complaint, the analysis is more complicated.

For a complaint attached to a proof of claim to be entitled to prima facie validity in the first instance, the complaint must state a claim upon which relief can be granted. *See In re Hongisto*, 293 B.R. 45, 50-51 (N.D. Cal. 2003) (allegations in state court complaint appended to creditor's proof of claim failed to state basis for imposing legal liability on debtor for creditor's arrest: Rule 3001(f) was thus inapplicable); *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140, 145 (10th Cir. B.A.P. 2003) (proof of claim which set forth facts not showing existence of claim against debtor was not entitled to Rule 3001(f) effect); *In re Marino*, 90 B.R. 25, 28 (Bankr. D. Conn. 1988) ("GLB's proof of claim did not set forth the necessary facts, it was not entitled to the presumption of prima facie validity, and the burdens of going forward and of proving its claim by a preponderance of the evidence are on GLB."); *In re Svendsen*, 34 B.R. 341, 342 (Bankr. D.R.I. 1983) ("Cesareo's proofs of claim do not 'constitute prima facie evidence of the validity and amount of the claim[s]' under Bankruptcy Rule 3001(f) because they fail to set forth all the necessary facts to establish the claim[s]."). *See generally* 9

24

Collier on Bankruptcy ¶ 3001.09[1] (Alan N. Resnick & Henry J
Sommer eds., 16th ed.).  If the complaint fails to set forth
sufficient facts that would show as a matter of law that the
claimant would be entitled to relief, then the proof of claim is
not entitled to the presumption of prima facie validity, and the
claimant bears the entire burden of showing its entitlement to
the claim.

The primary focus of the § 1962(c) section of the claimants'
voluminous complaint is on the District Court lawsuit between
Ellipso and the claimants (See ¶¶ 213, 215, 217, 220, 221).
These paragraphs clearly link the alleged predicate offenses with
the resulting injury, the District Court lawsuit, and,
accordingly, state a claim upon which relief can be granted.
Thus, to the extent the complaint alleges RICO injuries stemming
from the District Court lawsuit, those allegations are entitled
to a presumption of prima facie validity and the debtor bears the
initial burden of going forward.

Claimants additionally allege numerous other injuries
proximately caused by various predicate offenses.  The complaint,
however, fails both to allege what the injury was and how the
predicate offense connected with that injury caused the injury.
In paragraph 225 of the complaint, for example, the claimants
rely on 18 U.S.C. § 1956 (the laundering of monetary instruments)
as a predicate act, but only state that "[t]hese acts of money

25

laundering were an integral part of the scheme(s) to defraud the victims including Plaintiffs.  This racketeering activity proximately caused injury to Plaintiffs' business(es) and property, as set forth herein[.]"  The mere conclusory assertion that Ellipso committed fraud and that this fraud caused injury to the claimants is insufficient under both Rule 9(b) and the minimal pleading standards set forth by the Supreme Court in *Ashcroft v. Iqbal*, 566 U.S. ----, 129 S.Ct. 1937, 1949 (2009), to state a claim upon which relief can be granted.  Accordingly, paragraph 225 is not entitled to Rule 3001(f)'s presumption of prima facie validity and the burden of proof is squarely on the claimants.  Paragraphs 219, 223, 224, 226, 227, 228, and 229 suffer from the same deficiency and likewise are not entitled to the presumption.

This leaves paragraph 222, 18 U.S.C. § 1512 (tampering with a witness, victim, or an informant).  In this paragraph, the claimants allege that Ellipso tampered with witnesses in the TRSC arbitration and caused Castiel to present perjured testimony and fraudulent documents in the District Court lawsuit.  Claimants further alleged that Ellipso "introduced fraudulent documents, altered and destroyed evidence, and concealed documents" in both proceedings.  To the extent the allegations address actions in the arbitration proceeding, claimants fail to state a claim upon which relief can be granted and, accordingly, are not entitled to

26

the presumption of prima facie validity.  All of the statutory

provisions to which the claimants cite under § 1512 speak of acts

in an "official proceeding."  Under § 1515(a)(1), however,

"official proceeding" is defined solely to include (A)

proceedings before federal judges, (B) proceedings before

Congress, (C) proceedings before federal agencies, and (D)

insurance proceedings.  The TRSC arbitration does not fall within

any of these categories and, thus, the claimants are not entitled

to a presumption of prima facie validity on the § 1512 count to

the extent the count relates the to that arbitration.

2

Having determined that the only RICO claims entitled to

prima facie validity under Rule 3001(f) are those relating to the

District Court lawsuit, the next issue becomes whether the debtor

has presented sufficient evidence to overcome the presumption

regarding those RICO claims.

The debtor has objected to the § 1962(c) RICO claims

regarding the District Court lawsuit on two bases: (1) the lack

of an "enterprise" distinct from the Ellipso defendant and (2)

the failure of the claimants to establish a "pattern of

racketeering activity."  I will address first the debtor's

enterprise argument and whether the debtor has carried its burden

of presenting evidence demonstrating there was no enterprise

distinct from Ellipso, thereby shifting the ultimate burden of

27

persuasion to the claimants to prove the validity of their RICO claims regarding the District Court lawsuit.

