The document below is hereby signed.

Dated: October 24, 2011.



**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

```
In re                      )
                           )
ELLIPSO, INC.,             )    Case No. 09-00148
                           )    (Chapter 11)
              Debtor.      )    Not for Publication in
                                West's Bankruptcy Reporter
```

MEMORANDUM DECISION REGARDING APPLICATIONS FOR
APPROVAL OF COMPENSATION BY COUNSEL FOR DEBTOR

This addresses the First Interim Application for Approval of
Compensation by Counsel for Debtor (Dkt. No. 443, filed December
1, 2009) and the Second and Final Application for Approval of
Compensation by Counsel for Debtor (Dkt. No. 839, filed March 25,
2010).  For the reasons that follow, I will grant in part and
deny in part the applications.


I

On February 25, 2009, the debtor commenced the above-
captioned case under chapter 11 of the Bankruptcy Code and on
March 3, 2009, Tighe, Patton, Armstrong, Teasdale, LLC, filed a
disclosure of compensation (Dkt. No. 15) and the debtor, as a
debtor in possession exercising the powers of a trustee under 11

U.S.C. §§ 1101(1) and 1107(a), filed an application under 11 U.S.C. § 327 to employ that law firm as its counsel (Dkt. No. 16).  The application to employ Tighe Patton[1] was a bare-bones, five-paragraph filing.  In substance, it disclosed that (1) the firm would bill at a maximum rate of $450 per hour; (2) it had received a prepetition retainer of $2,990.00, from which $1,951.00 in prepetition fees and $1,039 in filing fees were paid; (3) the firm held $50,000 in its trust account as an advance retainer; (4) the firm, its members, and employed attorneys were "disinterested persons within the meaning of 11 U.S.C. § 101(14)" and that "neither [the firm] nor any member or employed attorney represent[ed] or ha[d] any connection with or [held] or represent[ed] any interest adverse to the estate of the Debtor, its attorneys or accountants . . . "; and (5) that the employment of the firm was in the best interest of the debtor and the estate.  The declaration of Kermit A. Rosenberg filed with the application under Fed. R. Bankr. P. 2014(a) recited that no member of his firm "has any connection with or represents any interest adverse to the debtor herein, its creditors, or any other party in interest herein, their attorneys, the United States Trustee, or any person employed in the Office of the

---

[1]  In the spring of 2009, Tighe, Patton, Armstrong, Teasdale, merged with another firm.  The firm is now known and Butzel, Long, Tighe, Patton.  For ease of reference I will continue to refer to the firm in this opinion as Tighe Patton.

United States Trustee," but disclosed the forgiveness of fees incurred by the debtor prepetition.

Prior to the filing of any responses to its application to employ, Tighe Patton filed an amended disclosure of compensation, clarifying that of the $50,000 retainer, it had remitted $5,000 to the debtor for deposit in the debtor in possession account for administrative expenses.  Tighe Patton also disclosed that it had waived $109,488.55 in prepetition legal fees not related to the bankruptcy.

Robert Patterson objected to Tighe Patton's application to employ on the basis that the firm suffered from impermissible conflicts of interest.  In support of his objection, Patterson alleged that Tighe Patton had previously represented the debtor and its principal owner and CEO, David Castiel, in various litigation in New York and Washington D.C, and that upon the filing of the bankruptcy petition, the debtor's position vis-a-vis Castiel had become adverse.  Patterson further contended that several oversights in the debtor's petition and schedules indicated that Tighe Patton was "a party in concealing the debtor's assets and exaggerating the Debtor's obligations." Based on these and other allegations, Patterson concluded that Tighe Patton was under Castiel's domination and control and would not act in the best interest of the estate.

In response to Patterson's objection, Tighe Patton filed a

reply wherein it made additional disclosures relevant to its application to employ.  First, with respect to Castiel, Tighe Patton disclosed that its representation of Castiel was limited to his official capacity as an employee and officer of Ellipso. Second, Tighe Patton disclosed that the debtor had paid it $5,000 for non-bankruptcy, prepetition services.  The reply did not state the date on which the payment was made.  Third, Tighe Patton disclosed that it had represented and continued to represent Virtual Geosatellite LLC[2] in non-bankruptcy matters.

The court held a hearing on Tighe Patton's application to employ at which Kermit Rosenberg, a member of Tighe Patton, appeared and presented testimony in support of the application. With respect to the firm's relationship to Castiel, Rosenberg disclosed that Tighe Patton had represented Ellipso and Castiel in his capacity as an officer for the company in other litigation for more than a year prior to the bankruptcy, but that the litigation in which it had previously represented Castiel had concluded and that the firm did not currently represent him.[3] With respect to Virtual Geosatellite LLC, Rosenberg disclosed that Tighe Patton had previously represented the company, that

---

[2]    There are two Virtual Geosatellite companies at issue in this proceeding: Virtual Geosatellite LLC and Virtual Geosatellite Holdings, Inc.  Tighe Patton only initially made disclosures with respect to Virtual Geosatellite LLC.

[3]    At the hearing Castiel waived any conflict with respect to Tighe Patton's prior representation of him.

4

the company held most of the valuable patents, and that these
patents would be the source of any reorganization by the debtor.
Rosenberg further stated that Tighe Patton had not provided any
services for Virtual Geosatellite LLC since the petition date and
that Ellipso had always paid for any services rendered to Virtual
Geosatellite LLC.  With respect to fees, Rosenberg disclosed that
Tighe Patton had actually received $60,000 from the debtor as a
retainer, but had remitted $15,000 of that back to the debtor
upon the debtor's request for use to pay administrative
expenses.[4]  Rosenberg also disclosed that the $5,000 payment
Tighe Patton had received for non-bankruptcy, prepetition work
was a check from the debtor that it received prior to the
bankruptcy filing but that the check did not clear until after
the case was filed.[5]  Finally, Rosenberg disclosed that all of
the amounts paid to Tighe Patton came from the sale of securities
in an account the debtor held at TD Ameritrade.