In order to establish liability under § 1962(c), the claimants "must allege and prove the existence of two *distinct* entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, LTD., v. King*, 533 U.S. 158, 162 (2001) (emphasis added).  The debtor first contends that the claimants' RICO count must fail because they have failed to identify an enterprise distinct from Ellipso, the alleged RICO "person" here.  To evaluate this argument, I must first identify who the claimants allege make up the "enterprise."

The complaint lists twenty-nine individuals and businesses and an unnumbered amount of "John Doe" defendants as having taken part in the alleged RICO violations.  Further, the complaint sets forth eight "enterprise alternatives" consisting of various permutations of the twenty-nine defendants, the broadest being the first which consists of "[t]wo or more of the Defendants, but not necessarily all of the Defendants, . . . ."  The RICO section of the complaint alleges that Ellipso was a part of each of the eight "enterprise alternatives," which, as a practical matter, does nothing to narrow down the scope of the alleged enterprise. Because, however, the only RICO claims the debtor needed to overcome here relate to the District Court lawsuit, it is easier

28

to identify the relevant defendants.

At the hearing on the objection, David Castiel, the debtor's CEO, testified that of all the potential entities that could be viewed as participating in the alleged RICO enterprise, only Castiel (CEO and treasurer of the debtor),[8] Gerald Helman (an Ellipso employee), Richard Burt (an Ellipso board member), Michael Taylor (an Ellipso board member), Juan Tomassoni (an Ellipso contractor), Linda Awkard (attorney for Ellipso in the District Court lawsuit), Awkard and Associates (Linda Awkard's law firm), Leftwich and Ludaway (attorneys for Ellipso in the District Court lawsuit); Natalie Ludaway (attorney at Leftwich and Ludaway), Mark Guberman (attorney at Leftwich and Ludaway), Matthew Goodman (attorney at Leftwich and Ludaway), Vanessa Lourie and Vanessa Carpenter Lourie LLP (attorney for Ellipso in the District Court lawsuit), Tighe, Patton (attorneys for Ellipso in the District Court lawsuit), and Thomas Patton (attorney at Tighe, Patton) had any role in the District Court lawsuit.  As a practical matter, these defendants can be placed into one of two groups--Ellipso insiders, employees, and contractors, on the one hand, and attorneys for Ellipso in the District Court lawsuit, on

---

[8]     The complaint refers to Castiel as both the CEO/treasurer and principal shareholder of Ellipso.  Regarding the RICO claim, however, the complaint makes no allegations that Castiel was working as anything other than as an insider of the debtor.  Accordingly, I will disregard his shareholder status for purposes of this count.

the other hand.  I will first address the insiders, employees,
and contractors.

A corporation is generally not distinct from its agents,
employees, officers, and directors.  In the context of a
corporate defendant, "an organization cannot join with its own
members to do that which it normally does and thereby form an
enterprise separate and apart from itself." *Yellow Bus Lines,
Inc. v. DiPalermo*, 883 F.2d 132, 141 (D.C. Cir. 1989).  In other
words, when naming a corporation as a RICO defendant, a plaintiff
must show that the corporation was associated in fact with more
than its own employees to form an enterprise distinct from
itself.  While an exception to this general rule exists for
"organizations created solely for illegal purposes and operated
to the detriment of third parties by corrupt directors or
controlling partners," *id.* at 140, the claimants have failed to
plead any such circumstances and, accordingly, there is no prima
facie validity for the debtor to overcome in this regard.
Moreover, the inclusion of Tomassoni, an independent contractor,
does not alter this result.  Independent contractors carrying out
the regular affairs of a corporation are not distinct for RICO
purposes.  *See Riverwoods Chappaqua Corp. v. Marine Midland Bank,
N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("Nevertheless, by alleging
a RICO enterprise that consists merely of a corporate defendant
associated with its own employees or agents carrying on the

30

regular affairs of the defendant, the distinctness requirement
may not be circumvented."); *Reed Const. Data Inc. v. McGraw-Hill
Companies, Inc.*, 2010 WL 3835196, at * 4 (S.D.N.Y. 2010).  The
claimants' complaint makes no allegations with regards to
Tomassoni in the District Court lawsuit or that his role in the
alleged "enterprise" was anything other than conducting the
"regular affairs" of the company.

Notwithstanding the foregoing well-established rule, the
claimants cite to *Cedric Kushner Promotions, LTD. v. King*, 533
U.S. 158 (2001), for the proposition that a corporation and its
employees are distinct "persons" for RICO purposes.  Claimants,
however, misread the case.

In *Kushner*, the plaintiff sued Don King, the president and
sole shareholder of Don King Productions, under § 1962(c) for
RICO violations.  *Id.* at 160.  The Second Circuit, affirming the
trial court's dismissal of the case, found that Don King the
individual and Don King Productions were not distinct enough to
constitute an enterprise, Don King Productions being both wholly
owned and managed by King.  *Id.* at 161.  The Supreme Court,
overturning the Second Circuit, found King the individual
sufficiently distinct to support a RICO claim: "The corporate
owner/employee, a natural person, is distinct from the
corporation itself, a legally different entity with different
rights and responsibilities due to its different legal status.