Patterson, John Mann, and Martha Davis, on behalf of the
United States Trustee, appeared at the hearing on Tighe Patton's
application to employ and voiced objections.  Patterson
reiterated the arguments set forth in his written objection and

---

[4]  Rosenberg testified that Castiel requested this
additional amount so that the debtor could fund ongoing expenses
of the company and that the $15,000 included $5,000 that Tighe
Patton had previously remitted and that had proven insufficient.

[5]  Rosenberg agreed to return these funds to the debtor.

expressed concern that the source of Tighe Patton's retainer was
an account on which he, as a creditor, held an attachment.  Davis
expressed concern that the amount received by Tighe Patton had
increased to $60,000 and that Virtual Geosatellite LLC was an
account debtor to Ellipso in the amount of $2.2 million.  Davis
also expressed concern about the sequential release of
information by Tighe Patton and argued that this alone was a
ground to deny its application for employment.

Ultimately, I granted Tighe Patton's application based upon
Rosenberg's testimony and representations at the hearing.  With
respect to the conflict stemming from a prior representation of
Castiel, I found that Castiel's waiver of the conflict cured the
issue.  With respect to Tighe Patton's failure to take a position
with regards to whether Castiel should be held personally liable
for a judgment in the District Court, I found that the debtor had
not waived any rights against Castiel at that point, and, in any
event, any tension that might exist because of that relationship
was insufficient to disqualify Tighe Patton as counsel for the
debtor.  With respect to the source of the funds, I overruled
Patterson's objection because there was no evidence that
Patterson's writ of attachment had been served on TD Ameritrade
prior to the transfer.  Finally, with respect to the piecemeal
nature of Tighe Patton's disclosures, I found Rosenberg's
explanation sufficient, but made approval of Tighe Patton's

retention subject to Tighe Patton filing an amended disclosure of
compensation that sufficiently set forth the total amount of
money it received from the debtor's TD Ameritrade account and how
it distributed those funds.  Tighe Patton filed its amended
disclosure of compensation on April 13, 2009, and I entered the
order approving its appointment on May 6, 2009.

On December 1, 2009, Tighe Patton filed its first interim
application for approval of compensation and reimbursement of
expenses as an administrative claim against the estate under 11
U.S.C. §§ 330(a) and 503(b)(2).  In that application, Tighe
Patton sought $148,689.00 for services rendered and $1,496.14 for
out-of-pocket expenses for the period of February 25, 2009,
through November 30, 2009.  This consisted of 406.1 attorney
hours at an average rate of $366.14 per hour.

John Page objected to Tighe Patton's fee application on the
grounds that it had several non-disclosed prior representations
of the debtor's affiliates and misfeasance during the case.  With
respect to the non-disclosure, Page contended that Tighe Patton
had failed to disclose that it was counsel to two of the debtor's
affiliates, Virtual Geosatellite Holdings, Inc., and Mobile
Communications Holdings, Inc., in *Draim v. Virtual Geosatellite
Holdings, Inc.*, Case No. 01-cv-02690 (D.D.C. 2001).  Page also
contended that Virtual Geosatellite Holdings, *Inc.*, in contrast
to Virtual Geosatellite *LLC*, owned 10% of Ellipso's equity

interest and that Mobile Communications Holdings, Inc. had two
potential claims against the debtor.  With respect to Tighe
Patton's misfeasance, Page contended, among other things, that
Tighe Patton had made unauthorized payments to Linda Awkard, had
wasted estate resources in unnecessary discovery disputes, had
assisted Castiel in putting forth a phony funding scheme for the
debtor's plan, and had filed frivolous objections to claims.

Robert Patterson, John Mann, Mann Technologies, LLC, and The
Registry Solutions Company, like Page, all objected to Tighe
Patton's fee application on the general bases that it held
impermissible conflicts of interest and had provided no benefit
to the estate.  Further, Patterson, *et al.*, additionally objected
to the fee application on the basis that Tighe Patton's $450 per
hour fee was unreasonable.

In response to the creditors' objections, Tighe Patton filed
a supplemental disclosure to its initial application to employ.
In that supplement, Tighe Patton disclosed five previously-
undisclosed additional representations that it had undertaken of
the debtor, its principal, and affiliates:

- Representation of Castiel, Virtual Geosatellite Holdings,
  Inc., and Mobile Communications Holdings, Inc., in *Draim v.
  Virtual Geosatellite Holdings, Inc.*, Case No. 1:01-cv-2690
  (D.D.C. 2009).  Tighe Patton began its representation in
  January 2005.  Castiel was dismissed as a party from the

8

litigation in March 2006, but Tighe Patton continued as
counsel of record for Virtual Geosatellite Holdings and
Mobile Communications Holdings until September 2009.

- Representation of Ellipso and Virtual Geosatellite LLC in
  *Ellipso Inc. v. Draim*, Case no. 1:06-cv-1373 (D.D.C. 2006).
  The representation in that case was from April 18, 2008,
  through April 28, 2008.

- Representation of Ellipso, Castiel, and Virtual Geosatellite
  LLC in *SST Global Technology, LLC v. Chapman*, Case No. 02-
  7687 (S.D.N.Y. 2006).  The representation in that case was
  from September 2003 until July 2005, when the case was
  terminated pursuant to a settlement agreement.

- Representation of Ellipso, Castiel, Virtual Geosatellite
  LLC, Mobile Communications Holdings, Inc., and Virtual
  Geosatellite Holdings, Inc., in *Sahagan v. Castiel*, Case No.
  603117 (Sup. Ct., N.Y. 2007).  The representation in that
  case was from May 2008 to September 2008 and related to an
  alleged breach of the settlement agreement in *SST Global
  Technology, LLC v. Chapman*, set forth above.