31

And we can find nothing in the statute that requires more 'separateness' than that." *Id.* at 163. *King*, however, represents the opposite of the case before this court.

Here, the corporation is the defendant, not its employees. While, for the reasons stated in *King*, an employee is distinct from the corporation, the converse is not typically true.  In *King* itself, the Court recognized the distinction:

> We note that the Second Circuit relied on earlier Circuit precedent for its decision.  But that precedent involved quite different circumstances which are not present here. This case [King] concerns a claim that a corporate employee is the "person" and the corporation is the "enterprise."  It is natural to speak of a corporate employee as a "person employed by" the corporation. § 1962(c).  The earlier Second Circuit precedent concerned a claim that a corporation was the "person" and the corporation, together with all its employees and agents, were the "enterprise." *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir. 1994) (affirming dismissal of complaint).  It is less natural to speak of a corporation as "employed by" or "associated with" this latter oddly constructed entity. And the Second Circuit's other precedent also involved significantly different allegations compared with the

32

> instant case. . . . We do not here consider the merits of
> these cases, and note only their distinction from the
> instant case.

*Id.* at 164.  A corporation acts through its agents, employees,
officers, and directors; they are a part of the corporation, not
distinct from it.  *Yellow Bus Lines I,* 839 F.2d 791-92.
Accordingly, Ellipso represents one person and not an enterprise
with its insiders, contractors, and employees for purposes of
this case.

The next issue, then, is whether Ellipso is distinct enough
from its attorneys to constitute an enterprise separate from
itself as a defendant.  Though there is no binding precedent in
this Circuit, other courts to address the issue have answered the
question in the negative.

In *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d. Cir.
1996), *reversed on other grounds*, 525 U.S. 128 (1998), for
example, the Second Circuit found that a corporation, its
subsidiaries, and attorneys were not distinct enough to
constitute an enterprise separate from the corporate defendant
for RICO purposes when each was operating with the scope of its
agency.  *Id.* at 1064.  Moreover, every other case the court has
found on point has held likewise. *See Daigneault v. Eaton Corp.*
2008 WL 2604929 at * 3 (D. Conn. June 16, 2008) (same); *In re*

*American Investors Life Insurance Co. Annuity Marketing and Sales Practices Litigation*, 2006 WL 1531152 at *23 (E.D. Pa. June 6, 2006) (finding an enterprise when the complaint alleged that the attorneys *were not* conducting the normal affairs of the corporate defendant); *Team Obsolete Ltd. V. A.H.R.M.A. Ltd.*, 2002 WL 719471 at *7 (E.D.N.Y. Mar. 1, 2002) (finding that an attorney acting within the scope of his retention was not sufficiently distinct enough to constitute a enterprise with the corporate defendant); *Goldbert v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1998 WL 50200 at * 4 (S.D.N.Y. Feb. 9, 1998) (holding that plaintiffs could not meet the distinctness requirement by claiming that Merrill Lynch and its attorneys constituted an enterprise).

Notwithstanding this, claimants contend that this Circuit's decision in *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095 (2009), holds that attorneys can constitute a distinct person for RICO purposes.  In *Philip Morris*, however, no attorneys were even named as defendants, *id.* at 59, and, as a result, the court never addressed the issue.  Rather, the entities making up the enterprise consisted of nine cigarette manufacturers and two trade organizations created jointly by the manufacturers.

Finally, I note that the claimants have not alleged that the attorneys were acting outside of the scope of their representation of Ellipso in the District Court lawsuit. Accordingly, they fall well within the scope of *Discon* and are

34

not distinct enough to form an enterprise separate from Ellipso itself.

In light of the foregoing, the debtor has met its initial burden of overcoming the prima facie validity of the claimants' proof of claim: the debtor has presented sufficient evidence showing that there was no enterprise distinct from the debtor involved in the alleged RICO violations related to the District Court lawsuit, which, for the reasons stated in Part A, was the only claim that was entitled to the presumption.  This renders it unnecessary to decide whether the prima facie validity of the District Court RICO claims has been rebutted by the debtor's presenting evidence showing that there was no "pattern of racketeering activity."  *See In re Atwood*, 293 B.R. 227, 233 (9th Cir. B.A.P. 2003) ("In effect, the omission of the proof of claim to address an essential element of the substantive claim deprives Chase Manhattan of the favorable Rule 3001(f) evidentiary presumption regarding validity and amount."); *In re Baltimore Emergency Services*, 401 B.R. 209, 216 (Bankr. D. Md. 2008) ("To overcome this presumption, the objecting party must demonstrate by evidence, a defense to one ore more elements of the cause of action asserted in the claim, which would render the claim unenforceable."); *In re Heron*, 381 B.R. 184, 188-89 (Bankr. D. Md. 2008) (same); *In re Irons*, 343 B.R. 32, 39 (Bankr. N.D.N.Y. 2006) ("In order to overcome this prima facie evidence, the

35

objecting party must provided evidence that disproves at least
one of the essential elements of the claim).