- Representation of Ellipso, Virtual Geosatellite Holdings,
  Inc., and Mobile Communications Holdings, Inc., in *Ellipso,
  Inc. v. Inciardi*, Case No. 02-433 (D.D.C. 2002).  The
  representation lasted for two days, until the case was
  dismissed by stipulation in accordance with the settlement

agreement in *SST Global Technology, LLC, v. Chapman*, set

forth above.

Tighe Patton also disclosed that in June, July, and August 2008,

it received $34,896.60 in fees from Ellipso,[6] but had received no

payments since that time from any of the parties for those cases.

At the same time Tighe Patton filed its supplemental

disclosure to the application to employ it filed a motion to

withdraw as counsel to the debtor in possession, citing an

impermissible conflict of interest with the debtor.  That alleged

conflict arose as follows.  Shortly after Tighe Patton filed its

application for compensation, Patterson, Mann, Mann Technologies,

and The Registry Solutions Company filed a suit in the District

Court against, among others, Tighe Patton and the debtor.  In

that suit, Patterson, *et al.*, asserted fraud and civil RICO

counts against both parties.  The suit sought $30,000,000 in

treble damages and $10,000,000 in punitive damages against the

defendants.  In its motion to withdraw, Tighe Patton contended

that the RICO suit put it in a position adverse to the estate

because, if it were found liable, it would have an administrative

claim against the estate for indemnification.  Tighe Patton

further contended that in light of the creditors' opposition to

its application for compensation and the RICO suit, it had an

---

[6]  In its prior disclosure, Tighe Patton had represented
this amount as the "approximately $30,000" received in June 2008.

incentive to make sure that no plan was confirmed and could no
longer act solely in the best interest of the estate.  On January
5, 2010, I denied Tighe Patton's motion.  Tighe Patton thereafter
filed a motion to reconsider the order denying its motion for
leave to withdraw, again citing to the District Court RICO
lawsuit and its potential indemnification rights against the
debtor as creating an impermissible conflict and, thus,
necessitating its withdrawing as counsel for the debtor.

        Prior to ruling on Tighe Patton's motion to reconsider, the
United States Trustee filed a motion to remove the debtor as
debtor in possession and appoint a trustee to oversee the estate.
The Trustee filed its motion based on the inordinate level of
conflict that had arisen in the case.  At a hearing on January
19, 2010, I granted the United States Trustee's motion and
directed the appointment of a chapter 11 trustee.  In light of
this, I granted in part Tighe Patton's motion to reconsider,
requiring it to continue representing the debtor (which was no
longer acting as a debtor in possession with fiduciary duties)
with respect to carrying out its remaining duties as merely a
debtor under the Bankruptcy Code but allowing Tighe Patton to
represent its own interest in the case (*e.g.*, objecting to
confirmation of the Mann Plan).

        On March 25, 2010, Tighe Patton filed is Second and Final
Application for Approval of Compensation by Counsel for Debtor.

The application sought $18,872.19, consisting of $17,745 in attorneys' fees and $1,127.19 in costs as an administrative claim against the estate.  Consistent with the court's order granting it authority to withdraw its representation of the debtor, Tighe Patton did not seek fees from the estate for services after December 22, 2009, other than for reviewing and filing the debtor's monthly operating reports required of it as a debtor in possession for months prior to the appointment of a trustee.

The creditors also filed an objection to Tighe Patton's second fee application.  Creditors Mann Technologies, The Registry Solutions Company, John Mann, and Robert Patterson's objection was substantively identical to their objection to Tighe Patton's first application.  Creditor John Page's objection incorporated the grounds in his original objection but added, as an additional ground, Tighe Patton's alleged continued malfeasance during the case.

The court held a hearing on the fee applications on May 18, 2010.  Tighe Patton, the creditors, and Martha Davis, on behalf of the United States Trustee, appeared at the hearing.  The United States Trustee joined in objecting to the application. After the presentation of evidence, I took the matter under advisement.  This represents the court's findings of fact and conclusions of law.

II

The creditors challenge Tighe Patton's fee applications on
three broad bases: impermissible conflicts under § 328, charging
for services that were not beneficial to the estate, and failure
to disclose all of its connections with the debtor prior to
appointment as counsel.  The United States Trustee joined with
the creditors as to the third basis.  The creditors also
challenge Tighe Patton's hourly rates.  I will address each
contention in turn.


A

Creditors John Page, Robert Patterson, John Mann, Mann
Technologies LLC, and The Registry Solutions all challenge Tighe
Patton's fee application on the basis that its prepetition and
postpetition representation of Castiel and affiliated entities of
the debtor created a conflict of interest that preclude it from
receiving fees for its work in the case.  With respect to
Castiel, the creditors contend that Tighe Patton's prior
representation of Castiel has caused it to place his interest
above the interest of the estate.  Specifically, the creditors
cite to the following acts: (1) "refusing to advocate placing any
responsibility on D. Castiel for his actions which caused the
bankruptcy of debtor"; (2) "refusing to take any actions to
recover any moneys from D. Castiel for his malfeasances"; (3)

filing "numerous false and materially misleading pleadings and schedules herein listing fraudulent claims; non existent creditors; false valuation of assets; and scurrilous accusations against Creditors and others who have questioned the conduct of D. Castiel"; (4) "opposing any and every effort by the Creditors to obtain information concerning Debtor's operations or financial status"; and (5) "extend[ing] this case by submitting false Plans and Disclosure Statements purportedly on behalf of the debtor, but in reality on behalf of D. Castiel." Joint Opp., DE 496, at 8.  With respect to Tighe Patton's representation of the debtor's affiliates, the creditors urge that the Tighe Patton's postpetition representation of Virtual Geosatellite Holdings, Inc., and Mobile Communications Holdings in the *Draim* case created a conflict that should preclude its receiving compensation because VGHI was equity interest holder in Ellipso and Mobile Communications Holdings, Inc. held an unscheduled claim against the debtor.