Outside of bankruptcy, the claimants would bear the ultimate
burden of persuasion to demonstrate that their claims are valid.
Having been stripped of any Rule 3001(f) presumption of validity
regarding their claims, the burden is the claimants' to establish
the validity of their claims.

3

Turning to the claimants' case, the claimants have asserted
that the debtor committed fifteen predicate offenses that
resulted in injury to them.  For ease of organization, I will
address each predicate offense in turn and evaluate whether the
claimants have met their burden with regard to each.

**Section 1084 (transmission of gambling information).**

Section 1084 of Title 18 provides that it is unlawful to use
a wire communication facility to (1) engage in the business of
wagering or betting or providing information to assist in the
placing of bets or wagers on any sporting event or contest, or
(2) transmit a communication entitling the recipient to money or
credit as a result of a wager, or (3) to transmit information
assisting in the placing of bets or wagers.  The only evidence
the claimants presented at trial was their mere conclusory, self-
serving assertion that all the allegations in the complaint were

true, to which I give no weight.  Otherwise, claimants' testimony

and exhibits at the hearing were devoid of any evidence

establishing that Ellipso itself used a "wire communication

facility" for any of the enumerated offenses.[9]  Moreover,

claimants likewise failed to present any evidence of who made up

the enterprise that undertook the § 1084 violation and whether

these individuals were "associated in fact," as required by

§ 1961(4).  Claimants also failed to present any evidence

demonstrating how they were injured by the violation.

Accordingly, to the extent the claimants' RICO claim is based on

Section 1084, it fails.


**Section 1955 (the prohibition of illegal gambling business).**

Section 1955 of Title 18 provides that it is unlawful to

conduct, finance, manage, supervise, direct, or own an illegal

gambling business.  Again, the claimants presented no evidence,

(aside from their unpersuasive, conclusory assertion that the

allegations in the complaint were true) that Ellipso either

---

[9]     Ellipso owned the rights to both the 8812/3 digits
assigned to it from the ITU.  There was no evidence that Ellipso
itself operated or used a wire communication facility and did not
just assign its numbers to an entity that did.  Even if the
debtor could be viewed as operating or using a wire communication
facility, there was no evidence that it was used for any of the
enumerated offenses (*e.g.*, that the debtor used the facility to
transmit information assisting in the placing of bets or wagers
for a purpose, as made clear by § 1084(b), other than the purpose
of transmitting bets from a state where the bet is legal to a
state or country where the bet is also legal).

conducted, financed, managed, supervised, directed, or owned any
gambling business.  The claimants likewise failed to present any
evidence showing who made up the enterprise, demonstrating
whether those individuals were associated in fact, or showing how
the claimants suffered any injury as a result of Ellipso's
alleged acts.  Accordingly, to the extent the claimants' RICO
claim is based on § 1955 it is appropriately dismissed.

**Section 1341 (mail fraud).**

The claimants next allege that Ellipso committed multiple
counts of mail fraud, some relating to transfers of proceeds of
racketeering activities and some relating to the District Court
lawsuit.  Once again, the record is devoid of any evidence of who
made up this enterprise beyond Ellipso, its employees, and
attorneys, which, for the reasons stated in Part B, do not
constitute an enterprise distinct from Ellipso itself, and the
claimants presented no evidence that any other entities were
associated in fact with Ellipso.  Without evidence in this
regard, the claim fails as a matter of law.

Moreover, the claimants failed to present any evidence that
any fraud was perpetrated by use of the mail.  The complaint
refers to two exhibits showing account activity and a check
register, but neither of the exhibits show that anything was done
by mail.  The other communications from the debtor to the

claimants were via email and therefore would not constitute mail
fraud.

Accordingly, to the extent the claimants § 1962(c) RICO
claim is based on § 1342 as a predicate act it is appropriately
dismissed.

## Section 1343 (wire fraud).

The claimants' wire fraud count is identical to the mail
fraud count save for the use of wire instead of mail.  Again,
though, claimants have failed to present any evidence as to who
comprised the enterprise beyond the debtor, its
employees/insiders, and its attorneys, and has failed to present
any evidence that it was associated in fact with those additional
entities.  Accordingly, to the extent their RICO claim is based
on this predicate offense, it fails as a matter of law.

## Section 1344 (financial institution fraud).

Section 1344 of Title 18 provides that it is unlawful to
knowingly execute or attempt to execute a scheme or artifice "to
obtain any of the moneys, funds, credits, assets, securities, or
other property owned by, or under the custody or control of, a
financial institution, by means of a false or fraudulent
pretenses, representation, or promises."  Once again, the
claimants have presented no evidence demonstrating what the

enterprise was that committed the fraud and whether that
enterprise was distinct from Ellipso.  Moreover, the claimants
have also failed to present any evidence showing what instances
of bank fraud, if there were any, injured them.  To the extent
the RICO claim is based on 18 U.S.C. 1344 it too must fail.