Sections 327 through 331 of the Bankruptcy Code govern the employment and compensation of attorneys for the debtor in possession.  Pursuant to § 327(a) of the Bankruptcy Code, the debtor in possession is entitled to employ an attorney to represent and assist it in carrying out its duties under the Bankruptcy Code.  The debtor may generally select the attorney of its choice, so long as the attorney does not "hold or represent

an interest adverse to the estate" and is disinterested.  11

U.S.C. § 327(a).  Pursuant to § 328(c) of the Bankruptcy Code,

"the court may deny allowance of compensation for services and

reimbursement of expenses of a professional person . . . if, at

any time during such professional person's employment under

section 327 . . . such professional person is not a disinterested

person, or represents or holds an interest adverse to the

interest of the estate with respect to the matter on which such

professional person is employed."  Section 101(14) of the

Bankruptcy Code defines "disinterested person" to mean:

> a person that–
> (A)  is not a creditor, an equity security holder,
>      or an insider;
> (B)  is not and was not, within 2 years before the
>      date of the filing of the petition, a
>      director, officer, or employee of the debtor;
>      and
> (C)  does not have an interest materially adverse
>      to the interest of the estate or of any class
>      of creditors or equity security holders, by
>      reason of any direct or indirect relationship
>      to, connection with, or interest in, the
>      debtor, or for any other reason.

The scope of § 328(c) is limited by § 327(c), which provides that

a person is not precluded from employment "solely because of such

person's employment by or representation of a creditor, unless

. . . there is an actual conflict of interest."  Importantly, a

party objecting to an application for compensation on the basis

of a conflict of interest bears the burden of establishing the

conflict.  *In re Leslie Fay Companies, Inc.*, 222 B.R. 718, 721

(S.D.N.Y. 1998); *In re Huntco Inc.*, 288 B.R. 229, 236-37 (Bankr. E.D. Mo. 2002) ("Specifically, the representation of a debtor in possession's affiliate is not a *per se* representation of an interest that is adverse to the estate.  Rather, the objecting party must identify some conflict between the affiliate and the debtor in possession apart from the affiliate relationship."); *see also In re AOV Industries, Inc.*, 798 F.2d 491, 495-96 (D.C. Cir. 1986) (under 11 U.S.C. § 1103(b), once an attorney has formally stated that it has complied with that section, the burden is on the party alleging conflict of interest to produce evidence to support its claim).

The objecting creditors have failed to show that Tighe Patton was not a "disinterested person" as that term is defined in the Bankruptcy Code up until the point at which it sought to withdraw as counsel for the debtor.  Up until the point that Patterson and Mann filed the RICO complaint in the District Court, Tighe Patton was neither a "creditor, an equity security holder, [n]or an insider" of the debtor.  Indeed, prior to seeking employment, Tighe Patton waived all of its prepetition fees and agreed to return the one postpetition payment it received.  Further, up until the filing of the RICO suit, Tighe Patton had no interest materially adverse to the estate: it was only upon the filing of the RICO complaint that it became in the firm's interest to oppose confirmation and move against the Mann

16

Plan.

Likewise, the creditors have failed to show that Tighe Patton represented an interest adverse to the estate.  With respect to Castiel, Rosenberg testified at both the hearing on Tighe Patton's fee application and the debtor's application to employ the firm, that the firm's representation of Castiel was limited to his official capacity as an officer of the debtor and the debtor's affiliates.  Given this limitation, the interests of Ellipso and Castiel were aligned and no impermissible conflict exists.

Notwithstanding this, the objecting creditors contend that certain of Tighe Patton's acts within the case show that an impermissible conflict existed.  For example, the objecting creditors made much of the fact that Tighe Patton declined to take a position on behalf of the debtor in the district court litigation on whether Castiel should be held personally liable for the so-called "bad faith judgment."  This, however, is not the conflict itself, but would be the result of any alleged conflict.  The same is true of the list of acts that the creditors detail in their objections: these would be all the the

end result of any conflict.[7]  In all cases, the result is not
enough.  Rather, the creditors bore the burden of showing what
position Tighe Patton took *in representing* Castiel was adverse to
the estate.  They have come forward with none, and thus this
basis for disallowing the firm's compensation fails.

Similarly, with respect to Tighe Patton's representation of
Virtual Geosatellite Holdings, Inc., the creditors have provided
no evidence that the firm's representation of that entity was
adverse to the estate.  The mere representation of an affiliate
of the debtor that has a potential claim in the bankruptcy is
insufficient to disallow Tighe Patton's compensation.  *In re
Global Marine, Inc.*, 108 B.R. 998, 1004 (Bankr. S.D. Tex. 1987)
("[M]ere existence of an intercompany claim does not in and of
itself constitute an impermissible conflict of interest that
would justify disqualification or denial of compensation.").
While Virtual Geosatellite Holdings, Inc. as an equity holder of
the debtor potentially held an interest that was adverse to the
estate, the representation of a party that held an adverse
interest is not enough.  Rather, Tighe Patton would have had to

---

[7]  Some of these acts include the Tighe Patton's failure to
use John Page's offer to purchase the company as the stalking
horse bid, the failure of Tighe Patton to object to Castiel's
bonus and wage claim (although the deadline for filing that
objection had not yet passed), the actions taken by Tighe Patton
to prevent the objecting creditors from obtaining discovery from
the debtor, and "allowing" David Castiel to sell off assets of
the debtor, among others.

represent Virtual Geosatellite Holdings, Inc. with respect to
that adverse interest.  The distinction is important.  The
Bankruptcy Code does not bar the representation of an entity with
an interest adverse to the estate but, rather, the representation
of *an interest* adverse to the estate.  11 U.S.C. § 328(c),
§ 327(c).  The creditors have presented no evidence that Tighe
Patton's representation of Virtual Geosatellite Holdings, Inc.
was with respect to its equity interest in Ellipso or that its
representation in either the *Draim*, *Sahagan*, or *Inciardi*
litigation was contrary to the interests of the debtor.  Absent
such evidence, Tighe Patton's prior representation of Virtual
Geosatellite Holdings, Inc. standing alone is not a basis for
disallowing its application for compensation.