**Sections 1461-1465 (obscene matter).**

Title 18 Section 1461 deals with the mailing of obscene
matter.  The claimants presented no evidence that the debtor
mailed anything obscene, no evidence that they were injured by
any mailings, and no evidence of an enterprise.  Accordingly, to
the extent the RICO complaint is based on Section 1461 it must
fail.

Section 1462 addresses the importation of obscene matter
into the United States and the receipt thereof.  Again, the
claimants have produced no evidence that Ellipso either imported
obscene matter into the United States or received any imported
obscene material.  Further, the claimants brought forth no
evidence of the existence of any enterprise that would fall
within the definition of 1961(4).  Accordingly, to the extent the
RICO complaint is based on Section 1462 it must fail.

Section 1463 addresses the mailing of obscene matters on
wrappers or envelopes.  Yet again, the claimants brought forth no
evidence that Ellipso mailed any such matter or that Ellipso was

part of an enterprise distinct from itself.  Accordingly, to the extent the RICO complaint is based on Section 1463 it must fail.

Section 1464 prohibits the uttering of obscene language by means of radio communication.  The claimants produced no evidence that Ellipso either uttered anything obscene, did so by way of radio communication, or was part of an enterprise distinct from itself.  Accordingly, to the extent the RICO complaint is based on Section 1464 it must fail.

Section 1465 prohibits the production and transportation of obscene material.  The claimants presented no evidence that Ellipso produced or transported any obscene matters in interstate commerce or did so as part of an enterprise distinct from itself.  Accordingly, to the extent the RICO complaint is based on Section 1465 it must fail.

**Section 1503 (obstruction of justice).**

Section 1503 prohibits, among other things, the corrupt influence, obstruction, or impeding of the due administration of justice.  The claimants allege in their complaint that Ellipso's filing of bad faith lawsuits, committing repeated acts of perjury, suborning perjury, falsifying evidence, concealing evidence, destroying evidence, filing false and fraudulent pleadings, unreasonably and vexatiously multiplying judicial proceedings, evading service of process, and witness tampering

were in violation of this provision and, consequently, support a
RICO claim.   Although there was evidence through both the
testimony of John Mann and Robert Patterson and the opinion of
Chief Judge Lamberth in the District Court case that could
support a claim under this Section, I need not reach the issue
because, once again, the claimants failed to present any evidence
of an enterprise beyond Ellipso, its employees/insiders, and its
attorneys, which, for the reasons set forth in Part B, are not
distinct enough to constitute an enterprise separate from Ellipso
itself.   Accordingly, to the extent the RICO complaint is based
on Section 1503 it must fail.

**Section 1512 (tampering with a witness, victim, or an informant).**

Section 1512 prohibits, among other things, tampering with
witnesses, altering, destroying, and concealing documents in an
official proceeding.   As with the obstruction of justice count,
the claimants presented some evidence of the concealment of
documents in the District Court case, namely the infamous Castiel
email stating that he knew of Patterson's interest in Mann
Technologies prior to August 2004.   I need not reach this issue,
however, because the claimants again failed to produce any
evidence that Ellipso was part of an enterprise distinct from its
insiders/employees and attorneys.   Accordingly, to the extent the
RICO complaint is based on Section 1512 it must fail.

42

**Section 1951 (interference with commerce, robbery, or extortion).**

Section 1951 prohibits the obstruction of commerce through the use of robbery, extortion, physical violence, or the threat of physical violence.  The claimants have presented no evidence that Ellipso engaged in any of these acts or that Ellipso was part of an enterprise engaged in these acts.  Accordingly, to the extent the RICO complaint is based on Section 1951 it must fail.

**Section 1952 (racketeering).**

Section 1952 prohibits (1) the distribution of proceeds of any unlawful activity, (2) the commission of any crime in furtherance of an unlawful activity, and (3) the promotion, management, establishment, or carrying on of an unlawful activity, or the facilitation thereof.  Importantly, the statute defines "unlawful activity" to mean (1) a business enterprise involving gambling, liquor, narcotics, or prostitution offenses, (2) extortion, bribery, or arson, and (3) money laundering and trafficking in stolen goods.  Yet again, the claimants have failed to produce any evidence that the moneys in the debtor's accounts were proceeds of an "unlawful activity" or that the debtor was associated with an enterprise distinct from itself. Accordingly, to the extent the RICO complaint is based on Section 1952 it must fail.