Tighe Patton's representation of Mobile Communications
Holdings, Inc. is more problematic.  First, as a preliminary
matter, as with Tighe Patton's previous representation of Virtual
Geosatellite Holdings, Inc. the mere representation of an
affiliate of the debtor that has a potential claim in the
bankruptcy is insufficient to disallow Tighe Patton's
compensation.  *In re Global Marine, Inc.*, 108 B.R. at 1004.
Again, rather, Tighe Patton would have had to represent Mobile
Communications Holdings, Inc. with respect to that adverse
interest.  In his objection to Tighe Patton's application for
compensation, John Page contends this was the case.

19

As detailed in the debtor's Second Amended Disclosure
Statement, pursuant to a 2002 stock purchase agreement Mobile
Communications Holdings, Inc. was to transfer its interest in an
entity known as ESBH to ICO Global in exchange for approximately
1.5 million shares of ICO Global stock.  While Tighe Patton did
not represent the debtor or Mobile Communications Holdings, Inc.
in that transaction, it did represent both entities in a later
lawsuit stemming from that transaction.  Ultimately, that suit
settled for approximately $3 million in May 2008.  In his
objection to Tighe Patton's application for compensation, John
Page contends that the proceeds of the settlement went to Ellipso
and that in light of the structure of the stock purchase
agreement the proceeds of the settlement should have gone to
Mobile Communications Holdings, Inc..  Accordingly, Page
concludes, the interests of the entities were adverse and, thus,
Tighe Patton was precluded from representing the debtor in this
proceeding.  At the hearing on the Tighe Patton's fee
application, however, Page presented no evidence to this effect.
Without evidence relating to the structure of the settlement,
whether Mobile Communications Holdings, Inc. received
consideration for any transfer of the ICO Global stock to
Ellipso, and the nature of Tighe Patton's representation as it
relates to the settlement agreement, I cannot say that an actual
conflict existed.  Accordingly, this basis for disallowing Tighe

20

Patton's application for compensation also fails.


B


The objecting creditors next contend that the court should
deny Tighe Patton's fee application because the fees its seeks
were not reasonable.  Under § 330(a), the court is given wide
discretion to review the reasonableness of fees.  In determining
reasonableness, the court may consider (i) the time spent, (ii)
the rates charged, (iii) whether the services performed were
necessary or beneficial to the completion of the case, (iv)
whether the time spent on the services were "commensurate with
the complexity, importance, and nature of the problem, issue, or
task addressed," (v) the skill of the person seeking
compensation, and (vi) whether the compensation sought is
reasonable "based on the customary compensation charged by
comparably skilled practitioners in cases other than cases under
this title."  11 U.S.C. § 330(a)(3).  Moreover, under
§ 330(a)(4), the court may disallow compensation for either
unnecessary or duplicative services or services that were not
reasonably likely to benefit the estate or necessary to the
administration of the estate.  At the hearing on Tighe Patton's
application, the objecting creditors focused on the third factor:
whether the services performed were necessary or beneficial to
the estate.

21

In determining whether to grant an application for compensation for attorneys' fees, "courts objectively consider whether the services rendered were reasonably likely to benefit the estate from the perspective of the time when such services were rendered." *In re Value City Holdings, Inc.*, 436 B.R. 300, 305 (Bankr. S.D.N.Y. 2010). In contrast to challenges as to disinterestedness and conflicts of interest, the burden of proof as to reasonableness rests upon the applicant. *In re Vu*, 366 B.R. 511, 521 (D. Md. 2007). "To satisfy this burden, a claimant must justify its charges with detailed, specific, itemized documentation. *In re Bennett Funding Group Inc.* 213 B.R. 324, 244 (Bankr N.D.N.Y. 1997). Moreover, "[t]his burden is not to be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or for use by the debtor." *In re Williams*, 378 B.R. 811, 822 (Bankr. E.D. Mich. 2007) (quoting *In re Pettibone Corp.* 74 B.R. 293, 299 (Bankr. N.D. Ill. 1987)).

The objecting creditors point to five specific matters in the case which they contend were not beneficial to the estate.

First, the objecting creditors take issue with Tighe Patton's actions regarding John Mann's motion to shorten exclusivity. Prior to the expiration of the exclusivity period, John Mann filed a motion to shorten the exclusivity period to allow him to file his own plan and preserve estate assets. (Dkt.

No. 76, filed May 8, 2009).  The debtor filed an opposition to
the motion (Dkt. No. 114), and Mann subsequently withdrew the
motion based on the debtor's alleged representation that it would
not seek to extend the period (Dkt. No. 127).  Rosenberg
testified at the hearing on Tighe Patton's fee application that
Tighe Patton advised the debtor to oppose Mann's motion because
it "looked to be contrary to the interest of Ellipso and its
creditors and looked like nothing more than a shell game to move
the assets away from the creditors."  I find Rosenberg's
testimony credible in this respect.

The plan Mann filed with his motion to limit the exclusivity
period transferred ownership of the company to Mann and provided
limited payments to unsecured creditors: "The Plan provides for
transfer of all equity interest in Debtor to Mann, reorganization
of the business and for payment of administrative expense claims,
deferred cash payments on secured claims and priority tax claims,
and pro rata payments on claims of unsecured creditors."
Unsecured creditors would receive not less than 10% of their
allowed claims, payable pro rata from "Distributable Cash" over a
five year term.  "Distributable Cash" was not defined in the
plan.  Without this integral term, I agree that Mann's plan did
not look to be in the best interest of creditors and Tighe
Patton's opposition provided a benefit to the estate.