43

**Section 1956 (money laundering).**

Section 1956 prohibits the laundering of money from a "specified unlawful activity."  "Specified unlawful activity" means the acts listed in Section 1952, above, as well as the RICO predicate offenses, among others.  This count fails on several bases.  First, under § 1956(a)(1), the claimants have utterly failed to present any evidence that any of the debtor's money was proceeds of a "specified unlawful activities."  Second, under § 1952(a)(2), the claimants have likewise failed to present any evidence that the debtor "transport[ed] . . . funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States" with either the "intent to promote the carrying on of specified unlawful activity or knowing that the . . . funds . . . represent the proceeds of some form of unlawful activity . . . ."  Third, under § 1956(a)(3) the claimants have failed to show Ellipso had either the intent to (a) promote the carrying on of an unlawful activity, (b) conceal property believed to be the proceeds of an unlawful activity, or (c) to avoid transaction reporting requirements.  Fourth, specific to RICO, the claimants have, as above, failed to adduce any evidence showing the existence of an enterprise distinct from Ellipso. Finally, the claimants have presented no evidence showing how they were injured as a result of any alleged money laundering.

44

Without such evidence the claimants' RICO count, to the extent it
relies on Section 1956 as an underlying predicate offense, must
fail.

**Section 1957 (engaging in monetary transactions in property from
specified unlawful activity).**

Section 1957 of Title 18 prohibits knowingly engaging in
monetary transactions in criminally derived property of a value
greater than $10,000 derived from the specified unlawful
activities set forth in § 1956, above.  Like § 1956, the claim
fails on several bases.  First, the claimants have again failed
to present any evidence that the debtor dealt in property derived
from a specified unlawful activity.  Second, the claimants have
likewise failed to prove an enterprise distinct from RICO and
have likewise failed to show they were injured by any alleged
violation of § 1957.  Accordingly, to the extent the claimants'
RICO claim is based on § 1957, it must fail.

**Sections 2314 and 2315.**

Section 2314 of Title 18, as relevant here, prohibits the
transportation of goods or money knowing they had been stolen,
converted, or taken by fraud; or transportation of money or
property in interstate commerce as part of an artifice to

45

defraud.  Again, the claimants have produced no evidence support

this claim, produced no evidence of an enterprise distinct from

Ellipso, and have produced no evidence showing how they were

injured by this alleged violation.

Section 2315 prohibits the receipt or possession of stolen

goods.  Once again, claimants have presented no evidence

demonstrating a enterprise distinct from Ellipso and,

accordingly, their claim here must fail.


**Section 152 (Bankruptcy Fraud).**

The claimants next cite to the bankruptcy fraud provisions

of § 152 as a basis for imposing RICO liability.  Particularly,

they rely on MCHI's bankruptcy filing in 2003 and the debtor's

current bankruptcy case.

Regarding the 2003 MCHI case, the claimants have produced no

evidence showing how they were injured as a result of the 2003

bankruptcy.  Moreover, if they were injured as result of the

filing and the filing was in fact fraudulent, they have not shown

the existence of an enterprise distinct from Ellipso.  Although

MCHI is a separate company, the evidence has shown that MCHI and

Ellipso were operated as one entity, consisting of the same

officers, same directors, and holding concurrent board meetings.

When subsidiaries are operating as one and the same company, they

are not distinct for RICO purposes.  *See Discon*, 93 F.3d 1055

46

(2nd Cir. 1996); *Katzman v. Victoria's Secret*, 167 F.R.D. 649

(S.D.N.Y. 1996).  Here there is no evidence that MCHI was

sufficiently distinct from Ellipso to form an enterprise with

Ellipso distinct from Ellipso itself.  Additionally, the

claimants have also failed to present any evidence showing how

they were injured by the alleged MCHI bankruptcy fraud.

Accordingly, to the extent the claimants' RICO claim is based on

the 2003 MCHI bankruptcy, it must fail.

Regarding this bankruptcy, claimants have presented no

evidence that Ellipso has committed fraud in this proceeding.

They have pointed to no false filings, concealment of assets,

concealment of records, or any other violation that would support

a finding of bankruptcy fraud.  Moreover, like the other RICO

counts, the claimants have also failed to produce any evidence of

an enterprise distinct from Ellipso.  Accordingly, the claimants'

RICO claim, to the extent it relies on bankruptcy fraud in this

case as a predicate offense, must also fail.

**Securities Fraud**

Claimants last cite to securities fraud as a basis for

imposing RICO liability.  Once again, the claimants have

presented no evidence that the debtor engaged in securities

fraud, no evidence that the debtor was part of an enterprise

distinct from itself if it did engage in securities fraud, and

47

have failed to show how they were injured as a result of any securities fraud by the debtor.  Accordingly, to the extent the claimants' RICO claim relies on securities fraud as a predicate offense, it must fail.

2

COUNT IV: 18 U.S.C. § 1962(d)

(Conspiracy to Commit RICO Violations).

Claimants also ask for civil relief under 18 U.S.C. § 1962(d), the RICO conspiracy statute.  Section 1962(d) provides that it is unlawful to conspire to violate §§ 1962(a),(b), and (c).  Importantly, under § 1962(d) a plaintiff may only recover "if he had been injured by an act that was itself tortious." *Beck v. Prupis*, 529 U.S. 494, 501 (2000).  Furthermore, "injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO is not sufficient to give rise to a cause of action under § 1964(c)[10] for a violation of § 1962(d)." *Id.* at 505.  Because, for the reasons stated previously, the claimants have failed to establish any RICO violation under § 1962(a), (b), or (c), they cannot recover for violations of § 1962(d) because they cannot prove injury.