Next, the creditors contend that Tighe Patton's actions with

respect to the funding of Ellipso's plan were not beneficial to
the estate.   On the day prior to the termination of the
exclusivity period the debtor filed its first plan.   The debtor's
plan provided for a $600,000 stalking horse bid by David Castiel,
which was subject to higher and better offers by third parties.
In formulating the plan, Tighe Patton rejected a higher stalking-
horse offer for $750,000 by John Page.   Ultimately, Castiel's
funding did not come through and the debtor was forced to
withdraw its plan.   The objecting creditors contend that Tighe
Patton's rejection of John Page's bid was in bad faith and, thus,
the fees incurred in connection with the debtor's plan should be
disallowed.

        At the hearing on Tighe Patton's fee application, Rosenberg
testified that the debtor went with Castiel's offer because the
funding was verifiable.   Rosenberg also testified that the debtor
was up against a deadline to file the plan before the exclusive
period expired and that Page's offer was constantly changing in
the days leading up to the deadline for the debtor to file its
plan.   Ultimately, Rosenberg continued, Castiel opted to go with
his funding source for the plan and not Page's because he did not

believe Page's funding source was solid.[8]   Rosenberg conducted no

due diligence on Page's offer, instead relying on Castiel to look

into Page's financials.   Rosenberg further noted that because the

plan was subject to higher and better offers, Page, or anyone

else for that matter, could have put in a higher and better bid

at any time and the debtor would have gone with that offer to

fund its plan.

While I am sympathetic to Page's plight in getting his bid

accepted as a stalking horse offer, I cannot say that in opting

for Castiel's offer Tighe Patton did not provide a benefit to the

estate.   The disdain with which the firm treated Page was

unbecoming of the standards to which professionals before this

court should aspire.[9]   Nevertheless, given the looming

exclusivity deadline, the lack of evidence regarding the

---

[8]   In opting for Castiel's offer, Rosenberg relied on the
representations of Linda Awkard, special counsel to the debtor
with respect to finding funding for the plan, that "she had
first-hand knowledge and that she had seen strong evidence of
their ability to fund this $600,000 in cash and in fact they
would."

[9]   This case aptly demonstrates the untenable position in
which counsel for a debtor in possession can be placed with
respect to representing a debtor in possession charged with
protecting the interests of the estate but being required to
ascertain the debtor in possession's decisions from the debtor's
management whose goals may deviate from the best interests of the
estate.   This, however, should not be construed as implying that
Tighe Patton was representing Castiel in this case or, for that
matter, an interest adverse to the estate.   Castiel's views
regarding exclusivity were not demonstrably adverse to the
estate.

viability of Page's funding source, and the fact that Castiel's offer was subject to higher and better offers, Tighe Patton's actions with respect to the debtor's plan provided a benefit to the estate and were justified under the circumstances, though the manner in which it treated Page was not.  Accordingly, I will overrule the creditors' objection in this regard.

Third, the objecting creditors contend that Tighe Patton's work on drafting an objection to John Mann's plan and disclosure statement that was never filed provided no benefit to the estate and, thus, should not be compensable.  After the exclusivity period expired on the debtor's plan, John Mann filed his proposed plan.  This plan was amended from the plan he had attached to his motion to shorten exclusivity in that it provided for a combination of cash and redeemable warrants to unsecured creditors.  Contrary to the creditors' assertion, however, Tighe Patton did file the objection to the plan and disclosure statement.  In substance, the objection contended that the disclosure statement failed to provide adequate information.  At the hearing on Mann's disclosure statement, I agreed with the debtor's arguments in this respect, but thought both Mann's plan and the debtor's plan should be permitted to go forward at the same time.  This, I reasoned, would allow creditors to resolve the uncertainty contained in the Mann Plan by opting for the debtor's lump-sum payoff plan.  Nevertheless, I granted Mann

leave to file an amended plan if he saw fit.  Mann opted to stay
with his initial plan.

In light of the fact that Tighe Patton actually filed the
objection to the Mann Plan and in light of the fact that I
ultimately agreed with its contentions, I do not find that the
fees it seeks with respect to the objection were not of benefit
to the estate.  Indeed, if the debtor had not filed a competing
liquidating plan, I would have likely required Mann to amend his
plan to provide more information to creditors.  Accordingly, I
will overrule the creditors' objection in this regard.

Fourth, the objecting creditors contend that the time Tighe
Patton spent contesting the creditors' discovery requests did not
provide a benefit to the estate.  Over the course of the case,
the objecting creditors attempted on numerous occasions to get
access to the debtor's business and financial records.  Tighe
Patton billed 29.4 hours relating to these discovery requests.
Of this, only 4.4 of the hours Tighe Patton spent were in
conferring to attempt to resolve the disputes.  Less that amount,
this resulted in total fees billed to the estate of $8,760.  When
asked about these actions on the stand, Rosenberg's only
justification was that it was based upon Patterson's prior felony
conviction, and, with respect to requests for documents by Mann
and Page, their affiliation with Patterson.

This explanation is insufficient to carry Tighe Patton's

burden to show the fees incurred in opposing the discovery requests were reasonable.  The fact that a party requesting documents had previously been convicted of a felony or, even more tenuous, that the party was affiliated with a person convicted of a felony does not provide a sound basis for denying discovery. Most of the time Tighe Patton billed opposing the objecting creditors discovery requests related to technical violations of the discovery rules.  Ultimately, Tighe Patton's policy of resisting discovery to these creditors resulted in nothing more than running up fees against the estate and delaying the inevitable.  More than mere distrust or dislike of a creditor is required to justify such actions.  Accordingly, I will disallow the $8,760 in fees Tighe Patton billed for in engaging in these acts.