---

[10]    This provision provides for a civil cause of action for RICO violations.

3

COUNT XXVI: Aiding and Abetting.

Claimants next seek to recover under a theory of aiding and abetting.  Claimants allege that Ellipso is liable for damages because it "either participated in, or provided substantial assistance in effectuating these racketeering acts."  (Compl ¶ 332).  There is, however, no private cause of action for aiding and abetting a RICO violation.  *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 657 (3d Cir. 1998) ("[A] private cause of action for aiding and abetting a RICO violation cannot survive the Supreme Court's decision" in *Central Bank*, 511 U.S. 164 (1994)).  Accordingly, the debtor's objection to count XXVI is sustained.

4

COUNT XXVII: Respondeat Superior.

In Count XXVII, claimants seek to recover against Ellipso under a theory of respondeat superior for "[t]he acts of racketeering and other illegalities set forth herein [] committed and carried out by Ellipso's officers, directors, employees, agents, servants, consultants, counsels, and others under the direction and control of Ellipso."  To the extent claimants seek to recover against Ellipso for alleged RICO violations by its employees/agents, the claim must fail as a matter of law.

49

Although courts are split as to whether respondeat superior recovery is available at all in civil RICO litigation, *see U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 892 (D.D.C. 2006), the courts that allow recovery under a theory of respondeat superior limit it to instances when the defendant is not the same as the enterprise. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1405 (11th Cir. 1994) ("[I]n order to preserve the non-identity rule, vicarious liability should not be imposed under § 1962(c) where the employer is also the RICO enterprise."); *Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 379 (6th Cir. 1993) ("[P]laintiffs may not use RICO to impose liability vicariously on corporate "enterprises," because to do so would violate the distinctness requirement."); *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992) ("There appears to be general agreement that respondeat superior liability is inappropriate under 18 U.S.C. § 1962(c) when the enterprise and person are not distinct.").  Because claimants have not shown the existence of an enterprise distinct from Ellipso itself, recovery for RICO violations under a theory of respondeat superior is unavailable and the debtor's objection to this count is sustained.

The non-RICO respondeat superior claims against the debtor also fail.  Under District of Columbia law:

Respondeat superior is a doctrine of vicarious liability which imposes liability on employers for the torts

50

committed by their employees within the scope of their
employment. *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C.
1986).  Under the doctrine, an employer is subjected to
liability for acts of his employee because of his
employment and in furtherance of the employer's
interests. *See id.* (citing *Penn Central Trans. Co. v.
Reddick,* 398 A.2d 27, 29 (D.C. 1979)). If the employee's
actions are only done to further his own interests, the
employer will not be held responsible. *See id.* (citations
omitted).  However, if the employee acts in part to serve
his employer's interest, the emmployer will be held
liable for the intentional tort of his employee even if
prompted partially by personal motives, such as revenge.
*See id.* (citing *Jordan v. Medley*, 711 F.2d 211, 214
(1983)) (other citation omitted)."

*Hechinger v. Johnson*, 761 A.2d 15, 24 (D.C. Sup. Ct. 2000).

Before addressing all the underlying counts that could

support a claim of respondeat superior against the debtor, I will

resolve a few preliminary issues to narrow the scope of the

analysis.  First, the only Ellipso employee that the claimants

presented any evidence had committed torts was David Castiel.

Second, in the section of the complaint detailing counts asserted

against Castiel--*i.e.*, counts for which the debtor could be held

vicariously liable--the claimants allege identical counts to

those alleged against Ellipso, but state that Castiel's name

should just be substituted for Ellipso's within those counts.

This often leads to absurd allegations.  For example, in Count

VII the claimants assert a claim for negligence.  Replacing

Castiel's name for Ellipso's in this count leaves an allegation

that Castiel allowed his moneys and assets to be dissipated by

expenditures and that Castiel filed for bankruptcy.  Rather than

51

address each count and point out the absurdities that result from the claimants' lazy drafting, I will instead restrict my analysis here to only those claims which are plausible with the substitution and on which the claimants presented evidence. The other claims are appropriately dismissed. Finally, under the doctrine of res judicata any respondeat superior claims against the debtor are limited in scope to torts which occurred after the District Court lawsuit or of which the claimants were unaware at that time. With these caveats, the scope of respondeat superior claims are accordingly limited to counts asserted against David Castiel that occurred after the commencement of the District Court lawsuit (or of which the claimants became aware after the District Court lawsuit), and that are plausible on their face after substituting Castiel for Ellipso in the counts.

**Count V (respondeat superior): Fraud.**

Claimants cite to the D.C. criminal fraud provision as a basis for recovery. Because, as stated with regards to Ellipso itself, no private cause of action exists under the D.C. criminal fraud statute, the claimants cannot recover of David Castiel and, as a result, cannot recover of Ellipso under a theory of respondeat superior. Accordingly, to the extent the claimants respondeat superior claim is based on the Castiel's alleged fraud, the debtor's objection to the claim is sustained.