Finally, the objecting creditors contend that by filing a motion to convert after the debtor was unable to secure funding for its plan and by objecting to the creditors' claims Tighe Patton was only trying to "play spoiler to the Mann Plan" and, thus, providing no benefit to the estate.  On both counts I disagree.  After the debtor's plan fell through, filing a motion to convert was the most responsible action the debtor could have taken.[10]  Indeed, to this day I am at a loss as to why this case

---

[10]  The debtor later requested that the hearing on its motion to covert be deferred, and has not requested that a hearing be re-set.

remains in Chapter 11 and the trustee has not pressed for its conversion.  With respect to the objections to claims, the fact that this court has upheld them is alone sufficient to demonstrate their benefit to the estate.  That the debtor might have been selective in choosing which objections to pursue first does not mean those that it did pursue were wasted efforts. Accordingly, I will overruling this objection as well.

C

The creditors' final basis for disallowing Tighe Patton's fees relates to the piecemeal nature of Tighe Patton's disclosures in this case.  The United States Trustee joins in this portion of the creditors' objection.

Under Fed. R. Bankr. P. 2014, an attorney or firm seeking to be appointed as counsel to the debtor in possession has a duty to disclose "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Failure to make such disclosures can result in revocation of the order authorizing the firm's employment and a denial of compensation.  *In re Crivelo*, 134 F.3d 831, 836 (3d Cir. 1998).  If the nondisclosure is intentional, the court "[s]hould not hesitate to order the denial of all compensation."  *In re Midway Indus. Contractors, Inc.*, 272 B.R.

29

651, 663 (Bankr. N.D. Ill. 2001); *see also Crivelo*, 134 F.3d at

839.  Where, however, the failure to disclose is unintentional,

whether to disallow fees is within the court's discretion.  *In re*

*Raymond Prof'l Grp., Inc.*, 421 B.R. 891, 906 (Bankr. N.D. Ill.

2009).  In determining whether it is appropriate to disallow

fees, courts have weighed five factors:

- Whether the connections at issue would have created a
  disqualifying interest under section 327(a);

- the materiality of the information omitted;

- counsel's efforts to correct the deficiency;

- the benefits provided to the estate by counsel; and

- whether the failure to disclose was inadvertent or
  intentional.

*In re American Int'l Refinery, Inc.*, 436 B.R. 364, 380 (Bankr.

W.D. La. 2010) (setting forth the factors and citing cases).

At the hearing on Tighe Patton's application, Kermit

Rosenberg provided testimony regarding Tighe Patton's connections

with the debtor, its principal and affiliates, and the firm's

failure to disclose those connections with its application to

employ and initial disclosures.  With respect to the firm's

disclosures in its application to employ, Rosenberg testified as

follows:

- At the time Ellipso retained Tighe Patton to serve as its
  bankruptcy counsel, Rosenberg ran a standard conflicts check

through the firm's conflicts database on Ellipso, Castiel,
and the affiliated entities.  That conflicts check only came
back with the firm's prior representation of Ellipso and
Castiel, and its ongoing representation of Virtual
Geosatellite LLC with respect to the sale of its
intellectual property.  It did not reveal the firm's ongoing
representation of Virtual Geosatellite Holdings, Inc., and
Mobile Communications Holding, Inc., in the *Draim* case, or
the firms previous representation of the debtor, Castiel and
the debtor's affiliates in the pre-bankruptcy cases.

- As part of the conflicts check procedure, all attorneys in
  the firm were emailed regarding the proposed representation
  of the debtor in this bankruptcy case.  No attorneys
  responded to the email.

- Rosenberg approached Thomas Patton, the attorney
  representing Virtual Geosatellite LLC, to inquire about that
  matter.  Patton informed him that the Virtual Geosatellite
  LLC matter was ongoing and was related to the sale of its
  intellectual property.  Patton said that he could not think
  of any other Ellipso-related entities that the firm was
  representing.  Thomas Patton was the attorney representing
  both Virtual Geosatellite Holdings, Inc., and Mobile
  Communications Holdings, Inc., in the ongoing *Draim* case and
  had represented the entities listed in the other cases

31

disclosed in the supplemental disclosure.

- At the time Tighe Patton filed its application for employment, the *Draim* matter had been largely concluded, though some work was done postpetition.[11]

- Rosenberg knew that there were over $100,000 in fees owed to the firm, but did not inquire as to what entities were involved in accruing those fees and assumed they related to the entities revealed in the conflicts check.

- Rosenberg first became aware of Tighe Patton's representation of Virtual Geosatellite Holdings, Inc., and Mobile Communications Holdings, Inc., upon the filing of the creditors' objection to Tighe Patton's first application for compensation.

- Upon being alerted to the issue, Tighe Patton ran an extended search on the federal courts' PACER database to see if any other representation by Tighe Patton of the debtor, Castiel, or the debtor's affiliated entities came up.  This resulted in Tighe Patton's supplement to its initial application to employ.

Weighing the five factors set forth by the bankruptcy court in *American International Refinery*, I find it appropriate to

---

[11]  Upon review of the docket in the District Court, the only work done in that case postpetition was the filing by Thomas Patton of a motion to extend time to file an appeal of Judge Facciola's findings of facts and conclusions of law in the proceeding and a reply to Draim's opposition to the motion.

disallow a portion of Tighe Patton's fees.

First, I do not find that the connections at issue would have created a disqualifying interest under section 327(a).  As previously stated, that provision only prohibits that representation of an interest adverse to the estate, not the representation of a entity that happens to hold an adverse interest.  There has been no evidence that the firm represented any entity with respect to an interest adverse to the estate.