**Count VI (respondeat superior): Conversion.**

Claimants next allege that Castiel converted moneys belonging to them and/or moneys Castiel was obligated to apply towards his obligations to the claimants.  Particularly, claimants alleged that Mann Technologies loaned Castiel money and that TRSC paid Castiel $72,000 in royalties and $25,000 in escrow funds.  There was no evidence, however, that Mann Technologies or TRSC gave any funds directly to Castiel; rather, the evidence showed that the moneys went to Ellipso.  Moreover, to the extent Castiel converted Ellipso's funds, that is a claim of the estate, not the creditor claimants.  Accordingly, the debtor's objection to the respondeat superior claim to the extent it relates to conversion (Count VI) is sustained.

**Count XI (respondeat superior): Intentional Interference with Contracts.**

Claimants next allege that Castiel interfered with their MCI contract.  For the reasons stated previously in the oral decision, however, the claimants cannot recover on the intentional interference claim because the claim belonged to GCC, not the claimants.  Accordingly, the debtor's objection to the respondeat superior claim to the extent it relates to Castiel's intentional interference with the MCI contract is sustained.

**Count XIX (respondeat superior): Malicious Prosecution.**

The court having determined above that Mann Technologies has
failed to prove lack of probable cause for Ellipso's instituting
the District Court lawsuit, its respondeat superior claim for
malicious prosecution is likewise denied.


**Count XXVIII (respondeat superior): Common Law Conspiracy,
Agency.**

Claimants last seek to recover under respondeat superior for
David Castiel's civil conspiracy to operate a RICO enterprise.
"The elements of civil conspiracy are: (1) an agreement between
two or more persons; (2) to participate in an unlawful act, or in
a lawful act in an unlawful manner; (3) an injury caused by an
unlawful overt act performed by one of the parties to the
agreement; and (4) pursuant to, and in furtherance of, the common
scheme." *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (2001).
Importantly, however, "[c]ivil conspiracy depends on performance
of some underlying tortious act; thus it is not independently
actionable." *Urban Development Solutions, LLC v. District of
Columbia*, 992 A.2d 1255, 1269 (D.C. 2010). This claim fails for
two reasons.

First, the claimants have presented no evidence showing that
there was an agreement between Castiel and another person to
participate in an unlawful act. The most that could be said is

54

that there might have been an agreement between Castiel and

Ellipso.  The intracorporate conspiracy doctrine, however,

prohibits liability on this basis.  *See Executive Sandwich*

*Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 739 (D.C. 2000)

("The intracorporate conspiracy doctrine holds that . . . a

corporation cannot conspire with its employees, and its

employees, when acting in the scope of their employment, cannot

conspire among themselves.") (quoting *McAndrew v. Lockheed Martin*

*Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)); *Lerner v. District*

*of Columbia*, 362 F. Supp. 2d 149, 165 (D.D.C. 2005) (same).

Second, under District of Columbia law it appears unlikely

that a claim for civil conspiracy can lie for violations of the

RICO statute.  *See Carr Realty*, 749 A.2d at 739 ("[W]e note

authority which suggests that a claim of civil conspiracy does

not lie for violations of a statute such as the DCHRA.").

For these reasons, the debtor's objection to the claimants'

respondeat superior claim to the extent it relates to civil

conspiracy is sustained.

5

Count XXVIII: Common Law Conspiracy, Agency.

The final count the claimants assert against the debtor is

common law conspiracy/agency to commit RICO violations.  For the

reasons stated above, this claim must fail as to a conspiracy

between Ellipso and Castiel.  Likewise, also under the

intracorporate conspiracy doctrine, Ellipso could not be found to having conspired with its attorneys to commit a RICO violation. See *Farese v. Scherer*, 342 F.3d 1223, 1232 (11th Cir. 2003); *Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999); *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 111 (7th Cir. 1990); *Doherty v. American Motors Corp.*, 728 F.2d 334, 339-40 (6th Cir. 1984); *Stepien v. Schaubert*, 2010 WL 1875763, at *6 (W.D.N.Y. 2010) ("The fact that the plaintiff has named the Board's attorneys as defendants in this matter does not negate the application of the intracorporate conspiracy doctrine.  The plaintiff has presented no factual basis that the conduct of the Board's counsel was outside the scope of its legal representation to the Board.").  Because the claimants have failed to present any evidence of a conspiracy of Ellipso with non-insiders/attorneys, their common law conspiracy count fails, and the debtor's objection to the claim on this count is appropriately sustained.

III

Pursuant to the foregoing and the court's oral ruling at the hearing on January 21, 2011, as amended herein, the debtor's objection to claims number 6, 7, 10, and 11, is sustained and the claims are disallowed in their entirety.  Separate orders follow.

[Signed and dated above.]

Copies to: Debtor, Debtor's Attorney; William Webster, Chapter 11

Trustee; Robert Patterson; John Mann; Ronald Patterson, Esq.,

attorney for Mann Technologies and TRSC.