Second, I do find that the information Tighe Patton failed to disclose was material.  Although Tighe Patton did not represent an interest adverse to the estate in the prior and ongoing litigation, it did represent entities that potentially held such interests.  Mobile Communications Holdings, Inc. held a potential claim against the estate based upon the *Sahagan* settlement proceeds having gone to Ellipso.  Virtual Geosatellite Holdings, Inc. held an equity interest in the debtor.  A firm's prior representation of a creditor and equity holder of the debtor would raise a red flag in any case that would require a close look by the court to insure there were no conflicts.

Third, I find that counsel's efforts to correct this deficiency were inadequate.  From the moment Tighe Patton sought to be appointed as counsel, the objecting creditors contended that there were serious conflict issues surrounding its previous representation of the debtor, Castiel, and the debtor's

33

affiliates.  Although, to be sure, the creditors did not
initially explicitly detail those conflicts, their initial and
continuing objections throughout the case certainly put the firm
on notice.  Indeed, Robert Patterson's objection to Debtor's
application to appoint Tighe Patton alerted it to the *Sahagan*
case (Dkt. No. 35, filed March 17, 2009), even including with the
opposition a copy of the *Sahagan* settlement agreement that listed
the affiliated entities of the debtor.  At a minimum, this should
have put Tighe Patton on notice that it needed to take a closer
look at its prior representations.  It was not until after the
creditors objected in December 2009 to its fees, however, that
Tighe Patton did this.  This is not a model of diligence.

Fourth, I do find that the Tighe Patton provided
considerable benefits to the estate.  The firm navigated through
a hotly-costed case and, for the most part, did so economically.
The quality of its work was first-rate and it worked diligently
towards seeing the case to completion.  Except for its ill-
advised discovery disputes with the creditors, it ably
administered the case.

Finally, I find based on Rosenberg's testimony that the
failure to disclose was inadvertent.  The creditors contend that
Tighe Patton's failure to disclose its prior and ongoing
representations was driven by its desire to move the debtor
quickly through bankruptcy and then continue its long-standing

34

relationship with the debtor.  I impute no such motives to the
firm.  Rather, I find that the failure is more a result of the
confluence of a poor conflicts check system and poor intra-firm
communications that amount to gross negligence.

With respect to the conflicts check system, only two
plausible explanations exist for its failure to flag the firm's
prior and ongoing representations, none of which reflect
favorably on Tighe Patton.  First, Rosenberg could have failed to
run all the entities through the system.  He, however, testified
that this was not the case.  Alternatively, the attorneys who
represented the affiliated entities could have failed to enter
their names in the system.  Regardless of the explanation,
someone at the firm dropped the ball.

What I find the most troubling, however, is that the
previous representations were not revealed through Rosenberg's
direct communications with Thomas Patton.  Rosenberg testified
that he asked Thomas Patton about any prior or ongoing
representation of the debtor or its affiliates.  At no time in
the course of those discussions did the cases disclosed in Tighe
Patton's supplemental disclosure come up.  With respect to cases
that had concluded years before, this is understandable (and more
the reason every firm needs adequate conflicts databases and
procedures in place that ensure all represented entities are
included).  With respect to the ongoing *Draim* matter or cases

35

that had terminated more recently, however, how Thomas Patton could have overlooked them remains unexplained.

It is inexcusable that Thomas Patton did not show up for the hearing on Tighe Patton's fee application.  The creditors' objections focused heavily on the firm's failure to disclose these prior and ongoing representations, so Tighe Patton knew it would be a central issue.  Had Patton appeared and testified to the effect that he had merely overlooked the affiliated entities because he always thought of Ellipso as the client, he could have allayed many of the court's concerns.  Instead, and in the face of the creditors' very clear objections, Tighe Patton opted not to have him present testimony.  The only inference to be drawn from this is negative and leads me to find that there was extreme gross negligence by Patton in his responding to Rosenberg's inquiries.  This results in greater disallowance than I would have otherwise provided

In light of the foregoing, I will disallow an additional 40% of Tighe Patton's fees.

D

The objecting creditors last contend that the hourly rates charged by Tighe Patton for its work on behalf of the debtor in possession were unreasonable.  The lion's share of the fees were charged by Kermit Rosenberg and Neal Goldfarb.  Rosenberg, a member of the firm, bills at an hourly rate of $450.  He has been

36

a member of the bar since 1975 and has actively practiced before
this court for as many years.  Goldfarb, senior counsel at Tighe
Patton, bills at an hourly rate of $300.  He has been a
practicing attorney since 1980.  At the hearing on Tighe Patton's
applications, Rosenberg testified that the rates charged by the
firm were within the range of attorneys with similar experience
in the District of Columbia and were well below the $465 per hour
rate published by the United States Attorney's Office for the
District of Columbia Laffey matrix.  The objecting creditors
presented no evidence in contravention.

I find the rates charged by Tighe Patton reasonable and
consistent with those charged by attorneys practicing before this
court in similar cases.  This was a complicated case, requiring
debtor in possession counsel with sufficient expertise to
navigate the myriad difficult issues that arose.  The hourly
rates charged by Tighe Patton were well within the range of that
which the court has come to expect of attorneys competent to
undertake such representation.  Accordingly, I will overrule the
creditors' objection in this respect.


III

For the foregoing reasons I will disallow $64,741.60 of the
attorneys' fees Tighe Patton seeks in its initial application
($8,760 + (($148,689.00 – $8,760) * 40%)), and $7,098 of the

37

attorneys' fees it seeks in its second and final application ($17,745 * 40%), for a total disallowance of $71,839.6.  The firm shall be entitled to all of the out-of-pocket expenses it seeks in its applications.

A separate order follows.

[Signed and dated above.]

Copies to: Debtor; Debtor's Attorney; Mann Technologies, LLC; The Registry Solutions; Robert Patterson; John Mann; John Page; William Webster, Chapter 11 Trustee; Office of the United States Trustee.